## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **CHARLES VAVRA,** <br><br> **Plaintiff,** <br><br> v. <br><br> **HONEYWELL INTERNATIONAL INC.,** a Delaware corporation, d/b/a **HONEYWELL INTELLIGRATED,** <br><br> **Defendant.** | Case. No. 1:21-cv-06847 <br><br> Honorable Jorge L. Alonso <br><br> JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff CHARLES "CHUCK" VAVRA, ("Vavra" or "Plaintiff"), by and through his undersigned attorneys, and for his Complaint against Defendant HONEYWELL INTERNATIONAL INC., d/b/a HONEYWELL INTELLIGRATED, ("Honeywell" or "Defendant"), states and alleges as follows:

### INTRODUCTION

1. For 13 years, Chuck Vavra did exemplary work as an estimator and engineer for Honeywell. Honeywell promoted him multiple times, and he received excellent reviews of his work. Vavra's final position at Honeywell was as Principal Engineer, in which he estimated large projects for Honeywell's key clients. He never faced any disciplinary action during his time working there—that is, until he objected to discriminatory and racist employee training imposed on him in 2020 and 2021.

2. In November of 2020, Honeywell announced an "Implicit Bias Training" initiative, in which all employees would be required to undergo training on the theory of implicit racial bias. The initial requirement came from Honeywell's Diversity, Equity and Inclusion office and created a deadline for completion of the online training of February 25, 2021.

3. Vavra strongly objected to the Implicit Bias Training and the increasingly hostile racial and intellectual environment emanating from Honeywell's Management. Under Honeywell's policies, Vavra should have been able to voice his objections to the training because of its discriminatory and racist nature.

4. Instead of being protected for voicing his objection and concerns about the training, Vavra was fired.

5. Vavra brings this action for discrimination, reprisal and wrongful discharge based on Honeywell's imposition of a discriminatory and racist employee training program, in contravention of federal and state law as outlined below, and upon Vavra's opposition to said training program.

**PARTIES**

6. Vavra is a resident of the State of Illinois within the Northern District of Illinois, and he currently resides in Bolingbrook, Illinois. Vavra is a former employee of Honeywell, where he worked most recently as a Principal Application Engineer.

7. Honeywell is a Delaware corporation, and Honeywell Intelligrated in particular, has its principal place of business in Mason, Ohio. Honeywell does business in the State of Illinois. Honeywell is engaged in the business of material handling automation and related software engineering.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action raises claims involving United States statutes. This Court further has supplementary jurisdiction over Plaintiff's state common law claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Honeywell because it has a physical presence and does business in the State of Illinois, and it employed Vavra, an Illinois citizen.

10. Venue is proper in the Northern District of Illinois under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(e)(1) because the actions Defendant Honeywell committed took place in the Northern District of Illinois and because Vavra would have worked in the Northern District of Illinois but for the alleged unlawful employment practice.

**BACKGROUND**

11. Vavra was hired by Intelligrated Systems, Inc. ["Intelligrated"] in its Woodridge, Illinois office in July of 2008. When Vavra was first hired, he worked as a Project Manager, where he served as a liaison with customers during the equipment manufacturing, design, and implementation of projects. In 2013, Intelligrated promoted Vavra to Estimating Manager, where he supervised engineers in the design and cost estimation of distribution systems for customers and provided sales support for the Sales Department. In or about July of 2016, Intelligrated was acquired by Honeywell, and began doing business as Honeywell Intelligrated, a division of Honeywell's Safety and Productivity Solutions ("SPS") division. Vavra's employment did not change at that time, but he technically became an employee of Honeywell International Inc. In February of 2021 Vavra was again promoted to Principal Engineer, estimating large projects for Honeywell's key clients, with a commensurate raise in compensation. During his employment with both Intelligrated and Honeywell, Vavra's

3

performance was exemplary, and he received excellent performance reviews. Vavra was never subject to any disciplinary or other negative employment actions during his entire employment from 2008 through February of 2021.

