IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES VAVRA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. l:21-cv-06847 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| HONEYWELL INTERNATIONAL INC., a Delaware corporation, d/b/a HONEYWELL INTELLIGRATED, | ) ) ) | Magistrate Judge Heather K. McShain |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The undisputed material facts, including Plaintiff's own testimony, evidence that summary judgment must be granted in Honeywell's favor. Vavra wholly fails to support his retaliation and discrimination claims brought pursuant to Title VII of the Civil Rights Act ("Title VII") and Illinois Human Rights Act ("IHRA"), and his wrongful termination claim is preempted.

### FACTUAL OVERVIEW[1]

Vavra began working at Intelligrated in 2008 and, in 2016, became a Honeywell employee when Honeywell acquired and integrated Intelligrated into Honeywell's Safety and Productivity Solutions ("SPS") unit. (SOF ¶ 1). At the time of his separation from Honeywell, Vavra was a Principal Applications Engineer. (SOF ¶ 10). In that position, he directly reported to Jeffrey Cortez, Manager of Concepting and Estimating. *Id*.

On September 24, 2020, John Waldron, SPS's President and CEO at the time, sent an e-mail to all SPS employees, with the subject line "Continue to Fight for Social Justice". (SOF ¶ 12). In the e-mail, he discussed his personal views about a Kentucky grand jury's failure to indict the

---

[1] Defendant cites to and incorporates by reference the facts contained in its Local Rule 56.1 Statement of Undisputed Material Facts that it filed contemporaneously with this memorandum. "SOF ¶ ___" are to the paragraph numbers contained in the Local Rule 56.1 Statement.

officers responsible for killing Breonna Taylor. *Id*. He expressed "[Ra]cial bias is real." and "[E]ach of us has unconscious bias within us." *Id*. Waldron called for "tangible actions to make a difference" and noted the efforts SPS had and was taking. *Id*. Waldron further noted his "hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues." *Id*. Vavra believed the e-mail contained racist and discriminatory statements, but he did not voice those concerns to his supervisor or anyone at Human Resources at that time. (SOF ¶ 13).

In or around November 2020, Honeywell announced a new mandatory Unconscious Bias Awareness Training ("UBA Training" or "the Training"). (SOF ¶ 14). The announcement stated, "[a]s part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees." (SOF ¶ 15). Employees were to complete the Training by Feb. 25, 2021. *Id*. Vavra received this e-mail, and was aware that it contained a link he could click that would open the Training video, but he never clicked on that link during his employment and he had no knowledge of the content of the Training. *Id*.; (SOF ¶¶ 15, 34). Like other mandatory training at Honeywell, not taking the Training would result in termination. (SOF ¶¶ 17-18).

With five days left before the training deadline, Vavra received daily automated reminders from Honeywell's Inclusion and Diversity team about completing it. (SOF ¶ 21). After missing the deadline, Vavra continued to receive daily automated reminders that he was past due. *Id*. Additionally, several individuals from Honeywell reached out to Vavra, and asked him to complete the Training, including his supervisor Jeff Cortez, Human Resources Director Katie Becker, and Sr. Manager of Estimating Brian Swinkola. (SOF ¶¶ 22, 27-29).

On March 2, 2021, Vavra responded to an inquiry from Becker about his failure to take the Training, stating "I do have issues completing this. I will be sending out an email shortly explaining

why." (SOF ¶ 28). On March 8, 2021, Vavra sent an e-mail to Becker (spanning 7 pages), carbon-copying Cortez and Swinkola, setting out his objections to Waldron's e-mail and the Training. (SOF ¶ 29). In the e-mail, Vavra stated he was not taking the Training "because it's absolutely ridiculous and doesn't work." *Id*. He expressed that Breonna Taylor's case should not have been brought into the workplace by Waldron and that Waldron was a "race-baiter" for doing so. He expressed that "'systemic racism' is just another manufactured crisis … and 'unconscious bias" training is a decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to." *Id*. He further expressed his belief that Waldron's email "demonized" white colleagues and that Waldron was "excluding and alienating an entire race of his colleagues" by not including them in the list of people to whom "his heart goes out to." *Id*.

On March 19, 2021, Chris Maines, Vice President of Engineering had a Microsoft Teams meeting with Vavra where he asked him to take the Training and told him that not taking the Training would be considered insubordination. (SOF ¶ 32). Vavra told Maines he would think about it. *Id*. On March 23, 2021, Vavra sent another e-mail to Maines, and again reiterated that was not going to take the Training. (SOF ¶ 38). He also stated, "Whatever the consequences are of that decision, I will accept." (SOF ¶ 38).

