# EXHIBIT A

## (EXCERPTS OF DEPOSITION OF CHARLES VAVRA)

## TO

## February 17, 2023
## Defendant's Local Rule 56.1 Statement

**RE:**   Charles Vavra v. Honeywell International Inc., et al.
Case No. 1:21-cv-06847

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3    CHARLES VAVRA,              )
                                 )
4                 Plaintiff,     )
                                 )
5         vs.                    )   No. 1:21-cv-06847
                                 )
6    HONEYWELL INTERNATIONAL     )
     INC., a Delaware            )
7    corporation, d/b/a          )
     HONEYWELL INTELLIGRATED,    )
8                                )
                  Defendant.     )
9
10           The deposition of CHARLES VAVRA, called
11    for examination, pursuant to the Federal Rules of
12    Civil Procedure of the United States District
13    Courts pertaining to the taking of depositions,
14    taken before YVETTE BIJARRO-RODRIGUEZ, CSR
15    No. 084-003734, a Certified Shorthand Reporter
16    within and for the County of Cook and State of
17    Illinois, at 155 North Wacker Drive, Suite 4300,
18    Chicago, Illinois, on the 14th day of December,
19    2022, at 10 o'clock a.m.
20
21
22
23    REPORTED BY:  YVETTE BIJARRO-RODRIGUEZ, CSR
24    LICENSE NO. 084-003734

Page 11

```
 1        Q.    Thank you.  That was my follow-up
 2   question if it was documents that we had sent to
 3   your attorney?
 4        A.    Yeah.  But I wouldn't consider it
 5   preparation for the deposition.  It was just
 6   informative.
 7        Q.    And those are things that you've looked
 8   at when they were received?
 9        A.    Briefly.
10        Q.    Okay.  I'm going to ask you some
11   questions that are just kind of background
12   questions.
13             Can I get your date of birth?
14        A.    August 17, 1965.
15        Q.    Do you go by any names other than
16   Charles or Chuck?
17        A.    I'll answer to Chaz or Charlie.  I have
18   friends that call me their own version of Charles.
19        Q.    Sure.  That makes sense.  Not known by
20   any aliases or anything like that?
21        A.    No.
22        Q.    Where are you currently living?
23        A.    In Bolingbrook, Illinois.
24        Q.    How long have you lived in Bolingbrook,
```

1    Illinois?

2         A.    I think eight, eight years.  I believe

3    that's about how long.

4         Q.    Time flies, right?  It's hard to

5    sometimes keep track of how long you've been

6    somewhere.

7              Do you -- have you -- strike that.

8    Let me ask that a different way.

9              The resident that you're currently

10   living in, you've lived in that for eight years?

11        A.    No.  Probably six years.

12        Q.    Okay.  And do you own that residence or

13   rent it?

14        A.    I own.  I rented prior to that.

15        Q.    Do you live with anyone?

16        A.    My wife and my stepson.

17        Q.    How old is your stepson?

18        A.    He is 20.

19        Q.    What is the highest level of school that

20   you've completed?

21        A.    Just high school and then just some

22   college, no degrees.

23        Q.    Where did you go to college?

24        A.    Morton College and then College of

1    burning a bridge, were you referencing your

2    separation from Honeywell?

3        A.    Yes.

4        Q.    You don't believe that you've made any

5    other postings on your LinkedIn?

6        A.    Not that I can recall.

7        Q.    With regard to your Twitter, have you

8    made any Tweets with respect to your lawsuit

9    against Honeywell?

10       A.    No.

11       Q.    When did you begin working with

12   Honeywell?

13       A.    I believe it was 2008 or -- well --

14   Honeywell acquired Intelligrated so it's actually

15   Honeywell Intelligrated.  So I started working for

16   Intelligrated in 2008 and then Honeywell acquired

17   Intelligrated in 2016 or thereabouts.

18       Q.    When Honeywell acquired Intelligrated,

19   you became a Honeywell employee at that point in

20   time?

21       A.    Yes.

22       Q.    Were you credited then with your service

23   date for when you were hired with Intelligrated?

24       A.    I believe so.

1      Q.    I'm asking because when I asked when you

2  started working with Honeywell, you had first

3  explained 2008.  That was your understanding of

4  kind of your service date even though they had not

5  owned Intelligrated --

6      A.    Correct.

7      Q.    -- prior to 2016?

8      A.    That's correct.

9      Q.    When you began working with

10 Intelligrated, what was the first position that you

11 held with them?

12     A.    Project manager.

13     Q.    What was the last position that you held

14 with Intelligrated before Honeywell acquired them?

15     A.    Estimating manager.

16     Q.    Was the estimating manager position --

17 did you hold the same role in 2016 when Honeywell

18 became your employer and acquired Intelligrated?

19     A.    One more time.

20     Q.    Sure.  In 2016, when Honeywell acquires

21 Intelligrated, are you still an estimating

22 manager --

23     A.    Yes.

24     Q.    -- or did your position change?

1      A.    It did not change.

2      Q.    What were your job duties as an

3  estimating manager?

4      A.    I had four or five reports, concepting

5  engineers.  We put pricing together.  We designed

6  systems, distribution and fulfillment conveyor

7  systems, material handling, if you will, for

8  various clients, and we priced them up for -- it

9  was basically sales support.  And, you know, I

10  would delegate projects to my reports and I would

11  supervise, you know, review their work before we

12  turned it over to sales.

13      Q.    The people that reported to you, do you

14  remember who they were?  Were they the same people

15  throughout your employment?

16      A.    No.  They changed.

17      Q.    At the time of your separation from

18  Honeywell, what position did you hold?

19      A.    Principal application engineer.

20      Q.    When did you receive the principal

21  application engineer position?

22      A.    I think that was in February of 2021.

23      Q.    Did any of your direct reports remain

24  your direct reports when you became the principal

1    applications engineer?

2         A.    No.

3         Q.    If we look at the 12 months before you

4    became the principal application engineer, so if

5    we're looking at 2020, do you remember who your

6    direct reports were?

7         A.    Yes.  12 months?

8         Q.    Sure.  Just in 2020 who your direct

9    reports were, if you remember?

10        A.    Yeah.  I can -- I think I had four at

11   the time.

12        Q.    Who were they?

13        A.    Griff Wood, Steve Cornstrom (phonetic),

14   Iva Sievk and Christine Brennan.

15        Q.    When Honeywell acquired Intelligrated's

16   business, is it integrated into Honeywell Safety

17   and Productivity Solutions?

18        A.    Yes.

19        Q.    Is Honeywell Safety and Productivity

20   Solutions sometimes referred to as SPS?

21        A.    Yes.

22        Q.    Is that a business group within

23   Honeywell?

24        A.    Yes.

1      Q.    What is the nature of SPS's business?

2  What do they do to the best of your understanding?

3      A.    Honestly, I never really got into

4  anything other than what we did for SPS to tell you

5  the truth.

6      Q.    And you told me what you were doing as

7  an estimating manager for SPS.  What were you doing

8  as a principal application -- am I saying that

9  right?  Was it principal applications engineer?

10      A.    Yeah.  So --

11      Q.    What were you doing in that role?

12      A.    Okay.  Well, it never really got started

13  but the goal was for me to work with a design

14  engineer, another principal engineer, who would

15  create the concepts for key customers and I would

16  price up the systems myself because they had a lot

17  of specialty requirements so -- and I knew -- I was

18  very familiar with those requirements.

19      Q.    Was there a certain facility that you

20  worked at while working for Honeywell?

21      A.    It was the Woodridge office until

22  COVID-19 and then everybody was working from home.

23      Q.    When COVID hits and everybody becomes

24  remote, when did they become remote to the best of

Page 26

1    employment with Honeywell?

2          A.    I believe it was.

3          Q.    Had you received any incentives or bonus

4    in this position?

5          A.    I don't think I had.

6          Q.    You don't recall?

7          A.    Yeah, I don't believe so.

8          Q.    If you look at the bottom of the letter

9    right before your signature, that final sentence of

10   it says, "Your employment with Honeywell will be on

11   an 'at will' basis."

12                    Do you see that?

13         A.    Yes.

14         Q.    You understood that your employment with

15   Honeywell was at will?

16         A.    Yes.

17         Q.    In your role as the principal

18   applications engineer, did you have a direct

19   supervisor?

20         A.    Yes.

21         Q.    Who was that person?

22         A.    Jeff Cortez.

23         Q.    Did Jeff supervise anybody else?

24         A.    Yes.  I don't know who exactly who --

Page 28

1                    (Whereupon, Vavra Deposition

2                    Exhibit No. 2 was marked for

3                    identification, YBR.)

4    BY MS. COLVIN:

5         Q.    I'm going to show you what we've marked

6    as Exhibit No. 2 to your deposition.  If we look at

7    the Bates number for this one, they begin with

8    HON_00000757 and continue on through HON_00000811.

9    Because there are several pages in this exhibit

10   I'll give you a minute to look through it and let

11   me know when you've had a chance to do that.

12                    (Witness peruses document.)

13        A.    I believe I probably seen this in the

14   training course at some point.

15        Q.    You've seen this document before.  What

16   is this document?

17        A.    This is the Code of Business Conduct for

18   Honeywell.

19        Q.    And if we turn to the very last page of

20   this document --

21        A.    The very last page?

22        Q.    Yes, the very last page.  I know it

23   looks all black but if you get to the bottom of it,

24   there's some white fonted print there in the

Page 29

1    center.

2                      Do you see that?  It says updated

3    July 2020.

4         A.    Okay.

5         Q.    Do you believe that this is the code of

6    code that was in effect during your employment from

7    2020 forward?

8         A.    I have no reason to not believe it.

9         Q.    During your employment with Honeywell,

10   you were aware that they had a code of conduct?

11        A.    Yes.

12        Q.    You mentioned you think you saw this in

13   some training that you received?

14        A.    Yeah.  I think we had to take this once

15   a year in a video format.

