# EXHIBIT D

## (EXCERPTS OF DEPOSITION OF JEFFREY CORTEZ)

## TO

## February 17, 2023
## Defendant's Local Rule 56.1 Statement

**RE:**  Charles Vavra v. Honeywell International Inc., et al.
Case No. 1:21-cv-06847

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4    CHARLES VAVRA,                    )
                                       )
5            Plaintiff,                )
                                       )
6       -vs-                           )  NO. 1:21-CV-06847
                                       )
7    HONEYWELL INTELLIGRATED,          )
     INC., a Delaware corporation,    )
8                                      )
             Defendant.                )
9

10

              Zoom Videoconference Deposition of JEFF
11

     CORTEZ taken before TRUDY G. GORDON, a Certified
12

     Shorthand Reporter, pursuant to the Federal Rules of
13

     Civil Procedure for the United States District
14

     Courts, pertaining to the taking of depositions,
15

     commencing at 10:00 o'clock a.m. on the 15th day of
16

     December, A.D., 2022.
17

18

19

20

21

22

23

24

Page 12

1    package at all?

2         A.    No, it does not.

3         Q.    Okay.  When you were last at Honeywell,

4    what was your position?

5         A.    Manager of concepting and estimating.

6         Q.    Manger of --

7         A.    Manager of concepting and estimating.

8         Q.    I'm having a hard time hearing.  I'm

9    sorry.

10        A.    I was -- I was called a manager of

11   concepting and estimating.

12        Q.    Concepting?

13        A.    Concepting and estimating.  Let me try

14   changing to a different mic.

15        Q.    Without getting too deep into the weeds,

16   what did that job consist of?

17        A.    I have changed microphones.  Let's see if

18   that helps any.

19              You know, I had a group of people.  We

20   were in charge of putting together all the designs

21   for our regions, and also all the costs to designs

22   and then creating the proposals for our customers.

23        Q.    How big was the group of people whom you

24   supervised?

1        A.    Well, it varied.  When I got laid off, at

2    that moment in time I had, I think, six at that

3    moment.

4        Q.    I'm going to focus on 2021 because that's

5    the year that's relevant for this lawsuit.  Back in

6    2021 at least in the early part of that year, was

7    Chuck Vavra one of the people in your group?

8        A.    Yes.  I took over that group at the

9    beginning of February of 2021 and Chuck -- Chuck had

10   been in charge of that group before I took over.

11   Then he was working for me at that point.

12       Q.    My understanding is that -- Correct me if

13   I'm wrong, if you can -- that Chuck had actually

14   asked for a non-managerial position with the group.

15            Is that --

16       A.    That's correct.

17       Q.    Okay.  Do you know why he did that?

18       A.    I mean just talking to him, he just got

19   tired of being a manager, and he wanted to get out of

20   the management role.  He had actually talked to me

21   about that over a year before that.  That's something

22   he had just been thinking about getting out of, and

23   wondering if I would take over for him, so ...

24       Q.    Did he say why he wanted to get out of the

1    management role other than he was just tired of it?

2         A.    I know he -- He got tired with some of the

3    paperwork and dealing with the management aspects.  I

4    don't remember in details what he said though.

5         Q.    My understanding is that at the time he

6    was let go he was -- his title was principal

7    application engineer.

8              Does that sound right?

9         A.    Sounds correct.  I don't have access to

10   any of that information.  That's -- From memory that

11   sounds about right.

12        Q.    And the only thing I'm going to ask you to

13   testify about today is what you remember obviously.

14   If you don't remember, please feel free to say so.

15             When he moved from management to principal

16   application engineer, was that a lateral move, a move

17   up, move down, do you know?

18        A.    I think -- I mean -- I don't know how it

19   was viewed in the company.  I think we maintained his

20   salary at that point.  So we tried -- We were trying

21   to make it a seamless transition for him.  Again, I

22   don't remember -- I don't know if you looked in the

23   chart what it would actually be considered as far as

24   lateral or ...

1      Q.    I'm going to ask that -- I don't mean to

2   put words in your mouth.

3            Is it fair to say that he moved from a

4   management job to more of a subject matter or

5   substantive job?

6      A.    That's correct.

7      Q.    All right.  Mr. Cortez, I've looked at the

8   employment records in this case, and it is my

9   impression that Mr. Vavra had a very good record at

10  Intelligrated and later with Honeywell in terms of

11  his performance.

