# EXHIBIT G

**(EXCERPTS OF DEPOSITION OF KATIE BECKER)**

## TO

## February 17, 2023
## Defendant's Local Rule 56.1 Statement

**RE:** Charles Vavra v. Honeywell International Inc., et al.
Case No. 1:21-cv-06847

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4  _____
 5  CHARLES VAVRA,
 6         Plaintiff,
 7     v.                                Case No.
 8  HONEYWELL INTELLIGRATED, INC.,       1:21-cv-06847
 9  a Delaware corporation,
10         Defendant.
11  _____
12             VIDEOCONFERENCE DEPOSITION OF
13                     KATIE BECKER
14  DATE:         Wednesday, December 28, 2022
15  TIME:         11:04 a.m.
16  LOCATION:     Remote Proceeding
17                Cleveland, OH 44114
18  REPORTED BY:  Carlos Toro Torres, Notary Public
19  JOB NO.:      5614856
20
21  PAGE 36 IS CONFIDENTIAL
22
23
24
25
```

Page 8

1      A    No.
2      Q    Do you have a confidentiality agreement with
3  Honeywell?
4      A    The standard intellectual property
5  agreement.
6      Q    Okay.  So there is nothing prohibiting you
7  from answering truthfully any questions I may ask as
8  long as I don't ask about intellectual property, I
9  guess; right?
10     A    Correct.
11     Q    Well, I'm not going to do that; I promise.
12 What was your position when you were with Honeywell?
13     A    HR director.
14     Q    You know, in a big organization like that,
15 an HR director can be different things.  I'm aware, of
16 course, of what a director-level position is.
17          But could you tell me just briefly what your
18 duties entailed as an HR director?
19     A    In my last position as HR director, I was
20 supporting the Intelligrated business at Honeywell.
21 It was -- so employee life cycle there once we
22 onboarded them through any terminations for the
23 Intelligrated business.
24     Q    I've never been comfortable with the term
25 "life cycle" for an employee.  But I think I

Page 9

1  understand what you're saying.
2      You're testifying today from Indiana; is
3  that right?
4      A   Ohio.
5      Q   Ohio, excuse me.  Were you located in Ohio
6  during the time that you were assigned to
7  Intelligrated?
8      A   Yes.
9      Q   Okay.  Has that been true throughout?  In
10 other words, let's say from 2019 until the present.
11     A   Yes.
12     Q   Okay.  I don't know a great deal, as you
13 might guess, about the Intelligrated division, but my
14 understanding is that it's primarily located in
15 Illinois.
16         Am I incorrect in saying that?
17     A   That's incorrect.  Our headquarters for
18 Intelligrated was in Mason, Ohio, and there were
19 regional offices, one of them being in Illinois.
20     Q   Thank you.  Okay.  I stand corrected.  Were
21 you actually assigned to the, for lack of a better
22 word, headquarters then?
23     A   Yes.
24     Q   All right.  But you were responsible for
25 Intelligrated employees at all the locations.

Page 10

1     A    Correct.
2     Q    How many employees was that at the time that
3 you left?
4     A    I think it was around 4,000 employees in the
5 Intelligrated business.
6     Q    Okay. Was there more than one director for
7 the Intelligrated division?
8     A    Yes, there were other HR generalists and
9 managers that supported the Intelligrated business as
10 well.
11     Q    My question was: Was there more than one
12 director-level position?
13     A    I -- there -- I honestly don't remember if
14 there was another HR director supporting Intelligrated
15 specifically; there could've been.
16     Q    It's not a huge issue. I'm curious because
17 4,000 is a lot of people for one director to
18 supervisor.
19     A    No, there were other HR professionals. I
20 don't know about director level. There were managers,
21 generalists.
22     Q    My understanding is there was also at least
23 one person at a VP level assigned to human resources.
24     A    Yes.
25     Q    Who was -- I'm sorry. We're talking over

Page 13

1  Who was calling the shots? It was probably
2  more than one person, I guess. But can you explain
3  that a little bit?
