IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CHARLES VAVRA,** **Plaintiff,** v. **HONEYWELL INTELLIGRATED, INC., a Delaware corporation** **Defendant.** | Case. No. 1:21-cv-06847 The Honorable Jorge L. Alonso The Honorable Heather K. McShain |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

This is a case involving an employee who was terminated for objecting to race-based communications and training in the workplace. Plaintiff brought his case based on the Civil Rights Act of 1964, the Illinois Human Rights Act, and Illinois public policy. Defendants have moved for summary judgment. Plaintiff herein responds.[1]

## II.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1] Based on information that was uncovered during discovery, Plaintiff will concede that his public policy wrongful discharge claim will not survive, and will agree to voluntarily dismiss it rather than waste the Court's time and resources.

of law." Fed. R. Civ. P. 56(a). "[T]he court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment." *Janowiak v. City of South Bend*, 750 F.2d 557, 559 (7th Cir. 1984). If "the evidence is such that a reasonable jury could return a verdict" for the nonmovant, then "[a] genuine dispute over a material fact exists" and summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985); *accord White Motor Co. v. United States*, 372 U.S. 253, 259 (1963); *Pfizer, Inc. v. Internat'l Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976)("summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles").

In this case, the Plaintiff's admitted protected activity consisted of complaints about racial training and racial stereotypes. Defendant further admits that it fired the Plaintiff for not engaging in the complained-of training. Therefore, to succeed in its Motion, the Defendant must demonstrate that no reasonable jury could find that its motivation for firing the Plaintiff had anything to do with his complaints about racial discrimination and racial stereotyping. If there is a connection between the Plaintiff's complaints and his termination, summary judgment must be denied.

### III. ARGUMENT

Plaintiff brings his action primarily based on the "opposition clause" of Title VII's retaliation section, which makes it illegal "to discriminate against any individual . . .

2

because he has opposed any practice made an unlawful employment practice by this subchapter. 42 U.S.C. § 2000e(3)(a).[2] "To prevail on a Title VII retaliation claim, the plaintiff must prove that: (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "Evidence must be considered as a whole," not under the former rubric of "direct" and "indirect" evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Here, Defendant admits that Plaintiff engaged in legally-protected activity and that he was fired. Plaintiff will therefore only briefly address the first two prongs, and focus on the obvious nexus between his complaints and his termination.

### A. Plaintiff Engaged in Protected Activity and Suffered an Adverse Employment Action

Plaintiff engaged in a protected activity when he opposed Honeywell's Unconscious Bias Awareness Training, believing in good faith that it was racist and discriminatory.[3] The protection in this area is broad, as the Supreme Court has explained: "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's **opposition** to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)(emphasis in original). Here the Plaintiff complained that

---

[2] As Defendant correctly notes, Illinois Human Rights claims for the most part run parallel with Title VII claims. (Defendant's Memorandum at 14.) Plaintiff will but rely on its Title VII argument to support both Counts.
[3] Defendant admits that "Honeywell did not question whether Vavra made his objections to the Training in 'good faith.'" (Defendant's Memorandum at 7.) Although Defendant does not make the logical connection, this admission obviously means that Defendant received Plaintiff's email and treated it as a ***discrimination complaint***.

3

Defendant had engaged in discrimination in a March 8, 2021 email to his supervisors and Human Resources. In his email he explained that he viewed the "race-baiting" statements of Defendant's CEO John Weldon as illegal and contrary to policy. (SOF ¶ 29.)[4] Plaintiff reiterated his opposition in a March 23, 2021 email to Vice President of Engineering Chris Maines. (SOF ¶ 37.) Plaintiff forwarded this email to Human Resources the following day. (SOF ¶ 38.) In this email, Plaintiff stated that these emails should constitute "an 'official' discrimination claim." (SOF ¶ 38.)[5] The first two prongs of the "opposition clause" are thus satisfied; to avoid summary judgment, the Plaintiff need only demonstrate the likelihood of a causal nexus.

### B. Plaintiff's Termination Is Causally Linked to His Protected Activity

"To demonstrate a 'causal link' between protected activity and an adverse employment action, a plaintiff must show the defendant 'would not have taken the adverse ... action but for [his] protected activity.'" *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Evidence demonstrating this causal link may include "suspicious timing" and a defendant's "departure from established procedures." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). In other words, given the timing of the events, and Honeywell's failure to follow its own policies, did the Plaintiff's email complaints (and subsequent communications) factor into his employment termination?