12. In 2020, following the killing of George Floyd in Minneapolis, Minnesota, Honeywell began a series of communications with its employees laying out the Company's theory of race and racial relations. In particular, on September 24, 2020 the CEO of the SPS Division, John Waldron, sent a company-wide email to all employees stating, among other things, that:

> Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us. When these biases compound, they can evolve into institutional biases. Breaking out of this cycle is critically important for moving society forward. Breaking this cycle requires courage – the courage to discuss, the courage to admit our bias and to encourage and promote our differences, the courage to change.
>
> Words alone aren't sufficient. We must take tangible actions to make a difference. We have, and we will continue to do so. In SPS, we are committed to doubling our efforts on the agenda we have set forth previously which includes engaging our Employee Resource Groups (ERG) with another round of listening sessions, upping our game when hiring ensuring 100% of the time that the interview panel and candidates are diverse, and you can expect to hear of other actions we will be taking.

13. In November of 2020, Honeywell announced an "Implicit Bias Training" initiative, in which all employees would be required to undergo training on the theory of implicit racial bias. The initial requirement came from Honeywell's Diversity, Equity and Inclusion office and created a deadline for completion of the online training of February 25, 2021. Vavra objected to this training based on what he felt were discriminatory, racist and otherwise incorrect and inappropriate components to the training. Vavra was told by numerous employees that they felt similarly about the training, but were intimidated by the Company's statements and felt they could not speak up about their feelings.

14. When Vavra received the email from the Diversity, Equity and Inclusion office mandating Implicit Bias Training, he was concerned, both because of what he knew about such training, and other communications from the Company, including the communication from John Waldron listed above. In particular, Vavra was aware of the questionable scientific validity of the Implicit Association Test ("IAT"), the basis for much Implicit Bias Theory.

15. Based on his concerns regarding Implicit Bias Theory as well as the increasingly hostile racial and intellectual environment emanating from Honeywell's Management, Vavra was hesitant to take the proposed training. Therefore, he declined to take the online, self-directed training by the February 25, 2021 deadline. Although Vavra was concerned about this course of action, he felt he would be protected for voicing his opinion under the terms of the Company's anti-retaliation policy, which read as follows:

> **HONEYWELL WILL NOT TOLERATE RETALIATION**
>
> It is important that you feel comfortable raising your questions and concerns. Honeywell will not tolerate any form of retaliation against you for making a good faith report of actual or potential misconduct. Making a report in "good faith" means your report is honest, sincere, and complete to the best of your knowledge.
>
> If you feel an act of retaliation has occurred, you should report your concerns via one of the methods outlined in "Asking for Advice and Voicing Concerns."

16. In response to Vavra's failing to take the training, he began to receive a series of increasingly urgent communications from Company Management reminding, encouraging, and finally cajoling him into taking the training. In one of such emails, a Human Resources Representative asked what "barriers" Vavra may have to taking the training. In response to this apparently rhetorical question, on March 8, 2021, Vavra wrote a detailed explanation of his concerns regarding the training, in which he explained his legal objections to the proposed training, as well as his view of the workplace, social, political and media environment giving rise

5

to the perceived need for the training. Vavra included the entire September 2020 communication from John Waldron, and provided his thoughts on that communication.

17. The March 8, 2021 email from Vavra to Human Resources Representative Katie Becker (which he copied to his supervisors), laid out Vavra's legal objections to the training, including in part:

> As the CEO of a division of a global company, I'm sure there is no way he would ever suggest that all of his black colleagues should somehow feel like victims in the Breonna Taylor case just because she was black. I'm sure he would never suggest that his colleagues of other races should have no feelings about the Breonna Taylor incident because they're NOT black, right? ***Because that would be kind of … oh, I don't know … racist and discriminatory?***

> (Emphasis added.)

> I found the courage to admit to myself that the CEO of SPS was a race-baiter. It appeared he was gaslighting his non-white colleagues into believing he is some sort of angelic empath that has taken it upon himself to be the spokesperson and apologist for all of his white colleague's and their evil ways by implying that we are all somehow tied to the killings of Breonna Taylor and George Floyd. He is also implying that all of our non-white colleagues should be dumb enough to believe it.

> \*\*\*

> Perhaps we would be better off focusing on why racism still exists today.

> \*\*\*

> So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias. Is Mr. Waldron a psychiatrist or a psychologist to make that assessment? … He made a 'conscious' decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated.