Cortez scheduled a Teams call with Vavra for April 7, 2021, with Becker present. (SOF ¶ 41). Cortez spoke with Vavra immediately before the meeting, and tried one last time to convince Vavra to take the Training. (SOF ¶ 42). Cortez even shared with Vavra that an example in the training included a person having a bias against a white male. *Id*. Vavra responded that he would not take the training. *Id*. During the meeting, Cortez told Vavra that he had to take the Training or be terminated. *Id*. Vavra confirmed to Cortez that he would not take the training. *Id*. Vavra was then terminated for refusing to undergo the Training. *Id*.

Vavra has never seen the UBA training video. (SOF ¶ 49). No other Honeywell employees refused to undergo the Training. (SOF ¶¶ 36, 49).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, the non-moving party must identify competent evidence that would be admissible at trial. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). "However, neither the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts, is sufficient to defeat a motion for summary judgment." *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571 (7th Cir. 2003). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, judgment is not just appropriate, it is required. *See Celotex Corp.,* 477 U.S. at 322.

## ARGUMENT

Plaintiff alleges that Honeywell subjected him to race discrimination and retaliation in violation of both Title VII and the IHRA, and wrongfully terminated him in violation of Illinois public policy. His claims fail and summary judgment should be granted in Honeywell's favor.

### I. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TITLE VII CLAIMS.

#### A. Plaintiff's Retaliation Claim Fails

"A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove (1) that he engaged in protected activity and (2) suffered an adverse employment action; and (3) there is a

4

casual link between the two." *Harbeck v. Baxter Healthcare Corporation*, 2019 WL 1382070, *4 (N.D. Ill. March 27, 2019) (J. Alonso) *quoting Lord v. High Voltage Software, Inc.,* 839 F.3d 556, 563 7th Cir. 2016). To establish the required casual connection, a plaintiff must show that the defendant "would not have taken the adverse…action but for the employee's protected activity." *Baines v. Walgreen Co*., 863 F.3d 656, 661 (7th Cir. 2017) (alterations in original). Even if Vavra establishes all of the elements of a *prima facie* case, if the employer presents unrebutted evidence of a non-invidious reason for the employment action at issue, the employer is entitled to summary judgment unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext for retaliation. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004).

Vavra alleges he felt he would be "protected" because he reported in "good faith" his opinion that Waldron's e-mail was racist and the Training would be too. (Dkt. 10, ¶15). But Vavra was not terminated for engaging in a protected activity. He was terminated for refusing to undergo a mandatory training. As such, his claim fails.

There is no dispute that Honeywell instituted UBA Training for all U.S. employees with a training deadline of February 25, 2021, and employees were informed the Training was "*required for all employees*" (emphasis added). (SOF ¶ 15). There is also no dispute that Vavra was aware of the Training, and knew that it was mandatory. (SOF ¶ 21). Indeed, when only 5 days remained to the Training deadline, he began to receive daily automated reminders to complete the Training. *Id*. The daily reminders continued for more than two weeks after Vavra missed the deadline. *Id*. In addition to the automated reminders, several individuals from Honeywell reached out to Vavra imploring him to complete the training. (SOF ¶¶ 22, 27-29).

There is also no dispute that Vavra repeatedly communicated to various individuals at Honeywell that he was refusing to undergo the Training, that he actually never underwent the

5

Training, and he has no knowledge about the actual content of the Training. There is no dispute that Vavra sent a seven-page e-mail to Becker and a five-page email to Maines stating he would not take the training and explaining he was not taking the Training because, in part, he does not believe unconscious bias exists, that "systemic racism" is manufactured, and Waldron, through his e-mail "is making his non-white colleagues all victims and turning his white colleagues…into villains." (SOF ¶ 29). Finally, there is no dispute that Vavra remained steadfast in his refusal even after he was informed that he would be terminated for his failure to complete the Training. (SOF ¶ 42).