16        Q.    If I have you turn to -- I'm going to

17   just direct your attention to some pages within the

18   code of conduct and so if you look at the -- these

19   aren't numbered so I'm going to reference to the

20   Bates number.  I'm looking at Page 770.

21        A.    Okay.

22        Q.    If we look at Pages 770 and 771, do you

23   see there at the upper -- I guess of the left-hand

24   corner of the page it says, "Asking For Advice and

Page 30

 1   Voicing Concerns."

 2                   Did I read that correct?

 3        A.    Yes.

 4        Q.    And did you understand that the

 5   Honeywell code of conduct included a reporting

 6   process for reporting any sort of concerns about

 7   your employment?

 8        A.    Yes.

 9        Q.    Would you agree that those are set forth

10   here in the code of conduct?

11        A.    Sure.

12        Q.    If we look at Page 771, on the

13   right-hand side of that it says, "Honeywell Will

14   Not Tolerate Retaliation."

15                   Do you see that?

16        A.    Yes.

17        Q.    You understood during your employment

18   that Honeywell had a policy for reporting concerns;

19   is that accurate?

20        A.    Yes.

21        Q.    And then if we could flip forward to

22   page -- Bates number 773 of this document.

23                   Do you know what is reflected on

24   Page 773?

```
                                            Page 31
 1        A.     Yeah.   I understand the premise.
 2        Q.     What is Honeywell informing employees on
 3   this page?
 4             MR. BECK:   Object to the form of the
 5   question.   But, Chuck, if you're able to tell what
 6   Honeywell is saying here, go ahead.
 7   BY THE WITNESS:
 8        A.     It's treating people with respect and
 9   creating a diversity inclusion in the workplace.  I
10   mean, in a nutshell.
11   BY MS. COLVIN:
12        Q.     Does this page also set forth the
13   company's nondiscrimination policy?
14        A.     Yes.
15        Q.     During your employment you were aware
16   that the company had a nondiscrimination policy?
17        A.     Yes.
18        Q.     I don't have any further questions about
19   this document.
20             THE WITNESS:   Would you mind if I run to
21   the bathroom real quick.
22             MS. COLVIN:   Sure.   No, I understand.
23   We can take a break for that.
24             THE VIDEOGRAPHER:   Off the record at
```

1    your deposition to prepare for your deposition?

2         A.    No.

3         Q.    I'm going to ask you questions about

4    this document throughout the deposition today and

5    we'll bounce between this document and some other

6    exhibits so this is one that we'll come back to.  I

7    tell you that so that you don't put it to the side

8    when we're done with this one into the pile of

9    documents, okay?

10        A.    Understood.

11        Q.    I'd like to turn your attention to

12   Paragraph 12 of the First Amended Complaint and

13   I'll just refer to it a complaint from here on out.

14   This is Page 4.

15        A.    Yep.  Yes.

16        Q.    I'll give you a second to read

17   Paragraph 12 to yourself.  Let me know when you've

18   done that and I'll then proceed with my questions.

19                    (Witness peruses document.)

20        A.    Okay.  Go ahead.

21        Q.    In Paragraph 12 do you agree that you

22   allege that "on September 24, 2020, the CEO of the

23   SPS Division, John Waldron, sent a company-wide

24   e-mail to all employees"?

Page 36

1      A.    I believe he sent it, yes.

2      Q.    Do you agree that in Paragraph 12 of

3   your complaint you allege that Mr. Waldron's e-mail

4   was quote "laying out the company's theory of race

5   and racial relations"?

6      A.    Yes.  Can you ask that question one more

7   time, please?  I want to make sure I understand

8   what you just said.

9      Q.    In Paragraph 12 of your complaint it

10  says, "In 2020, following the killing of George

11  Floyd in Minneapolis, Minnesota, Honeywell began a

12  series of communications with its employees laying

13  out the company's theory of race and racial

14  relations."

15           Did I read that sentence correctly?

16     A.    Yes.

17     Q.    My question to you was:  Do you agree

18  that you were alleging that Mr. Waldron's e-mail

19  laid out the company's theory of race and racial

20  relations?

21     A.    I believe he laid out his opinions, yes.

22                    (Whereupon, Vavra Deposition

23                    Exhibit No. 4 was marked for

24                    identification, YBR.)

Page 37

1    BY MS. COLVIN:

2        Q.    I'm going to show you what we've marked

3    as Exhibit 4 to your deposition.  Let me know when

4    you've had a chance to look at that document.

5                        (Witness peruses document.)

6        A.    Okay.

7        Q.    Have you seen this document before?

8        A.    Yes.

9        Q.    What is this document?

10       A.    This is the e-mail that is basically the

11   basis of this whole lawsuit.

12       Q.    Is this the e-mail from John Waldron

13   dated September 24, 2020, that you reference in

14   Paragraph 12 of your complaint?

15       A.    Yes.

16       Q.    If we look at the e-mail it says, From:

17   John Waldron Sent:  Thursday, September 24, 2020,

18   8:57 p.m. To:  Vavra, Chuck, Subject:  "Continue to

19   Fight for Social Justice."

20                    Did I read that accurately?

21       A.    Yes.

22       Q.    To the best of your knowledge, is this a

23   true and accurate copy of the e-mail that you

24   received on September 24, 2020, that forms the

Page 38

1    basis of your lawsuit?

2         A.    I believe it is.

3         Q.    If we look at the Bates numbers on this

4    document it's VAVRA000224 through 225; is that

5    accurate?

6         A.    Yes.

7         Q.    Do you understand that this is a

8    document you produced in discovery?

9         A.    Yes.

10        Q.    When you received Mr. Waldron's e-mail,

11   did you believe it to contain racist and

12   discriminatory statements?

13        A.    Yes.

14        Q.    At the time that you received this

15   e-mail, did you raise any concerns about your

16   beliefs to your supervisor Jeff Cortez?

17        A.    He wasn't my supervisor when this e-mail

18   came out.

19        Q.    This is September 24, 2020.  Thank you

20   for correcting me.

21             Your supervisor at that point in

22   time would have been Todd Bryant?

23        A.    Correct.

24        Q.    Did you raise any concerns to Todd

1    Bryant at that time regarding this e-mail?

2        A.    No.

3        Q.    Why not?

4        A.    Well, there's a lot of things that have

5    come out over the years that maybe I can say got

6    under my skin that I just swept off to the side

7    without voicing my concerns about it.  This was

8    different.

9        Q.    When you say there's a lot of things

10   that came out over the years, do you mean that came

11   out while you were working that were published by

12   the company?

13       A.    This is what led to my request to no

14   longer be a manager.

15       Q.    Why did this e-mail lead to your request

16   to no longer be a manager?

17       A.    Because I didn't want to be part of what

18   I felt was coming and I didn't want to -- as a

19   manager, I didn't want to push stuff like this on

20   to my reports, the unconscious bias training.  So I

21   think when the actual notice of the training came

22   out is when I was like -- and I just didn't want to

23   be a manager anymore at that point.

24       Q.    So when the notice of the unconscious

Page 41

1          Do you recall anything that Todd
2    said to you when you notified him that you weren't
3    interested in being a manager anymore?
4          A.    One more time.  I'm sorry.
5          Q.    Sure.  When you told Todd that you no
6    longer had an interest in being a manager, do you
7    recall what his response was?
8          A.    I don't.
9          Q.    Did he help you identify positions
10   within Honeywell that you could apply for that
11   would not have managerial responsibility?
12         A.    I believe that's the position I went
13   into.
14         Q.    Do you recall how you came about finding
15   that position or applying for that position?
16         A.    I know it was cumbersome because
17   everything -- I'm going to say I don't.  I just
18   know he had me go into a portal where the jobs were
19   available.
20         Q.    Fair to say that it was a position that
21   you had to apply for?
22         A.    Yes.
23         Q.    At the time that you received the e-mail
24   from John Waldron, did you raise any concerns about

Page 42

1    your beliefs that it was discriminatory to anyone
2    in human resources?
3          A.    No.
4          Q.    Is there a reason that you didn't at
5    that time?
6          A.    Because like I said, I mean, there's
7    been a lot of things over the years that I've just
8    swept under the rug.  The fact that this led to
9    something more is what made me raise my voice about
10   it.
11         Q.    What other things prior to this e-mail
12   did you feel like you were sweeping under the rug
13   or that you had issues with?
14         A.    I don't recall.
15         Q.    The e-mail issued by John Waldron, were
16   you the only recipient of this e-mail?
17         A.    No.
18         Q.    Was it your understanding that this was
19   an e-mail that was sent company wide?
20         A.    I don't know that for a fact.  I know
21   other people that I worked with received it.
22         Q.    Other than the people that you worked
23   with that you know received it, do you have any
24   understanding of who else received it?

Page 43

1      A.    No, I don't.  It doesn't sound like an

2    e-mail that was meant just for me.

3      Q.    Indeed the salutation is "Dear Friends

4    and Colleagues," correct?

5      A.    Yeah.  There's a good indication right

6    there.

7      Q.    Several months after receiving this

8    e-mail, did you send an e-mail to human resources

9    explaining why you believe Mr. Waldron's e-mail was

10   discriminatory?

11     A.    In great detail.

12     Q.    And we'll talk about that e-mail in a

13   little bit.

14           If I could have you take a look

15   back at the complaint and I'm going to turn your

16   attention to Paragraph 13 of the complaint.  In

17   this paragraph it states:  "In November of 2020,

18   Honeywell announced an 'Implicit Bias Training'

19   initiative, in which all employees would be

20   required to undergo training on the theory of

21   implicit racial bias.  The initial requirement came

22   from Honeywell's Diversity, Equity and Inclusion

23   office and created a deadline for the completion of

24   the online training of February 24, 2021.  Vavra

Page 44

1    objected to this training based on what he felt

2    were discriminatory, racist and otherwise incorrect

3    and inappropriate components to the training.

4    Vavra was told by numerous employees that they felt

5    similarly about the training, but were intimidated

6    by the Company's statement and felt they could not

7    speak up about their feelings."

8              Did I read that paragraph

9    correctly?

10        A.   Yes.

11        Q.   In Paragraph 15 you refer to "implicit

12   bias training."  Are those words that you used to

13   describe the training?

14        A.   No.

15        Q.   Where does the implicit bias training

16   language come from?