12           Do you have an opinion about that?

13     A.    His performance was perfectly fine.  He

14  did very well in his performance.

15     Q.    Okay.  The Honeywell attorneys in this

16  case have indicated that he was fired in part for

17  refusing to take this training that we're going to be

18  talking about, but also for insubordination.  Now you

19  were at least around the decision to let him go, as I

20  understand it.

21           Assuming that what I just told you is

22  true, was he insubordinate, as a general rule?

23     A.    I am not aware that that was an issue.  My

24  understanding was it was purely because of his not

1    complying with doing the training.  You could

2    consider him insubordinate because he didn't comply

3    with the training that he was told to take, if you

4    view it that way.  But that's not -- I can't say from

5    my understanding that -- And I was not part of the

6    choice of laying him off -- I mean, having him

7    terminated or not.  It was -- That was something that

8    was told that was done.  And I was just part of the

9    process of relaying -- you know, informing him of

10   that situation.

11        Q.    I have two follow ups to what you just

12   said.  You said it was my understanding.

13             How did you come about that understanding?

14        A.    I was informed the day before he was let

15   off -- fired that he was -- we were going to have a

16   meeting the next day, I was to set the meeting up

17   with HR and myself, and we were going to terminate

18   him.

19        Q.    Okay.

20        A.    And I was told that that was because of

21   the not completing the training -- refusing to take

22   the training.

23        Q.    Okay.  And I'm not trying to pick and nit

24   here.  But you said I was informed and I was told.

Page 18

1      Who is the HR person who you referred to

2  who may have informed you?

3      A.    I don't have that person --

4      Q.    Katie Becker?  Does that ring a bell?

5      A.    Katie was one of the HR people I worked

6  with.  It may have been Katie.  I don't remember

7  which person was the one I was working with on this

8  particular issue.

9      Q.    Okay.  Well, you said -- The second thing

10  I wanted to ask you about.  You said you were asked

11  to set up a meeting at which point Chuck would be

12  terminated.

13      Did you set up that meeting?

14      A.    Yeah -- Yes, to my memory, I set up a

15  meeting.  I may have already had a standing meeting

16  in place and we just changed over to do this work.

17  They just wanted -- We needed to have a -- I was told

18  to create a one-on-one meeting and then add HR on to

19  it so that they could be part of the call.

20      Q.    When you say set up a meeting, are you

21  talking about setting up something in Teams or Zoom

22  or something like that?

23      A.    We were all virtual at that point.  So,

24  yeah, it was probably in Teams.

1    Q.    My understanding from previous testimony

2  is that you were not actually in the meeting when

3  Chuck was terminated, am I right?

4    A.    No, I was there.  I mean, I was part of

5  the meeting when he was terminated.  I mean, I --

6  That's my memory at least to me.  Unless I'm

7  forgetting something.  But I believe I -- You know,

8  because I remember before the meeting starting

9  talking to Chuck and saying, Chuck, are you sure you

10  won't take that training.  I was still hoping he

11  would take the training at that point so we could not

12  go through with the process.  He said, no.  I said

13  okay, well, HR is going to be joining us in a second,

14  Chuck, and I believe I read a script telling him that

15  he was being terminated, and then HR took over at

16  that point.

17    Q.    So it was you and HR.

18         Anybody else on that meeting?

19    A.    I don't believe so.  I mean I -- For any

20  of these calls, what Honeywell ever does -- that's

21  how they normally do it, and that's -- It's a fairly

22  standardized process.

23    Q.    There's been a suggestion that Chris

24  Maines was on that call.

Page 20

1    A.    Oh, Chris wouldn't have been involved in

2    that.

3    Q.    Okay.  Fair enough.

4    A.    I know that multiple parties had

5    conversations with Chuck over the period of time

6    prior to that happening to try to convince him to do

7    the training.  But, no Chris was not involved in

8    that, the actual termination.

9    Q.    All right.  Let's work backwards then from

10   what you just testified about.  You said you read a

11   script.

12         Who provided that script?

13   A.    HR provided the script.

14   Q.    Do you recall what the script says?

15   A.    No, I don't recall.  Again I'm just -- I

16   know it was a standard script they usually gave us

17   for those situations.  You know, you would just read

18   down what was going on there, and turn it over to HR

19   to finish up the conversation.

20   Q.    Do you remember generally what was in that

21   script?