4  A   Lindsay Johnson was the HR VP for
5  Intelligrated at the time that I left.
6  Q   Okay. As you are undoubtedly aware, part of
7  the -- well, not part, the major issue in the case
8  brought by Chuck Vavra, my client, involved in
9  Honeywell's unconscious bias training.
10          Now, I am assuming subject to you telling me
11 I'm wrong, but I am assuming that this unconscious
12 bias training originated in a different department
13 other than the Intelligrated HR department.
14          Am I correct in saying that?
15 A   Correct, it was all of Honeywell.
16 Q   Okay. Was there a particular division or
17 department other than human resources that originated
18 this unconscious bias training?
19 A   I don't know who originated the unconscious
20 bias training.
21 Q   Okay. Is there a department or division
22 specifically devoted to diversity, equity, and
23 inclusion at Honeywell?
24 A   Yes, I believe they have a diversity,
25 equity, and inclusion function.

Page 15

1  implementation and completion of this unconscious bias
2  training?
3      A    I'm not sure I understand the question.
4      Q    Okay.  Did you have to tell somebody -- I'll
5  just put it in more concrete terms.  Did you have to
6  tell somebody above you on the org chart that you had
7  gotten all of your employees trained under unconscious
8  bias training protocols?
9      A    Employees that reported directly to me or
10 employees that we supported as HR individuals?
11     Q    Yeah, the employees whom you supported.
12     A    Yes, we had to ensure compliance with the
13 teammates that we supported as HR -- and report that
14 up.
15     Q    All right.  And my question is, to whom did
16 you report it up?
17     A    I don't remember at the time specifically
18 who we were reporting that information up to.
19     Q    Do you remember generally?
20     A    I don't remember generally either.
21     Q    Do you remember which department the person
22 was or persons were to whom you were reporting this up
23 as you said?
24     A    I was likely communicating within the HR
25 department.

Page 18

1  early 2021?
2      A    My role wasn't in implementing it.
3      Q    Did you have any role with respect to
4  unconscious bias training?
5      A    The HR team helped to ensure that teammates
6  completed the mandatory training.
7      Q    Since you referred to it as "mandatory
8  training," what was the consequence of not taking the
9  training?
10     A    Termination.
11     Q    Okay.  So this was a take-it-or-else.
12     A    Correct, you were required to take this
13 training for Honeywell.
14     Q    Okay.  Now, as an HR person at Honeywell,
15 you're obviously -- or you were obviously familiar
16 with the EEO policies of the company; correct?
17     A    Correct.
18     Q    And I'm going to assume that Honeywell has
19 the standard, very long EEO statements which describe
20 protected classifications and conduct which will not
21 be tolerated, et cetera.  Am I correct in saying that?
22     A    Correct.
23     Q    Okay.  And anti-retaliation's a standard
24 provision in those EEO statements; is that right?
25     A    Typically, I don't remember Honeywell's

Page 26

1    Q    Okay.  Let me ask you about my client, Chuck
2  Vavra.  You're familiar with Chuck; is that right?
3    A    Yes.
4    Q    Did you know him personally?
5    A    No.
6    Q    Okay.  Did you ever meet him?
7    A    I don't think so unless he would've come to
8  Mason, but I don't remember meeting him.
9    Q    Okay.  And when I say "meet" these days, I'm
10 not sure what people mean.  Did you ever Zoom with
11 him?
12   A    I don't remember if I ever had a virtual
13 meeting with him either.
14   Q    All right.  Let's work backwards if we can.
15 You were present at the meeting during which he was
16 terminated; is that right?
17   A    Correct.
18   Q    That was by Zoom, as I understand it.
19   A    It was -- we use Teams at Honeywell, but
20 yes.
21   Q    Oh, I'm sorry, Teams.
22   A    -- virtual, yes.
23   Q    Virtual-ed it, with that in mind, does that
24 change your previous answer about whether you ever
25 face-to-face with him online?

Page 27

1    A    Aside from the termination, yeah.
2    Q    Okay.  Were you actually using video during
3    that meeting?
4    A    I don't remember if we used video.
5    Q    Okay.  Now, I understand that perhaps you
6    did not make the decision to terminate.  Am I correct
7    in saying that?
8    A    Correct.
9    Q    Okay.  You carried it out based on someone
10   else's decision; is that right?
11   A    Correct.
12   Q    And why was he terminated?
13   A    Failure to complete the unconscious bias
14   training.