---

[4] Citations to Defendant's LR 56.1(a)(2) Statement are referred to as "SOF."
[5] Plaintiff's emails complied with Honeywell's Anti-Retaliation Policy, which states that "a good faith report of actual or potential misconduct" made "via one of the methods outlined in 'Asking for Advice and Voicing Concerns'" would not be retaliated against. (SOF ¶ 38).

Defendant terminated Plaintiff on April 7, 2021, fourteen days after his email to Human Resources complaining about allegedly racist practices. Defendant claims that it terminated Plaintiff "for refusing to undergo the Training." (Defendant's Memorandum at 7.) There are three problems with that argument. First, the complaint itself *was about what he considered to be discriminatory statements and training.* (SOF ¶ 13), . To the extent Defendants contest this they raise an issue of fact. Second, the timing of the Plaintiff's termination raises an inference of discrimination. Finally, Defendant failed to follow its own anti-discrimination policies. Each of these facts weighs against summary judgment.

   1. **The Timing of Plaintiff's Termination Supports an Inference of Discriminatory Intent**

Timing of an adverse action can establish illegal motive. To establish an inference of suspicious timing, "the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct.'" *Kidwell,* 679 F.3d at 966. "The closer two events are, the more likely that the first caused the second," but "[d]eciding when the is appropriate cannot be resolved by a legal rule; the answer depends on context." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

If there is more than one way of interpreting suspicious timing, the matter should go to a jury. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). In *Magyar*, the employee complained to her supervisor about two incidents of sexual harassment. *Id*. at 768. About a month later, "having received no follow-up information

5

from [her supervisor] about the resolution of the incident," she renewed her complaint to her employer's legal department while citing her supervisor's "failure to respond." *Id.* at 769. After the legal department followed up with her supervisor, the employee began to experience a series of adverse actions, culminating in her termination, nearly *ten months* after her initial complaint. *Id*. at 769-70.

The court noted three different ways to analyze timing: (1) from the date of the initial discrimination complaint to the date of termination (ten months); (2) from the date of the renewed complaint to the date of termination (thirty-three days); or (3) from the date of the renewed complaint to the date of "the first sign of an adverse employment action" (nine days). *Id*. at 772-73. The court chose "to assume that the suspicious-timing clock" restarted with the renewed complaint and concluded that this timeframe was sufficient to raise an inference of causation. *Id*. at 773. Significantly, the delay between the renewed complaint and the final decision to post the plaintiff's job was not material: "The fact that full execution of the adverse action took a while longer for bureaucratic reasons is immaterial." *Id*.

As in *Magyar*, this Court should apply the Rule 56 standard and should choose the measure of suspicious timing most favorable to the Plaintiff. Plaintiff emailed his first complaint on March 8 and was fired thirty (30) days later on April 7. Plaintiff was "adamant" in this email that he would not take the Training because of his claims of illegal discrimination. (SOF ¶ 29). HR Director Becker acknowledged the email and replied that she "will review and get back to you" (although she never did). (SOF ¶ 29). (Instead, "numerous individuals from various positions of authority within Honeywell" descended

6

upon Plaintiff to "personally remind[]" him to take the training he had already said "I AM NOT taking," and could not take without feeling himself a "sellout to myself, my integrity, my convictions." *Id.* Since there is no evidence that Defendant actually looked into the complaints alleged in either email, the policy cited above was not followed.

However, like the employee in *Magyar* the Plaintiff renewed his complaint on March 23 in an email to Mr. Maines, Vice President of Engineering. (SOF ¶ 37). Plaintiff then forward that email to HR representative Baker the following day. In this email Plaintiff said that both emails should both be considered "'official' discrimination claim[s]." (SOF ¶ 38). From this later email, only fifteen days elapsed until Defendant terminated Plaintiff. This Court should find that Plaintiff was terminated fifteen days after complaining of discrimination.