> \*\*\*

> The most disturbing … and somewhat laughable observation I made in Mr. Waldron's email was the **exclusion** of an entire race of his colleagues that his heart went out to. And I quote, 'My hands and heart are open to each of our Black, Hispanic, Asian and LGBTQ colleagues'. As far as I know, Breonna Taylor and George Floyd were both black. They weren't Hispanic and they weren't Asian. I can't speak for their sexual preferences because the media didn't sensationalize that aspect of them … only that they were black.

6

(Emphasis in original.)

18. Vavra received an email confirmation of the receipt of his email complaint, but no other substantive communication. He continued, however, to receive email requests to complete the implicit bias training. On Friday, March 19, 2021, Vavra was asked to attend a one-on-one meeting with Chris Maines, Vice-President of Engineering. During this meeting, Mr. Maines asked Vavra to reconsider and to take the training, which he characterized as "one more box to check" and "not a big deal." Vavra responded that it *was* a big deal to him, and that he believed it raised substantial legal and moral issues.

19. Following the conversation with Mr. Maines, Vavra decided to take the IAT by logging on to the harvard.edu website, in order ensure that he was fully informed about the background of the topic and his own stated views of the test. Vavra's results from that test indicated that he had a bias *in favor of* African Americans and *against* White Americans. He then took the same test three days later and was told that he *did* harbor implicit biases *against* African Americans. This confirmed to him what he had previously learned concerning the IAT, in that it is generally considered to be unreliable and incapable of validation.

20. On March 23, 2021, Vavra wrote to Mr. Maines again explaining his position on Implicit Bias Training, and included the results of his two IAT examinations. He specifically said, among other things:

> Can John Waldron or the Inclusion and Diversity group prove that everyone has "unconscious" bias? I highly doubt it. They call it a vague term like "unconscious" bias because they know they can't prove it and probably because they know that it's absolutely ridiculous. *I found John Waldron's 9/24 incredibly offensive, discriminatory and racist* and I don't want to be "trained" to be someone like that. His email was meant to be offensive as far as I'm concerned. ***I think a more valuable training than "Unconscious Bias" would be training on Title VII of the Civil Rights Act***.

***

7

> John Waldron suggested having the 'courage to discuss' [implicit racism] in his email. I propose we do it.

(Emphasis added.)

Vavra went on to explain that he did not know the legal definitions involved, but felt nevertheless that the law was being violated:

> I referenced John Waldron's discriminatory remarks in his 9/24 email in my last letter to HR. I am referencing it again today. I don't know what would be considered an "official" discrimination claim, but both should be considered as such.

Vavra never heard back from Mr. Maines.

21. In his position as Principal Engineer, Vavra would meet with supervisor Jeff Cortez on a weekly basis for a "check in" meeting. On April 7, Mr. Cortez scheduled such a meeting, although it was not on its usual day. The meeting took place via Microsoft Teams, and a Human Resources representative Katie Becker also took part. Mr. Cortez raised the issue of implicit bias training, and Vavra explained the reasons he did not want to take the training. Mr. Cortez stated that he understood, but that if Mr. Vavra didn't take the training "that would be it." Vavra again stated that he could not, in good conscience, take the training. Ms. Becker explained that he would therefore be terminated.

22. Honeywell terminated Vavra's employment.

23. Following his termination, Vavra wrote to Ms. Becker asking if he would be given a written reason for his termination. Consistent with the Company's Anti-Retaliation Policy, he further stated "*I was hoping that a discrimination claim wouldn't have ended with getting terminated, but it's a different country we're living in these days*. I wish you all the best and thanks for everything." (emphasis added). Ms. Becker wrote back stating that the Company would *not* provide any further information regarding the termination. To this day, no such explanation has been given.

8

24. Also following his termination, Vavra filed a charge with the Equal Employment and Opportunity Commission ("EEOC"), which charge is attached as **Exhibit 1**.

25. Vavra then requested a Notice of Right to Sue, and he received a Notice of Right to Sue on October 19, 2021, which notice is attached as **Exhibit 2**.