Vavra claims that he was terminated for opposing the training because of what he felt were "discriminatory, racist and otherwise incorrect and inappropriate components to the training." (Dkt. 10, ¶¶ 13, 15, 31). But that claim is not supported by the facts. It is undisputed that on an unknown date prior to March 2, 2021 – when Cortez sent Vavra an email imploring him to take the Training – Vavra spoke to Cortez and expressed his opposition. (SOF ¶ 23). While Vavra does not recall what he said, Cortez testified Vavra's concerns were not about the training being racist but rather that he did not like Honeywell "pushing in political correctness issues." *Id*. Vavra did however make his beliefs about the Training being racist known in his email dated March 8, 2021. (SOF ¶ 29). He was, however, not terminated until April 7, 2021. (SOF ¶ 42).

What occurred in the intervening period was that numerous individuals from various positions of authority within Honeywell personally reminded Vavra that the Training was mandatory, and that there would be consequences for refusing to undergo it. Cortez, Becker and Maines individually told Vavra to undergo the training, and Vavra told each one of them that he would not do so. Notably, trainees were not asked to sign a document stating that they agreed with the contents of the training. (SOF ¶ 35). He also wrote to Maines: "Whatever the consequences are

6

of that decision, I will accept." (SOF ¶ 38). Even before the termination meeting scheduled on April 7, 2021, Cortez asked Vavra one last time to take the Training, and Vavra again refused. (SOF ¶ 42).

Vavra fails to point to any evidence to show that he was terminated for sharing his beliefs or stating his objections to the training, rather than actually failing to undergo the mandatory training. Nor was Vavra even aware of the training's actual content, since he never viewed it. He cannot point to any instance of anyone from Honeywell telling him that his objections or statements about the training played any role in his termination. To the contrary, the record is replete with evidence demonstrating that Vavra was terminated for failing to complete the Training.

Cortez and Becker both testified that the reason Vavra was terminated was for refusing to undergo the Training. (SOF ¶ 50). Becker informed Vavra that the reason for his termination was his failure to complete the training. (SOF ¶ 43). In fact, in an e-mail to a former colleague, Susan Parmenter, Vavra himself admitted to this fact by stating "I was fired for not complying with [Honeywell's] 'Unconscious Bias' training mandate" after "Cortez scheduled a Teams meeting with me and tried one last time to get me to take the training and I stood my ground." (SOF ¶ 46). No reasonable jury could look at this evidence and conclude that Vavra's objections to the training, rather than his actual failure to undergo the Training, were the basis of his termination.

Vavra is effectively arguing that once an employee objects to a job requirement by alleging that the requirement in question is discriminatory (even when the employee lacks any knowledge or understanding of the requirement's contents), the employee should be permitted to refuse to meet the requirement and be immune from any discipline. That argument has no support. Honeywell did not question whether Vavra made his objections to the Training in "good faith." It

had no reason to question that Vavra honestly believes unconscious bias is not real and does not exist. Yet, Vavra's beliefs did not exempt him from taking the Training, which Honeywell had vetted before its rollout and found not to be discriminatory. Moreover, while Honeywell did not question Vavra's beliefs, Vavra had no basis to believe that the Training was racist. How could he when he never took it? While he may have believed that the Training was an Implicit Association Test to test his biases – it was not – and Cortez told him about the contents of the training.

Vavra's argument, if taken to its logical conclusion, would lead to absurd results. Like many employers, Honeywell has mandatory training on a variety of topics at any given time, such as the Code of Conduct, sexual harassment, and ethics and compliance. Vavra's argument, if accepted, would permit him and other employees to flout any mandatory training by simply declaring that the training in question is discriminatory in some day. Becker testified that an employee could not refuse to undergo a mandatory training on any topic simply because they did not agree with it, or by saying he or she thought that the specific training was racist or discriminatory. (SOF ¶ 18). Plaintiff's theory has no basis in Title VII case law. To the contrary, several courts presiding over similar facts have not been receptive to arguments similar to Vavra's.

*Daza v. State of Indiana*, 331 F.Supp. 3d 810 (S.D. Ind. 2018), is one such case. In *Daza*, the court noted that the plaintiff's discrimination and retaliation claims were based largely on his perception of the employer's environment while he was an employee. The plaintiff, who is Hispanic and Native American, was terminated shortly after his employer received a complaint from a trainer about his lack of participation while attending an in-person "Beyond the Appraisal" training. The plaintiff's supervisors concluded that he willfully refused to participate in the training and that this behavior continued to show his disregard for the employer's "Core4 Principles" of respect, teamwork, accountability and excellence. The morning of his termination, the plaintiff