17        A.   I'm thinking Doug Seaton put the

18   original -- I'm not sure.

19             MR. BECK:  I'm going to ask you not to

20   speculate, to testify about what you know and what

21   you don't know.

22   BY THE WITNESS:

23        A.   Okay.  I don't know.

24

Page 45

```
 1   BY MS. COLVIN:

 2        Q.    Who is Doug Seaton?

 3              THE WITNESS:  Can I answer that?

 4              MR. BECK:  Sure.

 5   BY THE WITNESS:

 6        A.    Doug Seaton is the first attorney I

 7   contacted about...

 8   BY MS. COLVIN:

 9        Q.    Okay.  I'm not going to ask you any

10   questions about your conversations with Doug.

11              Isn't it true that Honeywell

12   referred to their training as Unconscious Bias

13   Awareness Training?

14        A.    That is correct.

15        Q.    Let's correct that.  For the record, I

16   was reading Paragraph 13 of the complaint that we

17   were just talking about.

18                        (Whereupon, Vavra Deposition

19                        Exhibit No. 5 was marked for

20                        identification, YBR.)

21   BY MS. COLVIN:

22        Q.    I'm going to show you what we marked as

23   Exhibit 5 to your deposition and let me know when

24   you've had a chance to look at that.
```

```
                                          Page 46

 1                    (Witness peruses document.)

 2                    What I've shown you is Bates

 3     numbered VAVRA000363 through 364.  It's a two-page

 4     document.

 5                    Have you seen this document before?

 6          A.    I'm sorry.  Say that one more time.

 7          Q.    Sure.  My question to you is:  Have you

 8     seen this document before?

 9          A.    Yes.

10          Q.    What is this document?

11          A.    It's an e-mail from the Inclusion and

12     Diversity group, I believe, giving us notice about

13     the unconscious bias and awareness training.

14          Q.    If we go through the e-mail, if we start

15     at the top, this is from Louise Quilter-Wood.

16                    Do you know who Louise Quilter-Wood

17     is?

18          A.    No clue.

19          Q.    If we go down into the document in her

20     signature line there it states:  "Vice President HR

21     and Communications SPS."

22                    Did you understand that to be her

23     role with the company?

24          A.    Yes.
```

Page 47

```
 1              MR. BECK:  Counsel, can I ask where
 2     you're looking at?  I don't see that.  Oh, I'm
 3     sorry.  I do now.
 4     BY MS. COLVIN:
 5         Q.    If we go back to, kind of, the subject
 6     lines for the e-mail so it's from Louise
 7     Quilter-Wood to you, correct?
 8         A.    Yes.
 9         Q.    Subject line is "Take Action Today:
10     Unconscious Bias Awareness Training is Due Now."
11                   This is dated Wednesday,
12     February 24, 2021; is that accurate?
13         A.    Yes.
14         Q.    Is this a document that you produced
15     during discovery?
16         A.    I believe I did.  I'm not 100 percent.
17         Q.    When we're looking at, kind of, the body
18     of the top half of this e-mail, do you see that
19     there's some blue boxes and question marks there?
20         A.    Yes.
21         Q.    Do you know were there images there or
22     texts there?
23         A.    I don't know.  I'm not certain, but I
24     believe they were images.
```

Page 48

1      Q.    If we look under those boxes, there's
2  some red text there?
3      A.    Correct.
4      Q.    And it indicates that "You are receiving
5  this e-mail because you have not completed the
6  Unconscious Bias Awareness training which is due
7  February 25, 2021.  Please click the link at the
8  bottom of this e-mail and complete the training
9  within the next 24 hours.  Thank you.  Louise."
10          Did I read that correctly?
11     A.    Yes.
12     Q.    Was it your understanding that this was
13  an e-mail following up on the Unconscious Bias
14  Awareness Training notice that you had initially
15  received?
16     A.    Yes.
17     Q.    If we look underneath the red text, the
18  bottom half of this e-mail, is that the initial
19  e-mail that you received or the initial notice that
20  you received to take the Unconscious Bias Awareness
21  Training?
22     A.    I believe the bottom section is the
23  original, yes.
24     Q.    Do you know when you received the

Page 49

1    initial notice to take the Unconscious Bias

2    Awareness Training?

3         A.    I believe it was sometime in November.

4         Q.    If we look at the text of that initial

5    e-mail it states:  "As part of our commitment to

6    Inclusion and Diversity, Honeywell has launched

7    Unconscious Bias Awareness training which is

8    required for all employees.  While it's human

9    nature to have biases, we must strive to overcome

10   them to create an environment that values

11   everyone's perspectives - a workplace based on

12   trust, respect and open communication.  This

13   training aims to equip you with the insights and

14   tools needed to help spot and challenge the ways

15   biases prevent us from creating an inclusive

16   environment.  When we work to eliminate our

17   implicit biases, we not only treat each other

18   better, but we become a better company.  Combatting

19   unconscious bias allows us to build a culture that

20   supports better customer service, stronger business

21   results and a more engaged workforce.  If you want

22   to learn more about unconscious bias, watch this

23   video on Removing Bias From Our Everyday Decision

24   Making.  Please complete Unconscious Bias Awareness

1    training by February 25, 2021."

2                    Did I read that accurately?

3        A.    Sounds like it.

4        Q.    There is a -- that reference in that

5    third paragraph to watching the video on removing

6    bias from our everyday decision making, was your

7    understanding that that was a link you could click

8    to a video?

9        A.    Yes.

10       Q.    Did you ever click that link while you

11   were employed at Honeywell?

12       A.    No.

13       Q.    At the bottom of this notice, there is

14   an -- I guess we'll call it a red box, reddish in

15   color that says -- states:  "Take the Unconscious

16   Bias Awareness Training."

17                   Do you see that?

18       A.    Yes.

19       Q.    And is it your understanding if you

20   click that box it would take you into the

21   Unconscious Bias Awareness Training that it was

22   requiring employees to take?

23       A.    I don't know that but I can -- it looks

24   like something that would be clickable if it were

Page 51

1    in electronic format.

2         Q.    Louise's reminder e-mail indicates to

3    click the link at the bottom of this e-mail to take

4    the training, correct?

5         A.    Oh, yes.

6         Q.    Did you ever click that link?

7         A.    I don't believe I did either one of

8    them.

9         Q.    When you received the initial

10   announcement of the Unconscious Bias Awareness

11   Training in November of 2020, did you raise any

12   concerns about taking it at that time to your

13   supervisor?

14        A.    No.

15        Q.    Why not?

16        A.    I knew it would catch up with me sooner

17   or later.  In my e-mail -- I've been late on

18   trainings, you know, a lot over the course of the

19   years, and I eventually get to them, but I had no

20   plans to get to this one.

21        Q.    In other trainings that you've been late

22   to, did you receive follow-ups from the company

23   reminding you that that training needed to be

24   completed?

Page 52

1          A.     Not like this.

2          Q.     But you did receive some sort of

3     follow-up from the company on other training to get

4     it done?

5          A.     I believe so, yeah.

6          Q.     At the time that you received the

7     announcement in November of 2020, did you raise any

8     concerns about taking it to human resources at that

9     time?

10         A.     Not at that time, no.

11         Q.     We referenced before an e-mail that was

12    sent to human resources several months later.  In

13    that e-mail did you raise your concerns about

14    taking the training?

15         A.     Yes.

16         Q.     And we'll talk about that e-mail in a

17    little bit?

18         A.     Well, there were two.  I think I may

19    have raised it in the second one.  Well, probably

20    both of them.

21         Q.     And we'll talk about those e-mails.

22                I'd like to direct you back to your

23    complaint and this time we'll turn to Page 5 and

24    take a look at Paragraph 16 of your complaint.

Page 53

1    Right now I just want to focus on that first

2    sentence of Paragraph 16.  It says, "In response to

3    Vavra's failing to take the training, he began to

4    receive a series of increasingly urgent

5    communications from Company Management reminding,

6    encouraging, and finally cajoling him into taking

7    the training."

8                    Did I read that sentence

9    accurately?

10        A.    Yes.

11        Q.    What did you mean by that sentence?

12        A.    That as more time went by, the

13   notifications to take the training became more

14   frequent.

15        Q.    To the best of your knowledge, how often

16   were you getting reminders to take the training?

17        A.    I don't recall.  Towards the due date it

18   was probably every day.

19                         (Whereupon, Vavra Deposition

20                          Exhibit No. 6 was marked for

21                          identification, YBR.)

22   BY MS. COLVIN:

23        Q.    I'm going to show you what we have

24   marked as Group Exhibit 6 to your deposition.  This

Page 54

1    is a multipage exhibit.  It is not in sequential

2    order.  It is in date order.  I'll give you a

3    minute to look through that.

4                      (Witness peruses document.)

5         A.    Okay.  I think I get the gist.

6         Q.    This is a 16-page exhibit.  Have you

7    seen the pages that comprise this exhibit before?

8         A.    I'm sorry.  One more time?

9         Q.    The 16 pages that make up this exhibit,

10   have you seen those pages before?

11        A.    Yes.

12        Q.    Do you know what the pages of this

13   exhibit are?

14        A.    Letting me know how delinquent I was in

15   not taking their unconscious bias training.

16        Q.    If we look at these e-mails, if we start

17   on the top page which is Bates number VAVRA000215,

18   this is from Inclusion and Diversity.  It's to you

19   dated Wednesday, February 24, 2021, with the

20   Subject:  "Action Required:  Unconscious Bias

21   Awareness Training Due Soon."

22                    Did I read that accurately?

23        A.    Yes.

24        Q.    To your understanding this was an e-mail

Page 55

1    that you received from Inclusion and Diversity

2    reminding you to take the unconscious bias

3    training?

4         A.    Yes.

5         Q.    If we look at the body of this e-mail,

6    it states:  "You have five days left to take your

7    Unconscious Bias Awareness Training"?

8         A.    Yes.

9         Q.    If we look at the second paragraph of it

10   it states:  "You will receive an e-mail reminder

11   every day until you complete this action.  If you

12   fail to complete the training by February 25, the

13   matter will be escalated to your manager.  Please

14   do not delay."