22   A.    Just -- I mean, not -- I don't remember

23   details.  I mean, it would have been -- I mean, I

24   know it was considered a -- I believe it was

Page 21

1  considered a voluntary -- a voluntary separation

2  where he was choosing to quit type of situation.  It

3  wasn't a -- Because I -- I know, I completed the

4  training.  I think that's how they were wording it.

5  But I don't remember the details beyond that.

6       Q.   I drafted a few of those in my day.  I'm

7  sure they said it was voluntary.

8            You said that -- Again working backwards.

9  You said that you spoke to Chuck before the meeting

10 and asked him if he really wanted to go through with

11 this, and he told you no.

12           And picking up at that point, did he tell

13 you why?

14      A.   I asked him are you sure you don't want to

15 do the training?  He said he did not want to do the

16 training, yes.

17      Q.   Did he tell you why?

18      A.   He took offense to the training.  I -- He

19 and I talked about this previously, and I never -- He

20 had -- He was -- He just was adamant.  He said to me,

21 you know, he didn't want to take the training.  I did

22 not understand personally why he did not want to take

23 it, but I understood that he had set in his mind that

24 he was not going to do it.

1      Q.    You know, for purposes of my questions,

2  Mr. Cortez, I understand you didn't -- that you did

3  not understand his reasons.

4            But he did tell you his reasons; is that

5  right?

6      A.    I mean, we didn't get in-depth

7  conversations on that.  Because, again, I -- I asked

8  Chuck -- You know -- And Chuck would tell you, you

9  know -- And he appreciated that I didn't -- I wasn't

10 going to push him hard on the thing.  It wasn't my

11 place to -- You know, it's not my place to try to

12 convince him to do things.  I mean, I just -- I told

13 him I wanted him to understand there were going to be

14 consequences, and I didn't want -- I wanted him to

15 take the training.  But he -- He told me he didn't

16 like the company -- he didn't like what the company

17 was saying -- about some of the company's statements,

18 and he didn't like the training that they were

19 requiring -- He didn't think it was appropriate for

20 the company to be requiring it.  I said okay.

21     Q.    Did he -- Did he tell you which statements

22 he did not like?

23     A.    I mean, I think he -- I don't like to put

24 words in his mouth.  Again, I can only tell you my

Page 24

1  memory.  My understanding is he just felt like the

2  company was taking -- you know, pushing in political

3  correctness issues, and he just didn't like that, and

4  he didn't think the company had a right to do that.

5  I -- This particular training, in my mind, was not

6  that crazy of a training.  I took it.  It was a

7  relatively simple training, and I explained to him

8  what the training was.  I actually thought it was,

9  you know, honestly relatively non -- non-crazy.  I

10  didn't think there was anything weird about it.  So

11  I just said we -- I didn't understand why that was an

12  issue for him.  But, again, it was his choice.  I

13  respected his choice.  I'm not going to argue with

14  him and try to change his mind.

15      Q.    And let me -- Let me be clear.

16            I understand that you did not object to

17  the training.  I understand that you do not

18  understand his reasons for the objection.  That's all

19  fine.

20            But it's true, isn't it, that he told you

21  that he thought there were racist elements to the

22  training?

23      A.    I told him there wasn't.  I described it

24  to him.  I said, you know, the training I went

1   through, I didn't see it being anything racist about

2   it.  I mean, it was training that talked about

3   unconscious bias.  And one of the examples in the

4   training was an example where a while male was being

5   biased against because they had assumed that the

6   woman would be more apt to be able to figure

7   something out.  So to me that's pretty balanced

8   training about unconscious bias in general.  So I --

9   That's why -- I kind of told him I don't see the

10  concern.  But he had that concern.

11      Q.    He did have a concern that there was a

12  racial aspect to the training?

13      A.    I don't know if it was racial or political

14  correctness.  I don't remember him saying racist.  I

15  don't think -- I don't remember hearing him say -- he

16  said it was racist.  I think he thought it was

17  political correctness.

18      Q.    Well --

19      A.    But, again, I don't -- That's my memory.

20      Q.    Hang on.

21          I asked you if he brought up the idea of

22  racism in the training, and you said I didn't believe

23  it was that, and you explained why you thought it was

24  good training.  Hang on.  I'm going to ask a

Page 26

1     question.

2           Did he raise -- And this is a yes or no,

3     sir.

4           Did he raise the topic of race or

5     racialism as part of the training as one of the

6     reasons he did not want to take the training?