15   Q    Okay.  Were you aware that he had raised
16   objections to the unconscious bias training?
17   A    Yes.
18   Q    Okay.  And what were those objections as far
19   as you remember?
20   A    I don't remember the objections.  He sent an
21   email detailing those.
22   Q    Do you remember anything about the
23   objections?
24   A    No.
25            MR. BECK:  Okay.  I am going to try to

Veritext Legal Solutions
www.veritext.com                                888-391-3376

Page 33

1    situation, not one specific line.
2        Q    So you can't answer that question.
3        A    No.
4        Q    What would implicate the anti-retaliation
5    provision as you understand it?
6        A    I'm not sure.
7        Q    You just don't know anything about this at
8    all, it sounds like.
9        A    I really don't.
10       Q    Okay.  Who told you to fire Chuck Vavra?
11       A    I don't remember who the final
12   decision-maker was for this.
13       Q    Do you remember anything about who told you
14   to fire Chuck Vavra?
15       A    No.
16       Q    Chuck did ask for the reasons for his
17   termination; correct?
18       A    Is that in this email?
19       Q    No.  But did he ask you for the reasons for
20   his termination?
21       A    I believe he did, yes.
22       Q    And what did you tell him?
23       A    Failure to complete the unconscious bias
24   training was the reason for his termination.
25       Q    You mentioned many times now looking at

Page 39

1  Q   Okay. That's in question. So you were with
2  this organization in one form or another for ten
3  years.
4  A   Correct.
5  Q   Were you in HR the whole time?
6  A   Yes.
7  Q   I'm going to assume that you participated in
8  a lot of terminations during that time. Am I fair in
9  assuming that?
10 A   Yes, a fair amount.
11 Q   Okay. You, honestly, in light of that,
12 don't know what the policy is about people asking why
13 they were let go.
14 A   I don't know what the policy is on it, no.
15 Q   What was the practice?
16 A   It would depend on the termination type.
17 Q   Involuntary terminations.
18 A   Involuntary terminations, there's not
19 something typically sent from what I recall with their
20 termination reason on it.
21 Q   Right. Typically, in that situation, if
22 somebody asks why they were fired, what do you do?
23 A   We would tell them the reason. We did tell
24 Chuck verbally in his termination meeting that he was
25 terminated for failure to take the training.

Page 43

1  ma'am?
2        A    This is a very long email.
3        Q    Sure.  I'm going to summarize it for you
4  just because I think we're dancing around this a bit.
5             He thinks the unconscious bias training is
6  racist in its nature, and he said that to you on
7  several occasions.
8             Now, in light of what I just said, do you
9  now have a recollection of why he was refusing to take
10 this training back in March of 2021?
11       A    Yes.
12       Q    What is that understanding?
13       A    He took issue that this -- that he
14 considered the unconscious bias training to be racist.
15       Q    Okay.  Thank you.  And you communicated that
16 up the flagpole as you said.
17       A    Correct.
18       Q    Okay.  You don't remember to whom you
19 reported that.
20       A    I don't remember.  It would've been someone
21 within HR --
22       Q    Okay.  Did you have any communications with
23 the people over on the -- and I'm going to use this
24 term, and I don't know if it's right but, over on the
25 DE&I side?

Page 45

1  was racist.  Now, having said that, does that refresh
2  your memory about that meeting?
3       A    No, I mean, I don't remember his comments
4  during the termination meeting.
5       Q    If you were firing somebody and they said,
6  "Wait a minute.  I think you're firing me for racist
7  reasons," does that, as an HR professional who's
8  competent, Ms. Becker, does that raise potential
9  issues as far as you're concerned?
10      A    It can.
11      Q    In fact, it almost certainly would.
12 Wouldn't it?
13      A    I mean, in this particular instance, it had
14 already been reviewed by our legal team.  So I didn't
15 have the same concerns, but comments like that would
16 raise concern, yes.
17      Q    Okay.  I'm about done.  Fair to say that
18 Chuck was fired for refusing to take training which he
19 considered to be racist and illegal; right?  Yes, or
20 no?
21      A    It was terminated for failure to take the
22 mandatory training, yes.