Even if the Court were to find that thirty days is the correct measure, there is still an inference of causation. In several cases the Seventh Circuit or its District Courts have "found a month short enough to reinforce an inference of retaliation." *Magyar*, 544 F.3d at 772 (citing *Lang v. Ill. Dep't of Children & Family Servs.,* 361 F.3d 416, 419 (7th Cir. 2004). *See also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007)(holding that an adverse action that "followed closely" one month after a discrimination complaint can raise an inference of causation for a jury); *Rowlands v. UPS*, 901 F.3d 792, 802 (7th Cir. 2018) (finding that one-month interval plus evidence of pretext supported inference of causation); *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012)(same); *Brown v. Chi. Transit Auth.*, No. 17 cv 08473, 2020 U.S. Dist. LEXIS 27222, at *35 (N.D. Ill. Feb. 14, 2020) (finding two-month interval was a "temporal nexus [] close

enough to raise an inference of retaliation."); *Patton v. Forest River*, 2020 U.S. Dist. LEXIS 27029, *36 (N.D. Ind. Feb. 18, 2020) (finding one-month interval suspicious timing); *Suarez v. Kwoks Int'l Trading, Inc.*, 2007 U.S. Dist. LEXIS 71304, *39 (N.D. Ill. Sep. 25, 2007)(same); *Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680, 686 n.3 (N.D. Ind. 2012)(forty-six days "is right at the outer boundary of what might be considered suspicious timing").

While suspicious timing alone is ordinarily not enough, *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), "[c]lose temporal proximity provides evidence of causation . . . and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." *Lang*, 361 F.3d at 419. Here, whether measured at thirty or fifteen days, the suspicious timing of Plaintiff's termination creates a causal inference and, together with other evidence below, creates an issue of fact regarding discriminatory intent.

### 2. Defendant's Departure from its Established Policies in Responding to Plaintiff's Discrimination Claim Supports an Inference of Discriminatory Intent

Honeywell blatantly violated its broad non-retaliation policy by terminating the Plaintiff. This alone is sufficient evidence to avoid summary judgment. "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *see also Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005)("systematic abandonment of its hiring policies is circumstantial evidence of discrimination").

8

Here, Defendant significantly and without explanation deviated from its policies concerning reporting discrimination and retaliation. When Plaintiff raised his discrimination complaint, he complied with Defendant's policy for raising such a complaint. Defendant's Code of Business Conduct ("Code") reads: "If you know or suspect that unlawful or inappropriate discrimination or harassment has occurred, you should report the situation immediately via one of the channels described in "Asking for Advice and Voicing Concerns." (SOF ¶ 4). On the referenced page, Defendant directs employees to voice their concerns to "several resources," including "Your manager or supervisor" or "Your Human Resources representative." (SOF ¶ 4). On March 8, 2021, Plaintiff emailed his complaint to his supervisor Jeff Cortez, Mr. Cortez' supervisor Brian Winkola, and Human Resources Director Katie Becker. Additionally, on March 23, 2021, Plaintiff renewed his complaint in an email to Vice President of Engineering Chris Maines. (SOF ¶ 37). Plaintiff then forwarded this email to Ms. Becker the following day. (SOF ¶ 38). In this email, Plaintiff even explicitly stated that these emails should constitute "an 'official' discrimination claim." (SOF ¶ 38). While voicing his complaints, Plaintiff explicitly relied on Defendant's Anti-Retaliation Policy, which stated that Defendant "will not tolerate retaliation against you for making a good faith report of actual or potential misconduct." (SOF ¶ 6).

In contradiction to these policies, Defendant never followed up on Plaintiff's complaints and it did retaliate against him. In Defendant's Answer, it raised the following defense: "To the extent Plaintiff complained adequately of allegedly unlawful harassing, discriminatory, or retaliatory actions, Defendant undertook a prompt investigation and