26. Vavra has exhausted all administrative requirements prior to bringing this lawsuit.

## FIRST CAUSE OF ACTION

### Racial Discrimination and Retaliation under the Illinois Human Rights Act

27. Vavra restates and realleges the preceding paragraphs as if fully set forth here.

28. Defendant Honeywell is an "employer" within the meaning of the Illinois Human Rights Act, 775 ILST § 5/2-101(B).

29. At all times relevant, Vavra was an "employee" of Honeywell within the meaning of the Illinois Human Rights Act, 775 ILST § 5/2-101(A)(1).

30. The Illinois Human Rights Act makes it illegal to retaliate or otherwise engage in adverse action against an employee for opposing a practice made illegal by the Act. 775 ILST § 5/6-101(A).

31. When Vavra stated his opposition to what he believed to be racist and discriminatory statements and actions being taken by the Company, he was disciplined and then terminated by Honeywell. Honeywell was explicit in its decision to terminate Vavra *specifically because he opposed implicit bias training based on his conclusion that it was inherently racist*. Honeywell's termination of Vavra was in retaliation for the substance of his statements concerning racist and racially-provocative statements being made by Honeywell, its executives and managers, and its employees.

32. Because of Honeywell's illegal conduct, Vavra has suffered economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees.

## SECOND CAUSE OF ACTION

### Racial Discrimination and Retaliation under the Civil Rights Act of 1964

33. Vavra restates and realleges the preceding paragraphs as if fully set forth here.

34. At all times relevant, Honeywell employed at least fifteen employees, and thus was an "employer" for purposes of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

35. At all times relevant, Vavra was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

36. 42 U.S.C. § 2000e-3(a) makes it illegal to retaliate against or otherwise discriminate against an employee for opposing any practice made unlawful by Title VII of the Civil Rights Act of 1964.

37. Honeywell's actions in disciplining and ultimately discharging Vavra because of his opposition to the opinions being expressed on racial issues at Honeywell constitutes retaliation, reprisal and discrimination.

38. Because of Honeywell's illegal conduct, Vavra has suffered economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees.

## THIRD CAUSE OF ACTION

### Wrongful Termination

39. Vavra restates and realleges the preceding paragraphs as if fully set forth here.

40. There exists in Illinois a clear and well-established public policy against racist policies and practices in employment.

41. At the time Vavra was threatened by Honeywell because of his reluctance to participate in racially-offensive and illegal training, he had a good-faith and well-established belief that such training, behavior and language was both legally and morally wrong.

42. Because Vavra voiced his opposition to Honeywell's racially-based training, language, and culture, and ultimately refused to participate in said training, language and cultura, he was discriminated against and ultimately terminated from his employment.

43. Honeywell's actions in disciplining and subsequently terminating Vavra constitutes retaliation in violation of Illinois Public Policy.

44. As a result of Honeywell's illegal retaliation against Vavra, Vavra has suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, emotional distress damages, compensatory damages, punitive damages, and attorney fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Charles Vavra prays for judgment in his favor and against Defendant Honeywell, and for an Order of the Court as follows:

1. Adjudging that Defendant is liable to Plaintiff for his actual damages in an amount to be proven at trial, including front pay, back pay, treble damages and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law;

2. Awarding Plaintiff his costs, reasonable attorney fees and any other relief permitted by statute, after appropriate motion for the same; and

    3.    Awarding such other relief as the Court may deem just and equitable.

Dated:  January 13, 2022                                   Respectfully submitted,

                                                                    **Charles Vavra**

| | |
|---|---|
| John W. Mauck | By: s/ Whitman H. Brisky |
| Whitman H. Brisky |       One of his attorneys |
| Andrew S. Willis | |
| **MAUCK & BAKER, LLC** | |
| One North LaSalle Street, Suite 600 | |
| Chicago, Illinois 60602 | |
| (312) 726-1243 | |
| jmauck@mauckbaker.com | |
| wbrisky@mauckbaker.com | |
| awillis@mauckbaker.com | |

Alec J. Beck (MN #201133)
*Admission pro hac vice pending*
**PARKER DANIELS KIBORT**
888 Colwell Building
123 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

Douglas P. Seaton (MN #127759)
James V. F. Dickey (MN #393613)
*Admission pro hac vice pending*
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7000
doug.seaton@umlc.org
james.dickey@umlc.org