raised to HR his belief that the trainer had a problem with his ethnicity and that he may be terminated based on the trainer's complaint. The plaintiff maintained that it was racially discriminatory for his employer to expect him to act according to the Core4 Principles in his interactions with white employees when he did not believe he was treated according to those principles. The court found "this argument … a non-starter" because the plaintiff had not pointed to any evidence that the Core4 Principles were discriminatory in any way, nor that requiring him to comply – along with this fellow colleagues – with the principles was motivated by racial animus. *Id*. at 844. "While [plaintiff] may have disagreed with the Core4 Principles, this disagreement is not evidence that he faced racial discrimination by being required to abide by those principles." *Id*. The court also dismissed his retaliation claims, finding that there was no evidence that his complaint to HR caused his termination and the employer's reasons for his termination – the expectation that he adhere to the Core4 Principles – was not pretextual. *Id*. at 849.

Here, Vavra has pointed to no evidence that the UBA Training was discriminatory or that requiring him – and all other employees – to complete it was motivated by racial animus. In fact, the Training itself disproves the existence of any racial animus. The effort is rooted in Honeywell's goals of driving diversity, equity and inclusion. Vavra clearly disagreed with the Training, but his voicing his reasons for his disagreement is not evidence that he was subjected to retaliation. Honeywell required all employees to complete the training. He was the only employee who refused and he was terminated solely based on his refusal.

*Norgren v. Minnesota Dep't of Hum. Servs.*, No. CV 22-489 ADM/TNL, 2023 WL 35903, at *4 (D. Minn. Jan. 4, 2023) is strikingly similar to this case. In *Norgen*, the Minnesota Department of Human Services ("MDHS") required plaintiff and 31 of his colleagues to complete computer-based workplace training units on anti-racism and gender identity. The training units

9

were titled "How to be Anti-Racist" and "Understanding Gender Identity and Expression: Moving Beyond the Binary." *Id*. DHS Commissioner Harpstead sent an email to employees urging them to focus on "the training and brave conversations we need to have to change minds ... for life." *Id*. Norgen opposed the training because he equated it to Critical Race Theory ("CRT"), which he viewed as violating "the traditional view of equality under Title VII." *Id*. He also opposed the gender identity training because he viewed the concept of nonbinary gender to be "contrary to his sincerely held religious belief." *Id*. He requested a religious exemption, but it was denied. He e-mailed DHS's Equal Opportunity and Access Division Director and stated "your denial of my request and subjecting me to participating in the [gender identity] training ... subjects me to harassment." *Id*. Thereafter, he resigned from his position, and subsequently filed a lawsuit, claiming that he was constructively discharged due to "threat of being terminated for his religious beliefs, as well as the mandated training and refusal for exemption." *Id*. The District Court for the District of Minnesota granted DHS's Motion to Dismiss. It held that "[r]equiring all employees to undergo diversity training does not amount to abusive working conditions, and does not plausibly show that DHS imposed across-the-board training with the intention of forcing Norgren to quit." *Id*. at *4.

Another case, *Bourgeois v. United States Coast Guard*, 151 F. Supp. 3d 726, 739–40 (W.D. La. 2015) is also instructive. In that case, the plaintiff argued that he was retaliated against by being forced to attend a "training class" after he filed an EEO complaint. The defendants moved for dismissal (or alternatively for summary judgment), arguing that all employees were required to attend "cultural diversity training," and plaintiff was only required to watch a video of the training during his scheduled work hours. *Id*. The defendants also argued that the requirement that all employees participate in the watching of the video does not constitute an "adverse employment

action," and there is no causal link between the filing of the plaintiff's EEO complaint and the video. *Id*. The court granted the defendants' motion for summary judgment as it pertained to plaintiff's retaliation claim. It acknowledged that "[n]ot only was the plaintiff not singled out to watch the video, but it appears the video was the plaintiff's employer's attempt to rectify potential harassment that was occurring in the workplace environment." *Id*. at *40. Therefore, the plaintiff had not satisfied his burden of showing that the watching of the cultural diversity video was an "adverse employment action" that properly supported his retaliation claim. *Id*.

Finally, even in a case where a plaintiff was singled out to attend a sensitivity training, he failed to prevail on his retaliation claim. *Brennan v. City of Philadelphia*, No. CV 18-1417, 2020 WL 3574454, at *1 (E.D. Pa. June 30, 2020), aff'd, 856 F. App'x 385 (3d Cir. 2021) arose from the termination of plaintiff from his position as Chief Information Officer ("CIO") for the City of Philadelphia ("the City"). Plaintiff alleged that defendants retaliated against him for voicing concerns over multiple purportedly unlawful and wasteful City practices, including the implementation of the City's diversity initiative and hiring practices, and being asked to attend sensitivity training, which he complained as being "discriminatory and inappropriate." *Id*. at *4. In their motion for summary judgment, defendants argued that plaintiff was terminated not because he raised these complaints, but because he failed to attend sensitivity training as directed by one of the individual defendants. *Id*. at *6. The court granted defendants' motion for summary judgment, holding, in part, focusing on the fact that plaintiff was instructed to attend sensitivity training, and he failed to do so. *Id*. at *9.