15              Did I read that accurately?

16        A.    Yes.

17        Q.    And then if you page through these --

18   and let's page through them -- the next one is

19   telling you that you have four days to finish it?

20        A.    Yes.

21        Q.    And then three days?

22        A.    Yes.

23        Q.    And days two and one seem to be missing.

24   But do you believe that you received an e-mail on

Page 56

1     two days left and one day left to complete it?

2          A.    Yes.

3          Q.    And then the next one we have is you

4     have zero days left to complete it; is that

5     accurate?

6          A.    Yep.  Yes.

7          Q.    Then if we move on to the next page, the

8     subject line here changes a little bit, doesn't it?

9          A.    What page are we on now?

10         Q.    Sure.  This is Bates number VAVRA000290.

11         A.    Okay.

12         Q.    So now this is still coming from

13    Inclusion and Diversity?

14         A.    Yep.

15         Q.    It's still to you.  This one is dated

16    March 1, 2021, and the subject is "PAST DUE

17    Complete Your Unconscious Bias Awareness Training."

18                    Is that accurate?

19         A.    Yes.

20         Q.    If we look at the body of it it says,

21    "You are now one day past due in completing your

22    Unconscious Bias Awareness Training.  This matter

23    has now been escalated to your manager."

24                    Did I read that accurately?

Page 57

1          A.    Yes.

2          Q.    Did you continue to receive daily

3     e-mails from Inclusion and Diversity telling you

4     how many days you were past due?

5          A.    Yes.

6          Q.    And, in fact, if we continue on through

7     this document, you've got two days, three days,

8     four days, days five and six seem to be missing.

9                But do you believe that you

10    received an e-mail on days five and six past due?

11         A.    Yes.

12         Q.    And then we've got seven days.  Eight

13    days is missing.  But, again, you believe you

14    received one on the eighth day?

15         A.    Yes.

16         Q.    We've got 9 days, 10 days, 11 days.  12

17    and 13 are missing.  But, again, you believe you

18    received them on days 12 and 13?

19         A.    Yeah.  Had I been a manager I would be

20    the one sending them probably, but I didn't have

21    to.  Thank God.

22         Q.    To your knowledge, were these automated

23    e-mails from Inclusion and Diversity because you

24    hadn't completed it?

1            MR. BECK:  I'll object as calling for

2   speculation.

3   BY THE WITNESS:

4      A.   Yeah, I don't know.

5   BY MS. COLVIN:

6      Q.   You would agree that they're not

7   personalized to you, correct?

8      A.   Correct.

9      Q.   If we continue to go through this, they

10   end at day 17 where it states:  "You are now 17

11   days past due"?

12      A.   Right.

13      Q.   Do you know if there were other

14   employees who had not completed the training who

15   were receiving the same types of reminders?

16      A.   Well, going through some of the

17   discovery briefly the other day, I believe I saw a

18   list of employees that had not taken it.

19      Q.   At this point in time in February

20   of 2021, had you moved into the principal

21   applications engineer position?

22      A.   I can't recall what the official date

23   was.

24      Q.   To the best of your knowledge, in

Page 60

1      Q.    Okay.

2                        (Whereupon, Vavra Deposition

3                        Exhibit No. 7 was marked for

4                        identification, YBR.)

5    BY MS. COLVIN:

6      Q.    I'm showing you what we marked as

7    Exhibit 7 to your deposition.  Let me know when

8    you've had a chance to take a look at that.

9                        (Witness peruses document.)

10     A.    Okay.

11     Q.    Exhibit 7 is Bates numbered VAVRA000239.

12   It's a single page.  Have you seen this document

13   before?

14     A.    I believe I have.

15     Q.    What is this document?

16     A.    This is an e-mail from my immediate

17   supervisor acknowledging that he knows I had a

18   problem with the training but still asked me to

19   complete it.

20     Q.    Let's take a look at the e-mail.  It

21   appears that there's two e-mails on here; is that

22   correct?

23     A.    Correct.

24     Q.    If we look at the top one, it's from

Page 61

1    Jeff Cortez.  You mentioned he's your immediate
2    supervisor at this point in time, correct?
3          A.    Yes.
4          Q.    It's dated March 2, 2021, correct?
5          A.    Yes.
6          Q.    It's to you and the subject line is
7    Forward:  Action Required:  "Your Direct Report is
8    Late in Completing the Unconscious Bias Awareness
9    Training" and then there is an attachment that's
10   titled Unconscious Bias 2021 Past Due Employee
11   details."
12                    Did I read that accurately?
13         A.    Yes.
14         Q.    Do you recall receiving an attachment
15   with this e-mail?
16         A.    I don't.
17         Q.    Do you know what the attachment was?
18         A.    It would have been what I was just
19   talking about that I saw in the discovery, but I
20   can't be sure.
21         Q.    When you say what you were just talking
22   about, the list of people who had yet to complete
23   the training.
24                    Is that what you mean?

1          A.    Yes.

2          Q.    We'll come back to the body of this

3    e-mail but if we -- the top e-mail, but if we look

4    at the bottom half of this e-mail, it's From:

5    Inclusion and Diversity, Sent:  March 1, 2021, to

6    Jeff Cortez with the "Subject" Action Required:

7    "Your Direct Report is late in Completing the

8    Unconscious Bias Awareness Training;" is that

9    accurate?

10         A.    That is.

11         Q.    So he's just forwarding you the e-mail

12   that he received from Inclusion and Diversity that

13   instructed him to notify you that it's still

14   outstanding; is that correct?

15         A.    Yes.

16         Q.    If we go back to the top of this e-mail,

17   Jeff's e-mail to you he states:  "Chuck, know you

18   are not a fan of this training module.  However,

19   you are currently the only one who hasn't completed

20   this training so would ask that you do this.

21   Thanks Jeff."

22                Did I read that accurately?

23         A.    Yes.

24         Q.    When Jeff states that he knows you are

Page 63

1    not a fan of this training module, had you had a

2    conversation with Jeff about the module?

3         A.    I'm pretty sure I did.

4         Q.    Had you sent him any e-mails about the

5    module?

6         A.    I don't recall sending him anything,

7    just verbal conversations.

8         Q.    Through that verbal conversation he came

9    to the conclusion that you weren't a fan.

10                    Is that fair to say?

11        A.    That's what it sounds like.  It was a

12   long time ago so --

13        Q.    Sure, I understand.

14                    Do you remember when you had the

15   conversation with Jeff?

16        A.    I don't.  It was probably shortly before

17   this I'm guessing, you know, just probably days or

18   a couple of weeks.

19        Q.    Do you remember what you told him about

20   the -- what you thought about the training?

21        A.    I don't remember.

22        Q.    Do you know if anyone else was present

23   for that conversation?

24        A.    No.  It was -- no.

Page 64

1      Q.    Do you remember if it was a phone call
2   or a Teams meeting or Zoom or something, how the
3   conversation took place?
4      A.    It was probably a phone call.
5      Q.    Do you know how long you talked to him
6   about the training?
7      A.    No.
8      Q.    And you don't remember what you said
9   about the training to him?
10      A.    No.
11      Q.    Do you recall any sort of response that
12   he had to whatever was said during that
13   communication?
14      A.    I don't recall.
15      Q.    Do you recall if you told him that you
16   weren't going to take the training?
17      A.    If I recall, I think I told him that I
18   was putting something together for HR and he could
19   read it at the same time I sent it to HR.
20      Q.    Do you recall if he had any sort of
21   response to that?
22      A.    I don't.
23      Q.    When you received this e-mail on
24   March 2nd, did you have any conversation with Jeff

Page 65

1    about the e-mail he had sent to you asking you to

2    take it?

3         A.    Okay.  So what I just told you probably

4    happened after this e-mail, so I'd like to kind of

5    go back.

6         Q.    Sure.

7         A.    I'm trying to recall the timeline.

8         Q.    I understand.

9         A.    Because he wouldn't have sent this to me

10   knowing that I was preparing an e-mail to HR at the

11   time.  So that -- my e-mail to HR probably came

12   after this.  So what was your question?

13        Q.    Let's go back a little bit.

14              So my initial question was prior to

15   receiving this e-mail, you recall having a

16   conversation with Chuck that you think took place

17   on the telephone in which you talked about the

18   training because he knew you weren't a fan, but you

19   just don't recall when that conversation happened

20   or what the content of that conversation was,

21   correct?

22        A.    Correct.

23        Q.    My next question then is:  When you got

24   this on March 2nd, you got this e-mail from Jeff

Page 67

1    BY MS. COLVIN:

2         Q.    I'm going to show you what we marked as

3    Exhibit 8 to your deposition.  Let me know when

4    you've had a chance to look at this document.

5                        (Witness peruses document.)

6         A.    Okay.  I understand it.

7         Q.    Exhibit 8 is a three-page document which

8    is Bates numbered VAVRA000262 through 264.  Have

9    you seen this document before?

10        A.    I remember the first e-mail from Jeff

11   Cortez.  I think I recall the one from Justin Leib.

12   And I don't recall at the time seeing the list.  I

13   may have, but I might not remember.

14        Q.    Would you agree that this is an e-mail

15   chain?

16        A.    Yep.  Yes.

17        Q.    If we look at the top of the e-mail

18   chain, this is from Jeff Cortez to you dated

19   March 2, 2021, and the subject is Forward:

20   "Unconscious Bias Training," correct?

21        A.    Yes.

22        Q.    So Jeff is forwarding you the e-mail

23   chain; is that accurate?

24        A.    Yes.

Page 68

1      Q.    He's marked this as high importance; is

2   that accurate?

3      A.    Yes.

4      Q.    It states:  "Chuck, as I thought would

5   happen, getting additional pressure to get this

6   training completed.  Please get completed today and

7   let me know when done.  Thanks, Jeff."

8              Did I read that accurately?

9      A.    Yes.

10      Q.    If we just look back at Exhibit No. 7

11   for a second, so the one pager that we had just

12   talked about, that one is dated March 2, 2021, at

13   7:51 a.m.  And if you look at Exhibit 8, this one

14   is dated March 2, 2021, 10:11 a.m.; is that

15   accurate?