7     A.    I do not recall him doing that.  He may

8     have, but I do not recall it.

9     Q.    Okay.  Would there be any documents that

10    would refresh your memory?

11    A.    I mean, he had an e-mail which he sent out

12    to everyone -- to multiple people with his concerns.

13    So that would be the one document I could think of

14    that would be documenting what his concerns were.

15    Q.    And --

16    A.    I assume you have it because it went to

17    multiple people he sent it off to.  But I don't

18    remember what that e-mail said exactly.

19    Q.    I do have it, and we can take a look at it

20    here in a second.

21          Fair to say though, as a general matter,

22    once you saw that e-mail that he sent off to a number

23    of people, you did realize what his objections were,

24    at least in his mind?

Page 27

1      A.     In his mind.  I mean, again -- I mean, he

2   sent out -- He sent out that letter -- He sent out

3   that document without talking to me about it before

4   sending it out.  But, yes, he -- I mean, once I saw

5   it, I could see -- I mean, yeah, I saw his concerns.

6      Q.     Let's take a quick look at some of these

7   documents we're talking about.  This is already in

8   evidence in the case.  It was an exhibit to Chuck's

9   deposition from yesterday.  It's Exhibit No. 7.  I'm

10  not going to introduce it here unless a reason comes

11  up that we should.  But it appears to be an e-mail

12  chain, which includes you, from March 2nd of 2021.

13          Does that look about, right?

14     A.     Yeah.  It looks like how I would have

15  written something, yes.

16     Q.     So this is a good month or more before he

17  was actually let go, correct, if you -- if you

18  recall?

19     A.     I don't have his -- I don't remember when

20  he got let go.  I don't remember the actual dates.

21  So if you say it's a month, I'll agree with you.  I

22  know we were talking to him for quite a while about

23  the issue.  So I don't remember what the total time

24  was.

1      Q.    And we were talking to him means you and

2  who else?

3      A.    Well, I -- Again, I know when he -- You

4  know, it was a lot -- a number of different people

5  contacted Chuck to ask him to do the training.  I

6  know I did.  I know my boss did.  I know my boss'

7  boss did.  I believe Chris Maines did.  He was -- I

8  believe other people may have also -- I'm not -- I'm

9  not sure if everyone did.  My memory is at least

10  those people did because, again, this was something

11  that was an initiative, and I was -- everyone was

12  pushing to try to get him to do the training.

13      Q.    You start off assuming that this is a

14  correct copy of an e-mail that you sent e-mailing him

15  saying, Chuck, I know you are not a fan of this

16  training module.

17            Do you see that?

18      A.    Yep.  Yep.

19      Q.    Okay.  So as of March 2nd he had already

20  told you he didn't want to do this, correct?

21      A.    Yep, he told me pretty early on he didn't

22  want to do it.

23      Q.    And your testimony is you don't remember

24  his reasons for not wanting to do it other than the

Page 29

1    fact that you disagreed with his reasons?

2        A.    My testimony is that I don't remember the

3    details of his reasons.  And I didn't understand his

4    reasons.  I didn't -- I'm not saying I disagreed with

5    him.  I just didn't understand them.  So --

6        Q.    Okay.  Well, that's fine.

7        A.    It was his word -- Again, he had reasons.

8    I'm not saying they were right or wrong.  I mean,

9    it's for his personal reasons he had them.  But I

10   personally did not understand them.

11       Q.    As of March 2nd of 2021, if you can answer

12   this question, it's your opinion that he was telling

13   you his sincerely-held belief, correct?

14       A.    I do believe he was, yes.

15       Q.    And I understand you disagreed with it,

16   but he believed it, right?

17       A.    Oh, yeah, I mean, he firmly believed it.

18   I had no doubt he had -- he was very strongly

19   believing what he felt -- believed.

20       Q.    The second part of this e-mail chain on

21   Exhibit No. 7 is from Inclusion and Diversity to you,

22   and that makes people's ears perk up usually when you

23   get that e-mail, I assume.

24             First, the large paragraph, last sentence,

Page 30

1    it says, please ensure they complete this training as

2    soon as possible as the latest could result in

3    escalation to your manager and senior leadership, and

4    then there's an asterisk and a little bit of

5    lawyered-up disclaimer below that.

6              Did I read that correctly?

7        A.    Yeah, that looks correct.

8        Q.    Were you being pressured at this point

9    under penalty of your own discipline to make sure

10   everybody did the training?