23      Q    I'm going to ask the question again, and
24 it's a yes or no question, I believe.  He was fired
25 for refusing to take training that he considered to be

1  racist and illegal.
2      A   Yes, he considered it to be racist.  The
3  reason for his termination was failure to take the
4  mandatory training.
5              MR. BECK:  Thank you.  That's all I
6  have.
7                      EXAMINATION
8  BY MR. SEDAEI:
9      Q   Ms. Becker, I have a couple of follow-up
10 questions, not that many.
11             MR. SEDAEI:  First, and, Alec, I don't
12 know if you want to remove it from the share; I don't
13 need it anymore.  I don't need that at all.
14             MR. BECK:  I certainly would if I knew
15 how, but I don't.
16             MR. SEDAEI:  All right, so.  That's
17 fine.  You can leave it up if you like.  I think there
18 is like an option somewhere to stop sharing, something
19 to that effect.
20             MR. BECK:  I'm sure there's an option
21 somewhere, but go ahead.  And I'll -- with it while
22 you're doing.
23             MR. SEDAEI:  Okay.
24 BY MR. SEDAEI:
25     Q   Ms. Becker, I have just a few questions.

Page 47

1  You mentioned that the unconscious bias training
2  applied to the entire Honeywell.
3         But isn't it true that there were certain
4  countries where there the training was not required?
5      A   Yes, that's correct.
6      Q   Okay.  So did you mean the training was
7  mandatory for all of Honeywell within the United
8  States?
9      A   Yes, yes, my apologies.
10     Q   Okay.  That's fine.  I just wanted to make
11 sure we clarified that.  Mr. Beck asked a few
12 questions about an anti-retaliation policy that was in
13 place.  I just wanted to ask a simple question.
14        You understood at the time that it would not
15 be okay to retaliate against someone for complaining
16 about discrimination; is that right?
17     A   [Unintelligible response.]
18         MR. BECK:  Objection, leading, go
19 ahead.
20 BY MR. SEDAEI:
21     Q   Can an employee refuse to undergo a
22 mandatory training on any topic by simply saying that
23 he or she thought that specific training was racist or
24 discriminatory?
25     A   No.

Page 48

1  Q   So that was not a way for an employee to be
2  relieved of going through mandatory training by
3  complaining about it being racist or discriminatory.
4  A   Correct.  They still need to complete the
5  mandatory training.
6  Q   To your knowledge, did anyone else at
7  Honeywell refuse to undergo the unconscious bias
8  training other than Mr. Vavra?
9  A   I'm not aware of any others.
10 Q   I just want to make sure we clarify
11 something.  Mr. Beck showed an email where Mr. Vavra
12 was asking if there was more information that was
13 going to be sent his way about why he was terminated.
14     And you said that there was no additional
15 information.  At that time, isn't it true that
16 Honeywell had already communicated to him verbally why
17 he was terminated?
18 A   Correct.  We communicated that verbally in
19 the termination meeting.
20 Q   And what was the reason that Honeywell had
21 cited to him as the reason for his termination?
22 A   Failure to complete mandatory training.
23         MR. SEDAEI:  Okay.  I don't have
24 anything else.  Alec, just a quick note, if we can
25 keep the portion of the deposition where Ms. Becker

Page 51

1      CERTIFICATE OF DEPOSITION OFFICER
2           I, CARLOS TORO TORRES, the officer before
3  whom the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in the
16 outcome of this action.

17                                    CARLOS TORO TORRES
18                              Notary Public in and for the
19                                         State of Ohio
20
21 [X] Review of the transcript was requested.
22
23
24
25

Page 52

1                 CERTIFICATE OF TRANSCRIBER

2        I, AMY DAMOTH, do hereby certify that this

3 transcript was prepared from the digital audio

4 recording of the foregoing proceeding, that said

5 transcript is a true and accurate record of the

6 proceedings to the best of my knowledge, skills, and

7 ability; that I am neither counsel for, related to,

8 nor employed by any of the parties to the action in

9 which this was taken; and, further, that I am not a

10 relative or employee of any counsel or attorney

11 employed by the parties hereto, nor financially or

12 otherwise interested in the outcome of this action.

13

14                                         */s/ Amy Damoth*

15                                         AMY DAMOTH