made an appropriate remedial response." **(**COMPLAINT Docket No. 1.**)** This defense is unsupported by any evidence. First, Defendant admits that Plaintiff adequately raised a discrimination complaint when it says that it "did not question whether Vavra made his objections to the Training in 'good faith.'" **(**Defendant's Memorandum at 7.**)** Second, Defendant admits that it did *not* actually investigate or otherwise take seriously Plaintiff's complaints of discrimination. (SOF 10, Exhibit D, 37:6-10 - supervisor Cortez did not seriously read the Plaintiff's complaints; SOF 17, Exhibit G, 30:21-22; 31:5-6, 18-19 - HR Director Becker was unconcerned about Plaintiff's complaints of discrimination, and never actually reached out to ask his point of view; *Id*. 43:20-21 - *no one* in Human Resources did any investigation of Plaintiff's complaints). Rather than actually do an investigation (which presumably would involve talking to Plaintiff), Defendant simply kept sending increasingly strident messages requiring Plaintiff to take the training. (SOF ¶¶ 21-22, 27-29.) In fact, nothing in the record indicates that anyone ever discussed Plaintiff's substantive complaint with him. Then, on March 19, Plaintiff spoke with Mr. Maines, who took so little account of Plaintiff's discrimination concerns that he tried to persuade Plaintiff that the Training was but "one more box to check" and "not a big deal." (SOF ¶ 32.) This cavalier response belies Defendant's claim of "taking complaints seriously," and demonstrates that Honeywell simply preferred to terminate Plaintiff rather than confront his discrimination concerns.

  The policy states that all reports of discrimination will be carefully considered and "promptly and thoroughly" investigated. (SOF ¶¶ 4-5, Exhibit B, HON 771.) The Defendant has claimed that such an investigation was completed, and they made "an

appropriate remedial response." (Answer, Doc. 14, ¶ 6.) No one, however, seems to have any information about that investigation (and Defendant has produced none). The most basic and minimal procedure of responding to a discrimination complaint is a *response*. Plaintiff never received one; instead he was fired. No response was ever received. Thus Defendant departed from its policy procedures. This departure is additional evidence of discriminatory intent sufficient to defeat summary judgment.

### 3. There are Issues of Material Fact Concerning Defendant's Intent

Plaintiff complained about illegal racist training. Shortly thereafter Defendant fired Plaintiff, ostensibly for *not taking that same training*. This arises in the context of all decisionmakers knowing that Plaintiff had expressed his opinion that the training was "racist" and illegal. (*E.g.,* SOF ¶ 23, Exhibit D, at 27:4-5.) Because of this "coincidence," the issue of discriminatory intent is important or dispositive. That issue can normally not be answered except by a jury's weighing of credibility. *See Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)("where motive and intent play leading roles," summary judgment is improper); *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1396 (7th Cir. 1997)("because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate").

Retaliation need not be the sole or even the main motivator for the termination. "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). In other words, the illegal

motivation need only be the issue that pushed the decision "over the top." Here, Plaintiff's protected activity is coincident with his refusal to take the Training. The claimed "insubordination" and the protected activity are one and the same. Thus it is impossible at this stage for the Court to determine motivation or allocate responsibility. The Seventh Circuit has ruled on this *exact issue*. *See Castro v. DeVry University, Inc.*, 786 F.3d 559, 569 (7th Cir. 2015)("Employers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being … 'insubordinate' by opposing the unlawful activity"). *DeVry University* is dispositive of this Motion; as a matter of law, an employee who refuses to participate in what he or she believes to be an illegal activity should not be fired for being "insubordinate."

Therefore, it remains for a jury to decide the credibility of Defendant's motivation in light of its response to Plaintiff's complaint of discrimination. *See Poller,* 368 U.S. at 473. In light of the above material issues regarding Defendant's motivations, a jury should decide whether Defendant's motive was in fact retaliation.

**4. Plaintiff's Argument Would Not Lead to Absurd Results.**

Defendant claims that Plaintiff's argument "would lead to absurd results" because it "would permit him and other employees to flout any mandatory training by simply declaring that the training in question is discriminatory in some way." (Defendant's Memorandum at 8.) This is hyperbole, and is a standard "parade of horribles" defense. Plaintiff only asks Defendant to follow Title VII standards (and its own stated policies) by actually following up on complaints of discrimination rather than squelching the complainant, as the evidence suggests Defendant did here. (*See, e.g.,* SOF ¶ 1, Exhibit A,

12

at 133:16-20.**)** In support, Defendant points to four district court cases (only one of which is in this circuit). (Defendant's Memorandum at 8-11.) All four are distinguishable.