For the forgoing reasons, Vavra's retaliation claim fails and must be dismissed. It is without question that his termination resulted from his repeated refusal to undergo the Training.

  **B.**  **Honeywell Did Not Discriminate Against Vavra**

Vavra alleges that his termination constituted race discrimination under Title VII. His claim

11

fails because he cannot provide any evidence that would "permit a reasonable factfinder to conclude that [his race] caused" any adverse action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "[A]ll discrimination cases present the same basic legal inquiry: … 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017)

When reviewing the facts under the framework established by *Ortiz*, the evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.* at 765. While *Ortiz* modified the applicable standard in discrimination cases, its holding did not supplant the well-known burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id*. at *6. Under the burden-shifting framework set forth in *McDonnell Douglas*, the plaintiff in a Title VII race discrimination suit must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Once a *prima facie* case has been established, "the burden shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.' " *Id*. (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). Vavra cannot satisfy the second and fourth elements of *McDonnell Douglas*'s burden-shifting framework.

First, Vavra was not meeting Honeywell's legitimate business expectations. Honeywell required all U.S. employees to take the UBA Training. Vavra knew the Training was required, he was repeatedly asked to undergo the training, and he knew the consequence of not taking the

training was termination. Yet, he intentionally refused to complete the training. Indeed, he testified that when he began receiving the automated reminders to take the training, he disregarded them because he "had no plans" to take the training. *Id*. He stated in writing that he had no intention of taking the training, and he told Cortez, Becker and Maines he would not take the training and "whatever the consequences are of that decision, [he] will accept". The consequence was termination for insubordination.

Second, Vavra also cannot point to any similarly-situated individuals outside of his protected class (or inside his protected class for that matter) who were treated more favorably. Vavra was the *only* Honeywell employee who refused to undergo the Training. Therefore, there are no similarly-situated individuals who engaged in the same conduct as Vavra.

Vavra also cannot prove race discrimination outside of the contours set by *McDonnell Douglas* by looking at the evidence as a whole. The training requirement was applicable to all U.S. employees, regardless of their race. As noted above, Vavra has no evidence that the UBA Training was discriminatory or that requiring him – and all other employees – to complete it was motivated by racial animus. In fact, quite the opposite is true. The training was an effort by Honeywell to address and reduce potential racial inequity and drive a more diverse and inclusive culture in the workplace. Vavra was provided countless reminders and ample opportunity to undergo the Training, but he refused, *knowing what the consequences would be*. He was terminated for his refusal to undergo the Training, which is supported by the testimonies of Honeywell's witnesses, and his own admission. (SOF ¶¶ 46, 50). He cannot show that but-for his race he would not have been terminated. Therefore, his race discrimination claim is without merit.

II. **DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S IHRA CLAIMS.**

The IHRA provides a comprehensive scheme of procedures and remedies for redressing human rights violations. 775 ILCS 5/1–101 *et seq*. Similarly, retaliation is "a cognizable claim under ... the IHRA." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 887 (7th Cir. 2016) (citing 775 Ill. Comp. Stat. 5/6–101). In analyzing discrimination claims under the IHRA, Illinois courts have adopted the framework used by federal courts in addressing discrimination and retaliation claims under Title VII. *See Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill.2d 172 (1989); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016); *Blackford v. Fed. Express Corp.*, 80 F. Supp. 3d 809, 817 (N.D. Ill. 2015); *Rabé v. United Air Lines, Inc.*, 971 F.Supp.2d 807, 821 (N.D. Ill. 2013). As discussed *supra*, Plaintiff fails to point to any evidence based on which a reasonable jury could conclude that he was retaliated against for engaging in protected activity, or discriminated against on the basis of race. Therefore, similar to his Title VII claims, Vavra's IHRA claims are without merit and should be dismissed.