16      A.    Yes.

17      Q.    So this is the second e-mail you

18   received on March 2nd about getting this training

19   completed from Jeff?

20      A.    Apparently.

21      Q.    If we look at the e-mail that he

22   forwards to you, it's from Justin Leib, L-E-I-B.

23   Do you know who Justin Leib is?

24      A.    Yes.  I think I -- yes, I know who he is

Page 69

1    probably.

2         Q.    Who was he?

3         A.    I don't recall what his title was.

4    Okay.  Director of Applications/Systems Sales

5    Engineering.

6         Q.    That's from his signature line you're

7    looking at?

8         A.    Yeah.

9         Q.    Was he Jeff's boss?

10        A.    Not his immediate boss.  I believe he

11   was -- I believe he was two, three steps up maybe.

12        Q.    If you look at the e-mail from Justin,

13   it's to several individuals including Jeff; is that

14   correct?

15        A.    That's correct.

16        Q.    If you look at the body of it, he's

17   telling the recipients of the e-mail that "You have

18   people that have not completed the training.  I

19   want it completed today.  It should take less than

20   30 minutes;" is that accurate?

21        A.    Yes.

22        Q.    If you look down to the next e-mail

23   below that, there is an e-mail from John Dillon to

24   various recipients, correct?

Page 70

```
 1        A.    Correct.

 2        Q.    If you look at the recipient list,

 3   Justin is one of the recipients?

 4        A.    Yes.

 5        Q.    Who is John Dillon?

 6        A.    Well, I know who he is today.  He's no

 7   longer with Honeywell.

 8        Q.    Did you know who he was in March

 9   of 2021?

10        A.    Yes.  But I don't recall what his title

11   was at the time.

12        Q.    Do you -- was he a supervisor above

13   Chuck to your knowledge?

14        A.    Yes.

15              MR. BECK:  Chuck, you need to wait until

16   she's done with her questions.

17              MS. COLVIN:  Thank you.

18              MR. BECK:  It's an easy one forget.

19   BY MS. COLVIN:

20        Q.    Then if we look at the final chain on

21   this e-mail, it's an e-mail from Jennifer Carpenter

22   to John Dillon.  It appears to be she states:

23   "Below is a list of all your employees in your org

24   who have not taken unconscious bias training.  Can
```

Page 71

1    you please ask your leaders to drive this with

2    their teams and ask these employees to take ASAP."

3               Did I read that accurately?

4         A.    Yes.

5         Q.    Do you recall if this was part of the

6    chain that you received on March 2nd?

7         A.    I don't recall.

8         Q.    You testified a bit earlier today about

9    seeing a list in discovery.  Is this the list that

10   you were referring to?

11        A.    It looks like it.

12        Q.    If we take a look at that list, do you

13   know any of the employees on this list?

14        A.    I do not.

15        Q.    Do you know if any of these employees

16   reported to Chuck -- I'm sorry.

17        A.    To Jeff?

18        Q.    -- to Jeff?  Thank you.

19        A.    I don't.

20        Q.    When you received this e-mail from Jeff,

21   did you have any conversation with him at that time

22   about his request that you get it completed today,

23   the training?

24        A.    Which e-mail are you referring to?

Page 73

1          A.    Okay.

2          Q.    Exhibit 9 is a three-page document with

3     the Bates numbers VAVRA000259 through 261.  Have

4     you seen this document before?

5          A.    I believe so.

6          Q.    What is this document?

7          A.    It looks like the only difference

8     between this and the last one is just going up the

9     ladder to -- or actually I believe Brian Swinkola

10    who is Jeff Cortez' supervisor just asking me to

11    take the training.

12         Q.    So if we look at the top e-mail -- let's

13    strike that and back up.

14                You would agree that this is an

15    e-mail chain as well, correct?

16         A.    Yes.

17         Q.    As you noted, it appears to be the same

18    e-mail chain that Brian Cortez had sent to you that

19    same day, correct?

20         A.    You mean Jeff Cortez?

21         Q.    Jeff Cortez.  Thank you.

22                In fact, if we look at Exhibit 8,

23    Jeff's e-mail to you is dated 10:11 a.m.  If we

24    look at Exhibit 9, Brian's e-mail to you is dated

Page 74

1    10:24 a.m.; is that accurate?

2         A.    Yes.

3         Q.    You are the recipient of this and

4    there's a carbon copy to Jeff, correct?

5         A.    Yes.

6         Q.    It simply states:  "Chuck, please

7    complete the Unconscious Bias training.  Thanks."

8              And then it's got Brian's signature

9    block; is that accurate?

10        A.    Yes.

11        Q.    You mentioned that Brian was Jeff's

12   supervisor?

13        A.    I believe so.

14        Q.    Did you have any sort of day-to-day

15   interaction with Brian?

16        A.    Not at this point.

17        Q.    At some point after this, you had kind

18   of day-to-day interaction?

19        A.    I had more when I was an estimating

20   manager.

21        Q.    And --

22        A.    Because Brian used to be my counter -- I

23   believe he was my counterpart prior to my moving

24   into the principal engineering position.

Page 75

1          Q.     So you know who --

2          A.     From a southern office, different

3     office.

4          Q.     Let me unpack that.  Brian was not in

5     the Illinois Woodridge office; is that correct?

6          A.     Correct.

7          Q.     To your understanding he was part of SPS

8     but he worked in one of the southern states?

9          A.     Correct.

10         Q.     You understood that -- your

11    understanding was that when you were an estimating

12    manager, he had a similar counter-position to

13    yours?

14         A.     I believe so.  But I'm not a hundred

15    percent because like I said, things changed a lot

16    frequently.

17         Q.     During your employment though, you had

18    worked with him.  You knew who he was?

19         A.     Yes.

20         Q.     When you received Brian's e-mail on

21    March 2nd, did you have any conversation with Brian

22    with respect to his request that you complete the

23    training?

24         A.     No.

1      Q.    Did you ever have any conversation with

2   Brian regarding the training?

3      A.    No.

4      Q.    I'd like to turn your attention back to

5   your Complaint and if we look at Paragraph 16 on

6   Page 5.  Let me know when you're there.

7      A.    Okay.

8      Q.    If we look at the second sentence of the

9   paragraph it says, "In one of such e-mails, a Human

10  Resources representative asked what 'barriers'

11  Vavra may have to taking the training.  In response

12  to this apparently rhetorical question, on March 8,

13  2021, Vavra wrote a detailed explanation of his

14  concerns regarding the training, in which he

15  explained his legal objections to the proposed

16  training, as well as his view of the workplace,

17  social, political and media environment giving rise

18  to the perceived need for the training.  Vavra

19  included the entire September 2020 communication

20  from John Waldron and provided his thoughts on that

21  communication."

22          Did I read that accurately?

23      A.    Yes.

24

Page 79

1    Pages 8 and 9, that appears to be the start of the

2    chain.

3              Would you agree with that?

4        A.    I would.

5        Q.    It's from Katie Becker dated March 2,

6    2021, 12:16 p.m. and the subject line -- well, the

7    recipient also says Katie Becker.  Subject line:

8    "Unconscious Bias Training - Please Complete ASAP."

9              Did I read that correctly?

10       A.    Yes.

11       Q.    It says, "Good afternoon.  You have been

12   identified as having not yet completed your

13   unconscious bias training.  This training was due

14   on February 28, 2021.  Please log in to the

15   Learning Hub and complete this training ASAP.  If

16   you have any issues completing this, please let me

17   know.  Thank you."  And then it's her signature

18   block.

19              Did I read that correctly?

20       A.    Yes.

21       Q.    Did you receive that e-mail from Katie

22   Becker?

23       A.    Pardon me?

24       Q.    Did you receive that e-mail from Katie

Page 81

1      Q.    Do you believe that you sent that

2   e-mail?

3      A.    Yes.

4      Q.    If we go up the chain on the same page,

5   there appears to be a response from Katie Becker to

6   you; is that correct?

7      A.    Yes.

8      Q.    It still has a copy to Jeff and Brian?

9      A.    Yes.

10     Q.    And this is a response that Katie sent

11  on March 5, 2021; is that accurate?

12     A.    Yes.

13     Q.    Katie says, "Hi Chuck.  I don't believe

14  I received any follow-up e-mail on this.  This is a

15  required course for all Honeywell employees and

16  needs to be completed.  Can you please let me know"

17  what barriers you're having to completing this?"

18              Did I read that accurately?

19     A.    Yes.

20     Q.    Your reference in your complaint to HR

21  sending an e-mail asking about what barriers you

22  might have taking the training, is that this e-mail

23  to your knowledge?

24     A.    Yes.

Page 83

1              Do you recall that?

2         A.    Yes.

3         Q.    Does your March 8, 2021, e-mail to Katie

4    Becker set out the reasons why you believe that

5    Mr. Waldron's e-mail was discriminatory and racist?

6         A.    Yes.

7         Q.    Are there any reasons not contained in

8    that e-mail why you believe that Mr. Waldron's

9    e-mail was discriminatory and racist?

10        A.    You're going to have to repeat that.

11        Q.    Sure.  Are there any reasons that you

12   did not include in your March 8, 2021, e-mail on

13   why you believed the e-mail from Mr. Waldron was

14   discriminatory and racist?

15              In other words, did you put

16   everything, all of the reasons why you thought it

17   was discriminatory and racist in this e-mail?

18        A.    I believe I did, yes.

19        Q.    You didn't leave anything out; is that

20   accurate?

21        A.    I don't think so.  I tried to be as

22   thorough as possible.

23        Q.    Okay.  Does your e-mail to Katie Becker

24   also set forth the reasons why you objected to the

Page 84

1    unconscious bias training and your belief that the

2    training was also discriminatory and racist?

3          A.    Yes.

4          Q.    Are there any reasons not contained in

5    the e-mail on why you believe the training was

6    discriminatory and racist?

7                    In other words, did you include

8    everything in here?  You didn't leave anything out?