11       A.    I wasn't being pressured from a discipline

12   perspective.  I was being pressured to get it done,

13   yes.  But no one ever threatened discipline on me for

14   not getting it done.

15       Q.    Escalation is one of these nice new

16   management terms.  That means, doesn't it, in your

17   experience, that your manager or senior leadership is

18   going to take this up with you if you don't get all

19   of your people to do the training?

20       A.    Oh, yeah, I know -- I mean, I expect it to

21   be -- you know, that I would be asked by my managers

22   and stuff.  But, you know, it was just -- I didn't

23   think I was being -- Again, I was being told to get

24   it done, and asked to get it done, you know, but I

                                                      Page 31

1    wasn't worried that this would mean something to my

2    employment or issues like that.

3         Q.    Sure.  I wasn't -- I wasn't hinting

4    anything to the contrary.

5              I assume that you passed on Chuck's good

6    faith but mistaken objections to the training to the

7    people in your chain of command.

8              Am I correct in saying that?

9         A.    I did pass it up to my boss.  And I passed

10   it up to -- I believe I talked to my boss' boss also.

11   I don't -- I believe I talked to both on this, I

12   guess.

13        Q.    Your boss and your boss' boss.

14             Just so we have some names, who are those

15   people?

16        A.    So my boss would have been Brian Swinkola,

17   and his boss was Justin -- Justin Leib.

18        Q.    Okay.

19        A.    I believe they were both communicated on

20   this.  I know I talked to my boss about it.  I

21   believe I talked to my boss' boss too, but --

22        Q.    And you told at least your boss and

23   possibly your boss' boss that Chuck Vavra thought the

24   training itself was racist?

Page 32

1      A.    I -- Now, I do not know if I -- I don't
2   remember him telling me he thought it was racist.  I
3   know he told me he was not gonna do it, okay.
4      Q.    Okay.
5      A.    I don't -- I do not remember him saying
6   the word racist.  But I may be -- He may have very
7   well said that.  I'm not saying he didn't.
8      Q.    You don't remember one way --
9      A.    That's not the recollection I have.
10      Q.    You don't remember one way or the other?
11      A.    I don't remember.  I mean -- And he and I
12   did not -- Honestly, I did not -- You know, when -- I
13   was not pushing Chuck hard to do this.  I told him if
14   you -- You know, like you need to do it, I understand
15   you don't want to do it, you need to -- I wasn't
16   going to push beyond that.
17      Q.    Okay.
18      A.    I was only pushing -- So I wasn't trying
19   to -- I wasn't trying to convince him.  I was just
20   telling him he need to do it, you know.  I only told
21   him he needed to do it.  I didn't want to lose him as
22   an employee.
23      Q.    And this is going to seem again like it's
24   being nitpicky.  I apologize if that's the case.

Page 33

1     A.     Okay.

2     Q.     Although you don't remember exactly what

3  he told you about his objections, you do remember

4  very clearly that you disagreed with his objections?

5     A.     I remember very clearly that I didn't

6  understand his objections.  I -- But, again,

7  disagree -- You can call it a disagreement.  I didn't

8  understand -- I couldn't -- You know, again, it's his

9  choice and his -- I'm not there to tell him what he

10 believes or disbelieves.  That's his choices in the

11 world.

12    Q.     Sure.  And we'll go with not understand.

13 I didn't mean to lead you down that path.

14           This e-mail from you to Chuck is time

15 stamped 7:51 a.m., correct, right here?

16    A.     That's what it looks like.

17    Q.     Okay.  And by 10:11 that morning you're

18 e-mailing him again indicating that there's

19 additional pressure coming on to get the training

20 completed, correct?

21    A.     That's correct.  I can see from the look

22 on the e-mail chain it definitely looks that way,

23 yep.  Justin Leib who is my boss' boss.

24    Q.     And he's the gentleman you just referred

Page 34

1    to a moment ago; is that right?

2        A.    Yes.

3        Q.    Okay.  Going down in the e-mail chain

4    here, at the bottom --

5        A.    It looks like it.  Yeah, it probably was

6    Brian.  Okay.

7        Q.    I'm sorry?

8        A.    I was just trying to see if Brian Swinkola

9    was on this because again -- Todd Bryant had been my

10   manager prior to Brian Swinkola taking over as my

11   manager.  I just couldn't remember when that

12   happened.  But it looks like Brian was on this one.