Plaintiff's situation is very different from the employee's in *Daza v. State of Indiana*, 331 F.Supp. 3d 810 (S.D. Ind. 2018). First, Daza based his retaliation claim on the First Amendment, not Title VII. *Id*. at 837. Second, Plaintiff, unlike in *Daza*, does not have a long history of unprofessional and insubordinate behavior. *See id*. at 834-35. To the contrary, Plaintiff had a stellar work history. (SOF ¶ 10, Exhibit D, at 15:7-17:21.) His only act of "insubordination" was the protected activity itself, a circular argument the Seventh Circuit has rejected. *See DeVry Univ.*, 786 F.3d at 569. Similarly, the fact that the *Daza* plaintiff was found to have "baseless" complaints is immaterial to a retaliation claim. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69-70 (2006) (the standard for retaliation claims "is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint"). To the extent the *Daza* court found otherwise, it was simply in error.

*Norgren v. Minnesota Dep't of Hum. Servs.*, 2023 WL 35903 (D. Minn. Jan. 4, 2023) is completely off-point. There the court dismissed a Title VII retaliation claim because the plaintiff did not engage in protected activity. *Id*. at *16-17. Even more to the point, the court stated the plaintiff could not establish an adverse employment action. *Id*. **Nothing** in *Norgren* is relevant to this case. *Bourgeois v. United States Coast Guard*, 151 F. Supp. 3d 726 (W.D. La. 2015) is even more off point. Most significantly, Bourgeois alleged the cultural diversity training requirement was *itself* the adverse employment action constituting retaliation. *Id*. at 739. As the court stated, requiring all employees to undergo

a training cannot constitute an adverse employment action. *Id*. Here, Plaintiff's adverse employment action was his termination, not the Training. Furthermore, in *Bourgeois*, the training was the "employer's attempt to rectify potential harassment that was occurring in the workplace environment," meaning there was a nondiscriminatory, legitimate basis for instituting the training. *Id*. at 740. Again, Defendant excitedly points out that there was a "training," but does not dwell on the many distinctions between that case and this.

Finally, *Brennan v. City of Philadelphia*, 2020 WL 3574454 (E.D. Pa. June 30, 2020) is also distinguishable. There, the employee argued that his employer's proffered reason for his termination, that he did not take a sensitivity training, was pretext. *Id*. at 22-3. However, the employer had legitimate reasons, wholly distinct from Brennan's protected activities, to require him to undergo the sensitivity training. *See id*. at *25-6. Here, on the other hand, Plaintiff's refusal to take the Training is inseparable from his objection to the Training's racist basis; Defendant's claimed basis for terminating Plaintiff is indistinguishable from what Plaintiff claims was in fact retaliation for his complaint.

Caselaw cited by Defendant does not support its argument. In fact, given the facts of the case, the cited cases demonstrate why this case involves disputed factual issues, and is appropriate for determination by a jury.

## V. CONCLUSION

Plaintiff was terminated immediately after complaining about what he believed to be racist and illegal communications and training. Defendant has claimed that Plaintiff's refusal to take that very training was insubordination. Thus, Defendant admits it terminated Plaintiff for "opposing" a practice he claimed was illegal under the anti-discrimination

statutes. Under both Title VII and the Illinois Human Rights Act, that is forbidden. Summary Judgment should be denied.

Dated: March 20, 2023            Respectfully submitted,

**Charles Vavra**

| | |
|---|---|
| John W. Mauck<br>Whitman H. Brisky<br>Kirstin M. Erickson<br>**MAUCK & BAKER, LLC**<br>One North LaSalle Street, Suite 600<br>Chicago, Illinois 60602<br>(312) 726-1243<br>(866) 619-8661 | By: s/ Alec J. Beck<br>One of his attorneys |
| Alec J. Beck (MN #201133)<br>**PARKER DANIELS KIBORT**<br>888 Colwell Building<br>123 North Third Street<br>Minneapolis, MN 55401<br>(612) 355-4119<br>beck@parkerdk.com | Douglas P. Seaton (MN #127759)<br>James V. F. Dickey (MN #393613)<br>**UPPER MIDWEST LAW CENTER**<br>8421 Wayzata Boulevard, No. 300<br>Golden Valley, MN 55426<br>(612) 428-7000<br>doug.seaton@umlc.org<br>james.dickey@umlc.org |

15