III. **DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S WRONGFUL TERMINATION CLAIM.**

Vavra claims "there exists in Illinois a clear and well-established public policy against racist policies and practices in employment" and that Honeywell wrongfully terminated him because he "voiced his opposition to Honeywell's racially based training, language and cultura [*sic*]." Dkt. 10, ¶¶40-41. To prevail on a claim of retaliatory discharge under Illinois law, a plaintiff must show that (1) he was discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandated public policy. *Masud v. Rohr-Grove Motors, Inc.*, 2015 WL 5950712, *7 (N.D. Ill. Oct. 13, 2015) (J. Alonso), *citing Hartlein v. Ill. Power Co*., 601 N.E.2d 720, 728 (Ill. 1992). Public policy is "to be found in the State's constitution and statutes, and where they are

silent, in its judicial decisions." *Masud*, citing *Palmatere v. Int'l Harvester Co.*, 421 N.E.2d 876, 878-79 (Ill. 1981)

The Seventh Circuit has established that "[t]he IHRA preempts court claims where the basis for the claim arises from a matter covered under the Act, unless the plaintiff can establish a basis for imposing liability on defendants independent of the Act." *Nelson v. Realty Consulting Servs., Inc.*, 431 Fed. Appx. 502, 506 (7th Cir. 2011). *In Moore v. State Farm Mut. Auto. Ins. Co.*, No. 1:15-CV-01058-JEH, 2018 WL 1041292, at *2 (C.D. Ill. Feb. 23, 2018), the plaintiff based his claim of wrongful termination upon the defendant's alleged racial bigotry and its retaliation against him for filing charges of racial discrimination. The court found the plaintiff could not establish liability independent of the IHRA and the plaintiff's wrongful termination claim was preempted by IHRA and Title VII, because those were the exclusive means by which claims of racial discrimination and retaliation for opposing such discrimination are adjudicated. *Id.*; *see also More v. Roadway Express, Inc.*, No. 97 C 6661, 1998 WL 292417, at *7 (N.D. Ill. May 19, 1998) ("[w]here ... Illinois provides a statutory remedy for the particular type of misconduct that violates public policy, no independent common law tort is recognized; the person instead must proceed under the statute").

As a part of his wrongful termination claim, Vavra directly incorporates and references his allegations from his Title VII and IHRA claims. Dkt 10, ¶ 39. Vavra alleges no new facts unique to his wrongful termination claim. *Id.*, at 39-44. The public policy he alleges that was violated is codified in the IHRA. He cannot establish a basis of liability independent of Title VII and IHRA, and his claim is preempted by those statutes. Therefore, his wrongful termination claim should be dismissed.

## CONCLUSION

For all the foregoing reasons, Honeywell respectfully requests this Court grant its Motion for Summary Judgment in its entirety and to dismiss Plaintiff's Complaint.

**DATED:** February 17, 2023.

Respectfully submitted,

By: _/s/ Sam Sedaei_
One of the Attorneys for Defendant
**HONEYWELL INTERNATIONAL, INC.**

Jennifer Colvin (ARDC No. 6274731)
Sam Sedaei (ARDC No. 6317657)
**OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.**
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Telephone: 312.558.1220
*jennifer.colvin@ogletree.com*
*sam.sedaei@ogletree.com*

## CERTIFICATE OF SERVICE

  The undersigned attorney hereby certifies that on February 17, 2023, the foregoing ***Memorandum in Support of Motion for Summary Judgment*** was filed electronically with the Clerk of the United States District Court for the Northern District of Illinois using its CM/ECF system, which sent notification of such filing to the following:

> John W. Mauck
> Whitman H. Brisky
> Judith A. Kott
> **MAUCK & BAKER, LLC**
> One North LaSalle Street, Suite 600
> Chicago, Illinois 60602
> *jmauck@mauckbaker.com*
> *wbrisky@mauckbaker.com*
> *jkott@mauckbaker.com*
>
> Alec J. Beck
> **PARKER DANIELS KIBORT**
> 888 Colwell Building
> 123 North Third Street
> Minneapolis, MN 55401
> *beck@parkerdk.com*
>
> Douglas P. Seaton
> James V. F. Dickey
> **UPPER MIDWEST LAW CENTER**
> 8421 Wayzata Boulevard, Suite 300
> Golden Valley, MN 55426
> *doug.seaton@umlc.org*
> *james.dickey@umlc.org*
>
> ***Attorneys for Plaintiff***

              */s/ Sam Sedaei*
              One of the Attorneys for Defendant
              **HONEYWELL INTERNATIONAL, INC.**