9          A.    I believe I did.

10         Q.    In your March 8 e-mail, did you inform

11   Katie Becker that you would not take the

12   unconscious bias training?

13         A.    Yes.

14         Q.    The e-mail that you sent on March 8,

15   2021, as you noted it's comprehensive, correct?

16         A.    Yes.

17         Q.    How long did you spend drafting this

18   e-mail?

19         A.    Probably about three days.

20         Q.    And did you consult with anyone in

21   drafting the e-mail?

22         A.    No.

23         Q.    Did you have anyone review it before

24   sending the e-mail?

Page 87

1    sending out an e-mail shortly, correct?

2         A.    Yes.

3         Q.    Do you believe that that is the

4    communication we were talking about earlier in

5    notifying Jeff that you would be sending an e-mail?

6         A.    I believe that is.

7         Q.    Did you have any conversation to your

8    knowledge prior to sending this e-mail with either

9    Jeff or Brian about the e-mail?

10        A.    Did I have any -- what did you say?

11        Q.    To your knowledge, before you sent this

12   e-mail, did you have any conversation with Jeff

13   about the content of the e-mail?

14        A.    No.

15        Q.    Did you have any conversation with Brian

16   about the content of the e-mail?

17        A.    No.  Sorry.

18        Q.    Just to confirm, you didn't have any

19   conversation with Katie before you sent this

20   e-mail?

21        A.    No.

22        Q.    As I understand it from your testimony,

23   the only person that you talked to about the

24   content of the e-mail before you sent it was your

Page 89

1    at the time that she responded to it, she did not

2    reach out to you to set up a call or otherwise

3    discuss it, correct?

4          A.    No.

5          Q.    Do you have any knowledge of what Katie

6    Becker might have done with your e-mail after she

7    acknowledged it?

8          A.    I don't.

9                        (Whereupon, Vavra Deposition

10                       Exhibit No. 11 was marked for

11                       identification, YBR.)

12   BY MS. COLVIN:

13         Q.    I'm showing you what we've now marked as

14   Exhibit 11 to your deposition.  Let me know when

15   you've had a chance to look at that.

16                       (Witness peruses document.)

17         A.    Got it.

18         Q.    This is a one-page document that is

19   Bates numbered VAVRA000367.  Have you seen this

20   document before?

21         A.    I don't recall it, but I'm sure I

22   received it.

23         Q.    If we -- do you know what this document

24   is?

1      A.    Yeah.  It's just a reminder that I

2  hadn't taken my training and that it was late.

3      Q.    After you had sent your e-mail to Katie

4  on March 8th of 2021, did you continue to receive

5  those daily automated reminders from Diversity &

6  Inclusion that you were past due?

7      A.    I believe I did.

8      Q.    This e-mail, Exhibit 11, if we look at

9  it, it's from Lisa Hamilton.  Do you know who Lisa

10  Hamilton is?

11      A.    I don't.

12      Q.    Did you know who she was at the time

13  that you received the e-mail?

14      A.    I didn't.

15      Q.    It was to you with a copy to Tiffany

16  Costello and Jeff Cortez.  Do you know who Tiffany

17  Costello is?

18      A.    I believe she's just another HR rep.

19      Q.    Had you had any interaction with Tiffany

20  before that informed your knowledge that she was an

21  HR rep?

22      A.    I don't recall.

23      Q.    The subject line of this is "Unconscious

24  Bias Training."  It's dated March 18, 2021; is that

Page 91

1   accurate?

2        A.    Yes.

3        Q.    The content of the e-mail states, "Hi

4   Chuck.  Your unconscious bias training module is

5   still incomplete.  It was due to be completed by

6   February 28.  Please take the training ASAP.  Thank

7   you.  Lisa."

8                  Did I read that accurately?

9        A.    Yes.

10       Q.    Did you respond to Lisa Hamilton's

11   e-mail?

12       A.    Not that I recall.

13       Q.    Now, I want to turn your attention back

14   to your complaint.  If we look at Paragraph 18 at

15   Page 17 is where I want us to draw our attention.

16   Let me know when you're there.

17       A.    I'm there.  I might actually take you up

18   on one of those cough drops.

19             MS. COLVIN:  Yeah, sure.  Let me run and

20   grab it.  Let's go off record for a second.

21             THE VIDEOGRAPHER:  Off the record at

22   12:15.

23

24

Page 92

1              (Whereupon, a break was taken,

2              after which the following

3              proceedings were had:)

4         THE VIDEOGRAPHER:  Going back on the

5    record at 12:19.

6    BY MS. COLVIN:

7         Q.    All right.  We were looking at

8    Paragraph 18 on Page 7 of the Complaint.  It

9    states:  Vavra received an e-mail confirmation of

10   the receipt of his e-mail complaint, but no other

11   substantive communication.  He continued, however,

12   to receive e-mail requests to complete the implicit

13   bias training.  On Friday, March 19, 2021, Vavra

14   was asked to attend a one-on-one meeting with Chris

15   Maines, Vice President of Engineering.  During this

16   meeting, Mr. Maines asked Vavra to reconsider and

17   to take the training which he characterized as 'one

18   more box to check' and 'not a big deal.'  Vavra

19   responded that it was a big deal to him, and that

20   he believed it raised substantial legal and moral

21   issues."

22              Did I read that accurately?

23        A.    Yes.

24        Q.    Who is Chris Maines?

Page 95

1      A.    I believe he was also in Cincinnati or

2    Mason.  It's Mason which is a suburb of Cincinnati.

3      Q.    Like saying Naperville is Chicago?

4      A.    Exactly.

5      Q.    Did you meet with Chris Maines on

6    March 19th of 2021?

7      A.    It was a Teams meeting.

8      Q.    Did Mr. Maines set up the Teams meeting?

9      A.    I believe he did.  I don't know if I was

10   asked on the 19th or if the meeting was actually on

11   the 19th.  I believe it was.

12     Q.    Fair to say that the meeting occurred

13   either on March 19th or a day or two of March 19th?

14     A.    Yeah.

15     Q.    Was there anyone else present on this

16   Teams meeting?

17     A.    Not that I know of.

18     Q.    To your knowledge were -- well, strike

19   that.

20           Do you recall were cameras on or

21   were cameras off for the Teams meeting?

22     A.    Mine wasn't on.  I believe they were

23   off.

24     Q.    Do you recall what was said during that

```
 1    meeting?
 2         A.    Some things -- I don't know if I recall
 3    the entire conversation.
 4         Q.    To the best of your recollection, can
 5    you tell me what you do recall being said in that
 6    meeting?
 7         A.    Well, like I said, we joked about, you
 8    know, butting heads back when.  He was pretty to
 9    the point.  He said, you know, if you don't take
10    the training -- he mentioned -- he asked if -- he
11    goes, "hey, I could understand not wanting to take
12    the training.  If this is like the straw that broke
13    the camel's back," implying that I was getting
14    ready to leave Honeywell which I wasn't.  And I
15    told him -- I believe I told him I enjoyed -- I was
16    looking forward to my new role.  He said, well,
17    it's just another check box of things to do.  Don't
18    make -- read too much into it.  I asked him if he
19    had read the e-mail that I sent to HR.  He said he
20    had not and I think we ended it by -- you know, he
21    just tried to get me to take the training, like, it
22    was, like, no big deal.  Just take it.  I explained
23    it was a big deal to me.  And then I told him -- I
24    think it was right before the weekend.  I said,
```

1   "you know, let me think about it over the weekend."
2   I'll get back to you and see if I change my mind.
3       Q.    What do you recall telling him why it
4   was a big deal to you to take this training?
5       A.    I don't know if I went into a lot of
6   detail.  I can't recall what I said.
7       Q.    Do you recall if you told him that you
8   felt it was discriminatory?
9       A.    I probably did.  I don't recall.
10      Q.    Do you recall if you told him that you
11  believed it was racist?
12      A.    I don't recall if I did or not.
13      Q.    Do you recall if Mr. Maines told you
14  that you did not have to believe or agree with the
15  training but you did need to take it?
16      A.    That kind of sounds familiar, but I feel
17  like I read it somewhere as opposed to being told
18  it.
19      Q.    Do you recall if Chris told you that
20  refusing to take the training was insubordination?
21      A.    I remember him saying that.
22      Q.    Do you recall what your response to him
23  telling you that was?
24      A.    I don't.

Page 107

1   e-mail that were not included in this e-mail.

2   BY MS. COLVIN:

3        Q.    So did your March 8th e-mail and your

4   March 23 e-mail set forth all of the reasons why

5   you felt that John Waldron's e-mail was

6   discriminatory and racist?

7        A.    I could probably think of more but, yes.

8        Q.    Did you leave anything out when you

9   wrote it?

10       A.    I tried to be as thorough as possible.

11  You know, in hindsight, which I haven't thought

12  about, I think I covered everything pretty well.

13       Q.    Did your March 23 e-mail to Chris Maines

14  also set forth reasons why you continued to object

15  to taking the unconscious bias training and your

16  belief that the training was discriminatory and

17  racist?

18       A.    I apologize.  One more time.

19       Q.    Sure.  Did your March 23 e-mail to Chris

20  Maines also set forth the reasons why you continued

21  to object to the unconscious bias training?

22       A.    Yes.

23       Q.    Did the e-mail to Chris Maines also set

24  forth reasons why you believed that the training

Page 113

1    some organization or some media clip?  Do you

2    remember anything about the video?

3          A.    I honestly don't.

4          Q.    Do you know if the video or if the

5    YouTube clip still exists?

6          A.    I don't.

7          Q.    You mentioned that in response to this

8    Katie responded to you, and it looks like she

9    responded on April 1st; is that correct?

10         A.    Yes.

11         Q.    And she just says, Thanks for your

12   e-mail explanation and for speaking further with

13   Chris Maines about your concerns.  I will schedule

14   time early next week to discuss the situation.  And

15   then as you noted, you responded to Katie saying,

16   "thanks.  I look forward to speaking with you.

17   Have a great weekend."

18               Did I read those accurately?

19         A.    Yes.

20         Q.    You mentioned that that meeting never

21   happened?