13   So I'm assuming he was at this point my manager.

14       Q.    Mr. Swinkola is on here as a cc?

15       A.    Yeah.  So he was a cc.

16       Q.    Mr. Leib sent it to you and six other

17   people.  So it looks like this was getting a lot of

18   attention from senior management.

19             Would you agree?

20       A.    Yeah.  I mean, when any -- any of these

21   type of things come out, you know, they have a

22   tendency to get escalated pretty fast.  They were

23   very good at follow ups.

24       Q.    And at the bottom there's another --

Page 35

1    there's another link in the e-mail chain.  It's

2    something from John Dillon.

3              Who is that?

4         A.    John Dillon was -- At that point I think

5    he was in charge of our Intelligrated division, I

6    believe, at that point.  He may have just been part

7    of the division.  But yeah.  He would have been

8    Justin's boss, I believe.

9         Q.    So the word is coming from on high on this

10   topic, would you agree?

11        A.    Oh, yeah.

12        Q.    All right  This is Exhibit 8 to the Vavra

13   deposition.  And, again, I'm not going to mark it.

14   I'm going to move on to Exhibit No. 9.  Thirteen

15   minutes later it looks like your boss, Brian, is

16   writing to Chuck, copying you, saying get it done.

17        A.    Yes.

18        Q.    Is this something you remember getting?

19        A.    I do -- That looks very familiar, yes.

20        Q.    Okay.  And I'm going to ask this one more

21   time.  Tell me to jump in the lake, if you'd like.

22              You're under a lot of pressure here to get

23   this done, aren't you?

24        A.    Yeah, it was -- A lot of people were

Page 37

1    BY MR. BECK:

2         Q.    Now, we just looked at the first two pages

3    here.  Let me ask you about those first two.

4              Does this seem like what you saw back

5    around the --

6         A.    Yeah, it does look familiar.  I will not

7    claim I studied it.  I mean, I saw this e-mail from

8    him.  I was -- I read it.  I glanced over it.  I --

9    You know, no, it wasn't -- I did not dig deep into

10   it.  But, yes, I did glance over it.

11        Q.    Did you read the entire document?

12        A.    I believe I glanced at it.  I don't know

13   if I went through it in-depth.

14        Q.    Did you read these first two pages?

15        A.    I know I read the first page.  Beyond that

16   first page, I know I probably glanced at the rest,

17   but I don't -- I don't believe I read everything he

18   sent honestly.  I glanced through it.  I know I

19   glanced through it.  But beyond that, I can't say I

20   read it.

21        Q.    Do you recall that Chuck defined a term

22   called race-baiting early in his e-mail?

23        A.    Well, I can see it in his e-mail right

24   now.  I didn't recall that from before.  But now I'm

Page 38

1    seeing the e-mail, I can see it.

2        Q.    Did you recall -- Or do you recall that he

3    included a definition of a term called

4    discrimination?

5        A.    I didn't -- Again, I don't -- I did not

6    recall the details of this e-mail until you're

7    showing it to me right now, so --

8        Q.    I'm asking --

9        A.    The first paragraph I remember pretty

10   well.  I mean, I remember going on about that stuff.

11   The rest of this stuff, again, I believe I just

12   scanned it.  I don't think I -- It did not register

13   that deeply in my mind, at least memory-wise.

14       Q.    Let me ask you an easy one then.

15           Based on your experience as a manager at

16   Honeywell, what are you supposed to do if an employee

17   complains about discrimination in the workplace?

18       A.    I believe we're supposed to refer it to

19   HR.  I think there was -- There's a -- I think there

20   was like -- You know, I would have referred it to HR,

21   and I believe there was something else that there was

22   for discrimination.  There might have been another

23   group I referred to outside of HR.  But, you know,

24   that's -- If he had come to me directly about a

1     A.    It's a shame.  I hate to see a big e-mail

2   like that, him all upset about it.  I hated to see

3   that.  I mean, I -- You know, I didn't understand why

4   it had to be his concerns.  I hated to see it, that

5   he felt that way.  I mean, it's just awful that he

6   feels -- that he felt all that way.  I'm like -- So I

7   was like, oh, gosh, I wish he -- I wish he didn't

8   feel that way.  So, again, I can't change what he

9   feels.  But, again, I just wish he hadn't.

10    Q.    Okay.

11    A.    I don't want anybody to feel that way.

12    Q.    This e-mail is and the fact that he

13  declined to do the training were the reasons he got

14  fired, right, as far as you know?