22         A.    I don't believe so.

23         Q.    To your knowledge what happened next?

24         A.    I believe that Jeff had called me to

Page 114

1    schedule a meeting the following Wednesday with him

2    and Katie -- well, I didn't know Katie Becker was

3    going to be on the call at the time.  We used to

4    have, like, weekly, just casual conversations

5    between me and Jeff and this week it was pushed up,

6    if I recall.  And so I thought something was a

7    little odd about it, and then Katie Becker was on

8    the call, and I think I was given an ultimatum to

9    either take the training or that was it.

10        Q.    The weekly meetings that you were having

11   with Jeff, when did those start?

12        A.    Probably shortly after he replaced me in

13   my role, so I would say sometime in February or

14   March.

15        Q.    Those meetings became -- strike that.

16              Did those meetings occur when you

17   were reporting to him in your role as principal

18   applications engineer?

19        A.    Yes.

20        Q.    And those weekly meetings were to

21   discuss, kind of, what was going on, what work flow

22   was, what projects were?

23        A.    Talk about training I'm missing.

24        Q.    Were those meetings -- did they have,

Page 118

1    invite, or how do you recall that meeting being

2    scheduled?

3          A.    I don't recall.

4          Q.    When you received notice of that

5    meeting, did you have any knowledge of what that

6    meeting was going to be?

7          A.    No.  I just remember thinking it was odd

8    that it was being moved up.

9          Q.    Do you recall why you thought it was odd

10   that it was being moved up?

11         A.    No.  Well, in light of everything that

12   happened it didn't make me feel -- I felt that it

13   might have something to do with me not taking the

14   training.

15         Q.    Okay.  Do you recall the date of your --

16   strike that.

17                Was that meeting that got set up --

18   I think you referred to it as a meeting where you

19   were given an ultimatum; is that accurate?

20         A.    Yes.

21         Q.    Were you terminated in that meeting?

22         A.    Yes.

23         Q.    Do you recall the date of that meeting?

24         A.    I believe it was April 7th, Wednesday.

Page 119

1      Q.    How did that meeting take place?  Was it

2   a Teams meeting?  Was it in person?  Over the

3   phone?

4      A.    It was a Teams meeting.

5      Q.    You mentioned that Katie Becker was

6   present?

7      A.    Yes.

8      Q.    Was there anyone else to your knowledge

9   present for that meeting?

10     A.    Jeff Cortez.

11     Q.    Sure.  Jeff Cortez -- no, that's a good

12  point-out.  So the meeting was you, Jeff Cortez,

13  Katie Becker.

14          To your knowledge other than those

15  three people, was there anyone else present?

16     A.    Not that I know of.

17     Q.    Do you recall how long that meeting was?

18     A.    Well, taking into consideration my poor

19  judgment in time, I will say 10 minutes.

20     Q.    Do you recall who started the meeting?

21  In other words, did Katie give you any preface or

22  did Jeff start the meeting?

23     A.    Jeff started the meeting and to my

24  recollection Katie was just there to inform me of

Page 120

1    the departure procedure.  She didn't -- there was

2    no substantive conversation with Katie Becker.

3         Q.    What do you recall being said during

4    that meeting?

5         A.    I recall Jeff recollecting how --

6    recalling how I felt about the training and he said

7    something to the effect of "the bottom line is if

8    you don't take the training, this is it."

9         Q.    And what did you understand him to mean

10   by "this is it"?

11        A.    That I was being terminated.

12        Q.    You say that you recall him recapping

13   how you felt about it.  Do you recall anything that

14   he specifically said about how you felt about it?

15        A.    You know, when I knew that Katie Becker

16   was on the phone -- or on the call with us, my

17   heart kind of sank into my stomach because I knew

18   right then what was happening.  So, you know, the

19   whole thing was kind of fuzzy.  I remember after

20   getting the ultimatum, you know, I told Jeff that I

21   had to go talk to my wife.  I think I just asked to

22   be excused.  I went and talked to my wife because

23   she knows how I felt about everything.

24        Q.    Did he tell you you have until today or

Page 122

1    that he took the meeting?

2         A.    No, I don't.  I can assume.

3         Q.    Do you think he was probably at home

4    too?

5         A.    Yes.

6         Q.    And Katie was probably at home too?

7         A.    Yes.  I --

8         Q.    You don't really know -- you don't know

9    where they were?

10        A.    I don't.

11        Q.    Cameras on or cameras off?

12        A.    Off.

13        Q.    So you asked to have a chance to talk to

14   your wife and they said, that's fine, we'll wait.

15        A.    I don't know if -- I'm sorry.  Are you

16   finished?

17        Q.    Yeah.  I guess I'm trying to figure out

18   whether they reconvened the meeting, whether they

19   waited for you?  What happened next?

20        A.    I honestly can't recall.  I think I

21   asked to speak to my wife because there was a point

22   where I already knew what was going on and then I

23   asked if I could be excused for a minute.  I went

24   to talk to my wife.  And I believe -- I said,

Page 123

1    "babe, I think I'm getting fired."

2         Q.    Do you recall what she said in response?

3         A.    I said, I got to stand my -- I told her

4    I got to stand my ground.  She said she loved me,

5    if I recall, and she supports me in my decision if

6    that's the way it turns out.

7         Q.    Did you tell her that they had

8    ultimatumed you?

9         A.    Yes, I believe I did.  I can't -- I'm

10   not a hundred percent though.

11        Q.    Do you recall anything else that you

12   said that was said between you and your wife?

13        A.    No.

14        Q.    Was that just a short conversation?

15        A.    It was very short.

16        Q.    To the best of your recollection, then

17   did the meeting continue?

18        A.    Well, I think I went to go talk to my --

19   and, again, it's been two years.  If I remember,

20   there was just something of the tone.  You know,

21   Jeff doesn't hide his feelings very well.  There

22   was something that just made me think that they

23   weren't there to discuss my e-mail.  So I

24   assumed -- you know, I just assumed what was going

Page 124

1    on.  And then when I came back, we continued on and

2    that's where I got the ultimatum, if I recall.

3         Q.    Do you know if Katie Becker did anything

4    with the e-mail that you had sent to her with the

5    YouTube clip?

6         A.    I have no idea what she did with it.

7         Q.    Do you know if she did anything with the

8    e-mail that you had forwarded to her that was sent

9    to Chris Maines after you met with him?

10        A.    I have no idea what she did with

11   anything that I had sent her.

12        Q.    During this meeting with Katie and Jeff

13   that you think happened on April 7th, did you

14   confirm to them that you were not going to take the

15   unconscious bias training?

16        A.    The way it ended when Jeff told me that

17   if you don't take the training, this is it, I said,

18   well, then I guess this is it.

19        Q.    At that point did Katie then go through

20   the process with you?

21        A.    Yes.

22        Q.    And what do you recall her saying about

23   the process?

24        A.    Not much.  I mean, I was pretty frazzled

```
                                            Page 128

 1     Page 7.  Let me know when you've had a chance to

 2     review those paragraphs.

 3                     (Witness peruses document.)

 4          A.    Okay.

 5          Q.    Paragraph 19 states:  "Following the

 6     conversation with Mr. Maines, Vavra decided to take

 7     the IAT by logging on to the harvard.edu website,

 8     in order ensure -- there's a "to" missing -- in

 9     order ensure that he was fully informed about the

10     background of the topic in his own stated views of

11     the test.  Vavra's results from the test indicated

12     that he had a bias in favor of African-Americans

13     and against white Americas.  He then took the same

14     test three days later and he was told that he did

15     harbor implicit biases against African-Americans.

16     This confirmed to him what he had previously

17     learned concerning the IAT, in that it is generally

18     considered to be unreliable and incapable of

19     validation."

20                  Did I read that accurately?

21          A.    Yes.

22          Q.    Paragraph 19 says:  "Following the

23     conversation with Mr. Maines."

24                  Is it your understanding that that
```

Page 129

1    is in reference to the meeting that you had with

2    him on March 19th?

3         A.    Yes.

4         Q.    Do you recall when you took the IAT by

5    logging into the harvard.edu website?

6         A.    I think it was -- the first time was on

7    a Saturday night.  The second was probably the

8    following Tuesday, but I'm not a hundred percent

9    sure on either.

10        Q.    This IAT training that you took on the

11   harvard.edu website, that was not Honeywell

12   training that you were being requested to take,

13   correct?

14        A.    No.

15        Q.    Did you believe that the unconscious

16   bias training that Honeywell required employees to

17   take required employees to take the Implicit

18   Association Test?

19        A.    Do I believe that the Honeywell training

20   required employees to take the IAT that I took at

21   harvard.edu; is that what you're asking me?

22        Q.    Well, what I'm asking is:  Did you think

23   that the content of the unconscious bias training

24   that Honeywell was requiring employees to take

Page 130

1    required employees to take an IAT test.

2         A.    I don't know.

3         Q.    Why did you reference the IAT test if

4    you do not know whether you believed the training

5    to include it?

6         A.    Well, because unconscious bias is

7    synonymous with implicit bias, is it not?

8         Q.    That's your belief that unconscious bias

9    is synonymous with implicit bias, correct?

10        A.    (No response.)

11        Q.    Did you have any --

12        A.    Similar.

13        Q.    They're similar how?

14        A.    Well, I just don't believe that -- I

15   think unconscious -- I don't think there's -- I

16   don't believe that unconscious bias is -- I think

17   it's a made-up term.  I think people's biases are

18   more conscious than unconscious.

19        Q.    Did you have a belief of what the

20   content of Honeywell's unconscious bias training

21   was?

22        A.    I believe that John Waldron if he sent

23   an e-mail out like he did setting his colleagues up

24   for a forthcoming training, I believe he would have

Page 131

1    taken the test before asking the rest of his

2    colleagues to take it.

3         Q.    When you say "the test," do you mean the

4    IAT test --

5         A.    The training.

6         Q.    -- or the training?

7         A.    The training.  I'm sorry.

8         Q.    Did you have any belief that the

9    Honeywell training included any sort of testing to

10   determine what an employee's biases may be?