15    A.    I don't know if this e-mail had anything

16  to do with his not getting -- being fired.  I was not

17  told that.  What I was told was the reason he got

18  terminated was because we wouldn't do the training.

19  Nothing was said about this e-mail, to me at least.

20    Q.    Nothing was said as a voice.

21          Who said that?

22    A.    I said I had no conversations about this

23  e-mail with anyone else.  And when we were -- When I

24  was told about the termination, this e-mail was not

Page 42

1    brought -- nothing was stated about this e-mail.  The

2    only thing we talked about was the fact that he

3    hadn't done the training.  That's the only thing we

4    talked about.

5        Q.    Well, you did talk about this e-mail with

6    Brian?

7        A.    Again, it was just -- That was, as you

8    said, over a month before the actual termination

9    happened.  I'm saying that was not anything having to

10   do with the termination piece at that point.  It was

11   just a conversation between me and my boss just

12   saying I hate to see this big e-mail, hate to see

13   this, hate he felt that way.

14       Q.    Mr. Cortez, I'm not trying to cut this too

15   fine.  But when you got this e-mail on or about the

16   9th of March of last year, you understood that this

17   was his reason for not wanting to take the training,

18   right?

19       A.    I understood that he -- This was his

20   reasoning, yes.

21       Q.    And, in fact, you had asked him to send a

22   explanation for his refusal to take the training

23   previously, correct?

24       A.    I may have.  I don't -- I don't remember

Page 50

1   clearer.

2       MR. BECK:  It does I'm -- going to -- I'm going

3   to let it go for now.  But if we get into the

4   representation issue, we're going to have to take it

5   up with the magistrate.  Go ahead.

6       MR. SEDAEI:  All right.

7                      EXAMINATION

8   BY MR. SEDAEI:

9       Q.    Well, Mr. Cortez, what do you remember

10  specifically -- Let me first ask you.

11            You said that you underwent the training,

12  correct?

13      A.    Yes.

14      Q.    What do you remember specifically about

15  the training?

16      A.    It was relatively short.  I mean, it was

17  like 20, 30 minutes.  It wasn't -- It's wasn't a long

18  one.  It was a virtual -- The training was a

19  computerized training.  You just -- You know, you did

20  it, presented little videos that you watched, and

21  they weren't videos of, I don't think, live people.

22  I think it was just videos of, you know, graphical

23  people.  But it was little -- There was like -- I

24  think it was like three or four different scenarios

Page 51

1   and each scenario you then had to -- They talked

2   about, you know, what the bias was going on there.

3   Then there was a quiz at the end, I believe.

4       Q.   Were you asked to sign anything saying you

5   agreed with the contents of the training afterwards?

6       A.   I don't -- I don't remember what we -- I

7   think I just took a test.  I think it was just taking

8   a test and completing the test.  As long as you

9   passed the test that was the thing.  I don't believe

10  there was another statement beyond that I had to

11  sign.

12      Q.   Do you know if anyone else other than

13  Mr. Vavra refused to take the training?

14      A.   I was not aware of anyone else.  Of

15  course, I -- No one would have shared with me beyond

16  the people that worked for me.  But I was not aware

17  of anyone.

18      Q.   To your knowledge, Mr. Vavra didn't

19  actually take the training, correct?

20      A.   That's what -- He told me he never took

21  it.  And the system never showed him completing it.

22  So ...

23      Q.   So to your knowledge, he never actually

24  watched the video of the training?

1      A.     I don't know that.  I can't say that for
2   an absolute fact because I don't recall if the system
3   recorded him seeing it.  But my memory is he said he
4   hadn't done it.
5      Q.     Okay.  But you did do the training.
6             Did you find the training offensive in any
7   way?
8      A.     No.
9      MR. BECK:  Object as --
10  BY THE WITNESS:
11     A.     I mean, it was --
12     MR. BECK:  Hang on.
13            I'll object as leading.
14            Please go ahead.
15     MR. SEDAEI:  Go ahead and answer.
16  BY THE WITNESS:
17     A.     All right.  I personally found no -- had
18  no concerns with it.  I mean, the scenarios I kind of
19  mentioned earlier kind of ranged across different
20  categories, and I thought it was relatively
21  innocuous.  I didn't see much issues with it.
22  BY MR. SEDAEI:
23     Q.     Did you find the training racist?
24     A.     No.