11        A.    One more time, please.

12             MS. COLVIN:  Can you repeat the question

13   for me?

14                    (Whereupon, the record was read

15                     as requested.)

16   BY THE WITNESS:

17        A.    I don't know.

18   BY MS. COLVIN:

19        Q.    You did not take the unconscious bias

20   training that Honeywell required employees to take,

21   correct?

22        A.    Correct.

23        Q.    Is it fair to say that at the time that

24   you refused to take the unconscious bias training

Page 132

1    required by Honeywell, you did not know what the

2    content of that training was?

3         A.    I had my thoughts on it based on John

4    Waldron's e-mail.

5         Q.    What were your thoughts of what that

6    training was based on John Waldron's e-mail?

7         A.    That it was going to try to make me feel

8    guilty for the color of my skin, that it was going

9    to make people of color feel like victims for the

10   color of their skin.  Again, it was based on the

11   content of John Waldron's e-mail that made me

12   believe that.

13        Q.    Have you ever see the Honeywell

14   unconscious bias training that you did not take?

15        A.    No.

16        Q.    Do you know how long the training

17   Honeywell required took to take?

18        A.    No.

19        Q.    Did you understand that Honeywell

20   required all employees to take the training as a

21   condition of employment?

22        A.    I did not.  I knew there might be some

23   disciplinary action.

24        Q.    What did you think the disciplinary

```
                                          Page 133
 1    action would be if an employee refused to take the
 2    training?
 3          A.    I don't know.
 4          Q.    Would you agree that some of the e-mails
 5    that you received reminding you that you had not
 6    taken the training stated that the training was
 7    required of all employees?
 8          A.    Yes.
 9          Q.    Did you think that you would not be
10    terminated for your refusal to take the training?
11          A.    Did I think that I would not be
12    terminated?
13          Q.    Correct.
14          A.    Yes.
15          Q.    Why did you have that belief?
16          A.    Because I would have -- I would have
17    expected somebody to address my concerns before
18    terminating me to understand -- to better my
19    position if they didn't understand it after my
20    e-mails.
21          Q.    It's your position that in speaking to
22    Chris Maines or Jeff Cortez or Katie Becker that
23    they did not address your concerns about the
24    training and what was your belief of what the
```

Page 134

1    training was conveying to employees?

2          A.    Nobody had any follow-up questions or

3    anything after my e-mails.

4          Q.    Are you aware of any other employee who

5    did not take the training?

6          A.    I am not.

7          Q.    Are you aware of any employee who did

8    not take the training but remained employed?

9          A.    I don't know.

10                         (Whereupon, Vavra Deposition

11                         Exhibit No. 16 was marked for

12                         identification, YBR.)

13   BY MS. COLVIN:

14         Q.    Showing you what we're marking as

15   Exhibit 16 to your deposition.  Let me know when

16   you've had a chance to review this multipage

17   document.

18                         (Witness peruses document.)

19         A.    Okay.

20         Q.    Exhibit 16 is a document that is Bates

21   numbered VAVRA000226 through 233.  Have you seen

22   this document before?

23         A.    Yes.

24         Q.    What is this document?

Page 135

```
 1        A.    This is my letter to Chris Maines and
 2   then correspondence after I was terminated.
 3        Q.    Would you agree that this is an e-mail
 4   chain?
 5        A.    Yes.
 6        Q.    And as you mentioned, it includes your
 7   March 23 e-mail to Chris Maines, correct?
 8        A.    Correct.
 9        Q.    We've talked about that e-mail already
10   today?
11        A.    Yes.
12        Q.    And then if we go up the chain which
13   starts on Page 2, you mentioned there were
14   communications after your termination.
15              Is the e-mail at the bottom of
16   Page 2 one such communication?
17        A.    Yes.
18        Q.    And that's an e-mail from you to Katie
19   Becker on April 7 with the subject:  "My
20   Termination," correct?
21        A.    Correct.
22        Q.    And you're letting her know that you
23   were able to get your personal stuff off of your
24   laptop, correct?
```

Page 136

1          A.     Yes.

2          Q.     And then you state:  "I was hoping that

3    a discrimination claim wouldn't have ended with

4    getting terminated but it's a different country

5    we're living in these days.  I wish you all the

6    best and thanks for everything.  Best regards."

7                     And then your signature block,

8    correct?

9          A.     Yes.

10         Q.     Katie responded to that e-mail?

11         A.     Yes.

12         Q.     Is her response the next e-mail up in

13   the chain?

14         A.     Yes.

15         Q.     That was also sent, if you look at the

16   bottom of Page 1 on April 7th?

17         A.     I'm sorry.  Say it one more time.

18         Q.     Katie's response to you was also on

19   April 7th?

20         A.     Yes.

21         Q.     She thanked you for your e-mail.  She

22   attached a copy of an IP agreement with a password

23   and then she said, "If you have any additional

24   questions on the exit items we discussed this

Page 137

1    morning, please let me know."

2                    Did I read that accurately?

3         A.    Yes.

4         Q.    Do you recall discussing the IP

5    agreement or any other documents you may have

6    signed during your employment with Honeywell at

7    that termination meeting?

8         A.    No.

9         Q.    And then you responded to her; is that

10   correct?

11        A.    Yes.

12        Q.    That was the next day on April 8th where

13   you ask her "Thanks Katie.  Are you going to send

14   something stating the exact reason why I was fired

15   or will that come from Jeff Cortez?"

16        A.    Yes.

17        Q.    That's the e-mail you had mentioned

18   before requesting a reason and you had mentioned

19   that Katie responded that you would not be

20   receiving anything else, correct?

21        A.    Correct.

22        Q.    Is that e-mail response from Katie

23   telling you that you would not receive any

24   additional information that next e-mail above in

Page 138

1    the chain?

2         A.    Yes.

3         Q.    And that's dated April 11, 2021?

4         A.    Yes.

5         Q.    She informed you that you will not

6    receive any additional information regarding your

7    termination but you will receive information on

8    your benefits and who those will be coming from,

9    correct?

10        A.    Correct.

11        Q.    Did you have any further e-mail

12   communications with Katie Becker after April 11,

13   2021?

14        A.    Not that I can recall.

15        Q.    Did you have any further verbal

16   communications with her?

17        A.    Not that I can recall.

18        Q.    Did you have any further e-mail

19   communications with Jeff Cortez after your

20   termination?

21        A.    Not that I can recall.

22        Q.    Did you have any further verbal

23   conversations with Jeff after your termination?

24        A.    Isn't that what you just asked me?

Page 139

1      Q.    I had asked if you had any e-mails with
2  him after the termination?
3      A.    Oh, sorry.  Yeah, I don't recall e-mails
4  or verbal conversations.
5      Q.    Do you recall receiving any sort of
6  verbal communication or e-mail communications with
7  Chris Maines after your termination?
8      A.    Not that I can recall, no.
9      Q.    Did you have any verbal conversations or
10  e-mail communications with anyone in Honeywell
11  management after your termination besides these
12  e-mails that we've just discussed?
13      A.    Not that I can recall.
14      Q.    Do you know who made the decision to
15  terminate your employment?
16      A.    I do not.
17                  (Whereupon, Vavra Deposition
18                  Exhibit No. 17 was marked for
19                  identification, YBR.)
20  BY MS. COLVIN:
21      Q.    Showing you what we're going to mark as
22  Exhibit 17 to your deposition.  Let me know when
23  you've had a chance to review that.
24                  (Witness peruses document.)

Page 154

1    Anthony in regard to this e-mail?

2          A.    I don't recall.

3          Q.    Do you recall having any telephone

4    conversation with him after sending him this

5    e-mail?

6          A.    I don't recall.

7          Q.    Did you send this to him for the same

8    reason that you sent him the copy of the e-mail

9    that you sent to Chris Maines?

10          A.    Yes.

11                          (Whereupon, Vavra Deposition

12                          Exhibit No. 22 was marked for

13                          identification, YBR.)

14    BY MS. COLVIN:

15          Q.    Showing you what we're marking as

16    Exhibit 22 to your deposition.  Have you seen --

17    well, go ahead and take a look at it first and let

18    me know when you've had a chance to review it.

19                          (Witness peruses document.)

20          A.    Okay.

21          Q.    This exhibit is numbered VAVRA000293 to

22    294.  Have you seen this document before?

23          A.    Yes.

24          Q.    What is this document?

Page 155

1        A.    This is an e-mail from one of my
2    ex-coworkers at the time.
3        Q.    The e-mails are between you and Susan
4    Parmenter?
5        A.    Yes.
6        Q.    Did Susan Parmenter ever report to you?
7        A.    No.
8        Q.    You would agree this is a chain e-mail,
9    correct?
10        A.    Yes.
11        Q.    Susan had reached out to you on
12    April 7th; is that correct?
13        A.    Yes.
14        Q.    Had there been any announcement that you
15    were leaving Honeywell?
16        A.    I believe Jeff Cortez had sent an e-mail
17    out to certain individuals or the team.
18        Q.    Do you believe that Susan received some
19    e-mails indicating that you were leaving?
20        A.    I believe so, yeah.
21        Q.    In response to Susan noting that you
22    would be missed, you explained to her that you had
23    been fired, correct?
24        A.    Yeah.  I don't think the e-mail that

1    Jeff sent out let people know what exactly happened

2    because a lot of people had been leaving

3    voluntarily at the time.  I'm just saying.

4         Q.    For people who left Honeywell, was it

5    common for there to be an e-mail saying that this

6    was their last day or they no longer work here but

7    not providing an explanation of, you know, if they

8    had gone to another company, whether they had quit,

9    whether they had terminated, just that they're no

10   longer a member of the team?

11        A.    Yeah, it would be common.

12        Q.    You shared with Susan your thoughts

13   about the unconscious bias training mandate,

14   correct?

15        A.    I did.

16        Q.    Susan responded to you.  After her

17   response did you have any further e-mails with her?

18        A.    I don't believe so, no.

19        Q.    Did you have any verbal conversations

20   with Susan about your termination?

21        A.    No.

22        Q.    Did you have any verbal conversations

23   with Susan about the unconscious bias training?

24        A.    No.