**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHARLES VAVRA,** | |
| **Plaintiff,** | No. 1:21-cv-06847 |
| **v.** | Judge Jorge L. Alonso |
| | Magistrate Judge Heather K. McShain |
| **HONEYWELL INTELLIGRATED, INC.,** a Delaware corporation | |
| **Defendant.** | |

**Nonmovant's Local Rule 56.1 (b)(2) Response to Defendant's Statement of Material Facts**

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| 1. | Plaintiff Charles Vavra ("Vavra") is an individual who, at all relevant times, resided in Bolingbrook, Illinois. *See* First Amended Complaint, Dkt. No. 10, ¶6; Exhibit A, Deposition of Charles Vavra ("Vavra Dep."), 11:22-12:3. Honeywell is a Delaware corporation, which does business in the State of Illinois. *See* Defendant's Answer and Defenses to Plaintiff's First Amended Complaint, Dkt. No. 14, ¶7. Honeywell Intelligrated has its principal place of business in Mason, Ohio. *Id.* Honeywell Safety and Productivity Solutions is a business group within Honeywell that provides products, software and connected solutions that improve productivity, workplace safety and asset performance. *Id.*; Ex. A, 22:19-24. | Admit |
| 2. | Plaintiff filed his Complaint on December 23, 2021, and his First Amended Complaint on January 14, 2022. *See* Dkt. Nos. 1, 10. In his First Amended Complaint, Plaintiff alleges race discrimination under Title VII of the Civil Rights Act and Illinois Human Rights Act, and wrongful termination under | Admit that Plaintiff filed his Complaint on December 23, 2021 and his First Amended Complaint on January 14, 2022. Admits that his Complaint alleges wrongful termination (now withdrawn). Denies that Plaintiff's Complaint alleges race discrimination, but rather alleges |

1

|   | Movant's Fact | Nonmovant's Response |
|---|---|---|
|   | Illinois public policy. *See* Dkt. No. 10, ¶¶27-44. | retaliation under 42 U.S.C. § 2000e(3)(a) and 775 Ill. Comp. Stat. 5/6-101(A). (First Amended Complaint, Doc. #10, ¶¶ 28, 36.) |
| 3. | This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action raises claims involving a United States statute. *See* Dkt. Nos. 10, 14, 8. This Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. *See Id*. | Admit. |
| 4. | Honeywell maintains a number of policies in its Code of Business Conduct that applied to all employees at all relevant times. *See* Exhibit B, Ex. 2 to Vavra Dep. (Code of Business Conduct). Vavra acknowledges receiving and being aware of Honeywell's Code of Business Conduct throughout his employment. Ex. A, 28:5-29:15. | Admit. |
| 5. | Honeywell specifically prohibits discrimination and its policy states: Respecting Each Other and Promoting a Positive Workplace Honeywell respects and values the diversity reflected in our various backgrounds, experiences, and ideas. Together, we provide an inclusive work environment that fosters respect for all coworkers, clients, and business partners. Our workplace is one that reflects the diversity of the communities in which we operate and we are committed to providing employees with a workplace that is free from unlawful discrimination, harassment, or personal behavior that is not conducive to a productive work climate. This pledge applies to all phases of the employment relationship, including hiring, promotion, demotion, transfer, discipline, layoff or termination, compensation, use of facilities, and selection for training or related programs. Ex. B at Bates Number HON_00000773; Ex. A, 30:21-31:17. | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| 6. | Honeywell also prohibits retaliation and its policy states:<br><br>Honeywell Will Not Tolerate Retaliation<br>It is important that you feel comfortable raising your questions and concerns. Honeywell will not tolerate retaliation against you for making a good faith report of actual or potential misconduct. Making a report in "good faith" means your report is honest, sincere, and complete to the best of your knowledge. If you feel an act of retaliation has occurred, you should report your concerns via one of the methods outlined in "Ask for Advice and Voicing Concerns."<br>Ex. B, at Bates Number HON_00000771; Ex. A, 30:12-15. | Admit. |
| 7. | Honeywell offers employees multiple methods by which they can report concerns of perceived harassment, discrimination and/or retaliation, including an independent third-party 24-hour Helpline. Ex. B at Bates Numbers HON_00000771 and HON_00000773; Ex. A, 29:22-30:8. | Admit. |
| 8. | During his employment, Vavra was aware that Honeywell had non-discrimination and retaliation policies, as well as methods for reporting concerns. Ex. A, 28:5-31:17. | Admit. |
| 9. | In or around 2016, Honeywell acquired Intelligrated, integrated it into Honeywell's Safety and Productivity Solutions ("SPS") business unit, and it became known as Honeywell Intelligrated. Ex. A, 19:11-17; 22:15-24. Vavra began working at Intelligrated in 2008. *Id.* Vavra became a Honeywell employee when it acquired Intelligrated and he was credited with his 2008 service date. *Id.*, 19:11-20:9. Vavra knew his employment with Honeywell was at-will. *See* Exhibit C, Ex. 1 to Vavra Dep. (Offer Letter); Ex. A, 26:8-16. | Admit. |
| 10. | Vavra's first position with Intelligrated was Project Manager but he held the position of | Admit. |

3

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  | Estimating Manager at the time of the acquisition. Ex. A, 20:9-21:1. In or about February 2021, Vavra received the position of Principal Application Engineer and he held that position for the remainder of his employment. *Id.*, 21:17-22. In that position, he directly reported to Jeffrey Cortez, Manager of Concepting and Estimating. *Id.*, 26:17-22; *See* Exhibit D, Deposition of Jeffrey Cortez (Cortez Dep.) 12:3-5. Cortez reported to Brian Swinkola and Swinkola reported to Justin Lieb. Ex. D, 31:13-17. |  |
| 11. | Vavra worked out of Honeywell Intelligrated's Woodridge office until the COVID-19 pandemic, and then began working remotely. Ex. A, 23:19-22. | Admit. |
| 12. | On September 24, 2020, John Waldron, SPS's President and CEO at the time, sent an e-mail to all SPS employees, with the subject line "Continue to Fight for Social Justice". *See* Exhibit E, Ex. 4 to Vavra Dep (Waldron e-mail); Ex. A, 35:16-36:16; 37:2-38:9; 42:15-21. The entirety of the e-mail states:<br>Dear Friends and Colleagues,<br>Yesterday's decision by the grand jury in Louisville, Kentucky not to indict the officers who killed Breonna Taylor is difficult for me to understand. I'm sure I don't have all the facts, and I'm struggling to process the many thoughts and emotions I have around this tragic situation. I can only imagine how our Black colleagues are feeling ... again. Each time these situations occur, they highlight how far we must go to create an equal and just society where all people have the same opportunities to succeed.<br>Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us. When these biases compound, they can evolve into institutional biases. Breaking out of this cycle is critically important or moving society forward. Breaking this cycle | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | requires courage — the courage to discuss, the courage to admit our bias and to encourage and promote our differences, the courage to change. <br><br> Words alone aren't sufficient. We must take tangible actions to make a difference. We have, and we will continue to do so. In SPS, we are committed to doubling our efforts on the agenda we have set forth previously which includes engaging our Employee Resource Groups (ERG) with another round of listening sessions, upping our game when hiring ensuring 100% of the time that the interview panel and candidates are diverse, and you can expect to hear of other actions we will be taking. <br><br> Shortly after George Floyd's death, one of our Black colleagues reminded me that it was white people in America that freed the slaves and ultimately supported the civil rights movement and legislation of the 1960s. That time is upon us again — we, me included, must insist upon racial equality. We must demand it from ourselves. We must welcome dialogue about it. We must have zero tolerance for its absence. <br><br> My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you. <br> John *Id.* | |
| 13. | At the time Vavra received this e-mail, he was still an Estimating Manager, and reported to Todd Bryant. Ex. A, 38:19-23. Vavra believed the e-mail contained racist and discriminatory statements, but he did not voice those concerns to Bryant or anyone in Human Resources at that time. *Id.*, 38:10-13; 38:24-39:2; 41:23-42:3. | Admit. |
| 14. | Vavra alleges that in November 2020, Honeywell's Diversity, Equity and Inclusion office announced an Unconscious Bias Awareness training ("UBA training" or "the training") initiative whereby employees | Admit that in or around November of 2020 Honeywell's Diversity, Equity and Inclusion office announced mandatory bias training. The terms "implicit bias" and "unconscious bias" are used interchangeably in Plaintiff's |

5

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | were required to complete on-line training by February 25, 2021.<br>Dkt. No. 10. ¶13; Ex. A, 43:14-45:17.<br>Vavra's First Amended Complaint allege [sic] that the training was "Implicit Bias Training" and required employees to undergo training on the theory of implicit bias. Dkt. No. 10. ¶13; Ex. A, 43:14-45:7 | communications. (SOF ¶ 1, Exhibit A at 130:14-18.) |
| 15. | On February 24, 2021, Louise Quilter-Wood, Honeywell's Vice President HR and Communications, SPS, sent an e-mail to certain Honeywell employees, including Vavra, with the Subject "TAKE ACTION TODAY: Unconscious Bias Awareness Training is Due Now." *See* Exhibit F, Ex. 5 to Vavra Dep (Training Rollout). The e-mail informed the recipient: "You are receiving this message because you have not completed the Unconscious Bias Awareness training which is due Feb. 25, 2021. Please click the link at the bottom of this email and complete the training within the next 24 hours." *Id.*; 45:22-48:11.<br>Beneath the directive to complete the training, the e-mail also contained the content of the original e-mail that announced the training:<br>As part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees.*<br>While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication.<br>This training aims to equip you with the insights and tools needed to help spot and challenge the ways biases prevent us from creating an inclusive environment.<br>When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company.<br>Combating unconscious bias allows us to build a culture that supports better | Admit. |

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  | customer service, stronger business results, and a more engaged workforce. If you want to learn more about unconscious bias, watch this video on Removing Bias from Our Everyday Decision Making. Please complete Unconscious Bias Awareness training by Feb. 25, 2021. Ex. 5; Ex. A, 48:17-50:3. Vavra believes that he received the original announcement of the training in November, 2020. Ex. A, 48:24-49:3. |  |
| 16. | Vavra is aware that the e-mail contained a link he could click that would open the UBA training video, but he never clicked on that link during his employment at Honeywell. Ex. A, 50:4-12. | Admit. |
| 17. | At all relevant times, Katie Becker was the Human Resources Director supporting the Intelligrated business. *See* Exhibit G, Deposition of Katie Becker (Becker Dep.) 8:11-23; 9:24-10:1. Becker's role in the UBA training was to help ensure that employees completed the training, which was mandatory. *Id.*, 15:4-14; 18:3-6. Becker testified that the UBA training applied to all Honeywell employees within the United States. *Id.*, 13:10-14; 46:25-47:9. | Admit. |
| 18. | The consequence of not taking the UBA training was termination. Ex. G, 18:7-13. An employee could not refuse to undergo, and the employee would not be relieved from completing, a mandatory training on any topic simply by saying he or she thought that the specific training was racist or discriminatory. *Id.*, 47:21-48:5. | Ms. Becker responded to her attorney's questions as follows:<br><br>Q: Can an employee refuse to undergo a mandatory training on any topic by simply saying that he or she thought that specific training was racist or discriminatory?<br><br>A: No.<br><br>Q: So that was not a way for an employee to be relieved of going through mandatory training by |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | | complaining about it being racist or discriminatory.<br><br>A: Correct. They still need to complete the mandatory training.<br><br>(Exhibit G at 47:21-25, 48:1-5.) |
| 19. | When Vavra received notice of the UBA training in November 2020, he did not raise any concerns about the training to his supervisor or Human Resources. Ex. A, 51:9-14; 52:6-10. When Honeywell announced that it was implementing the UBA training, Vavra requested to no longer be a manager, because he "didn't want to push stuff like this on my reports, the unconscious bias training." *Id*., 39:17-23. Vavra did not share the reason for his request to not be a manager with Bryant. *Id*., 40:5-23. Thereafter, Bryant referred Vavra to a jobs portal to apply for an alternative position. *Id*., 41:14-22. According to Cortez, Vavra told him over a year before Vavra stopped being a manager that he wanted to get out of a management role. Ex. D, 13:4-14:1. | Admit. |
| 20. | Vavra admits that he was late on taking trainings during his employment and eventually would complete them but he "had no plans" to take the UBA training. Ex. A, 51:9-20. Whenever he was late for a training, Vavra would receive some sort of reminder about that training. Ex. A, 51:21-52:5. | Admit. |
| 21. | After failing to take the UBA training in response to the original announcement, Vavra received several reminders from Honeywell's Inclusion and Diversity team about it. *See* Group Exhibit H, Ex. 6 and 11 to Vavra Dep. (Training Reminders), at Bates Numbers VAVRA000213-000216, VAVRA000281-291, VAVRA000367, VAVRA000370-000372, and VAVRA000374-000378; Ex. A, 52:22-53:18. When only 5 days remained to the | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | February 25 UBA training deadline, he began to receive daily reminders about the training. Ex. H, Ex. 6 to Vavra Dep., at Bates Numbers VAVRA000213-0002161; Ex. A, 54:16-56:6. Vavra subsequently missed the deadline for taking the UBA training, and at that point, he continued to receive daily email notifications indicating how many days he was past due on his training requirement. Ex. H, Ex. 6 to Vavra Dep., at Bates Numbers VAVRA000289-000291, VAVRA370-000372, and VAVRA374-000378; Ex. A, 56:7-58:12. On March 18, 2021, Vavra was 17 days past due in completing the UBA training and he received both a daily e-mail notification and a personalized email instructing him to "Please take the training asap." Ex. H, Ex. 6 to Vavra Dep., at Bates Number VAVRA000377; Ex. H, Vavra Dep Ex. 11, at Bates Number VAVRA000367; Ex. A, 58:9-12; 89:13-91:9. | |
| 22 | In addition to the automatic reminders, several individuals from Honeywell reached out to Vavra and asked him to complete the training. Ex. D, 27:16-28:12. On March 2, 2021, at 7:51 a.m., Cortez forwarded Vavra an email he had received the prior evening from Honeywell's Inclusion and Diversity in which Cortez was asked to ensure that his direct reports who had not completed the UBA training complete it. *See* Exhibit I, Ex. 7 to Vavra Dep. (Cortez E-mail 1); Ex. A, 60:6-62:15. In forwarding the email, Cortez wrote to Vavra, "Chuck — know you are not a fan of this training module, however you are currently the only one who hasn't completed this training so would ask that you do this." Ex. I; Ex. A, 62:16-23; Ex. D, 27:6-15, 28:13-18. | Admit. |
| 23. | Vavra believes Cortez commented about his not being a fan of the training because sometime prior to Cortez sending the email, Vavra had a conversation with Cortez during which Vavra expressed issues he had | Jeff Cortez did discuss Vavra's belief that the training had "racist elements." (Exhibit D, at 24:20-24, 25:1-10.) "I kind of told him I don't see the concern. But had that concern." (*Id.* 25:18-10.) Cortez |

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  | with the training. Ex. A, 65:14-22; Ex. D, 28:19-22. However, neither Vavra nor Corte [sic] recall when the conversation occurred or what was said during the conversation. Ex. A, 62:24-65:22; Ex. D, 28:23-29:10. Cortez does not recall Vavra ever telling him that he though the UBA training was racist. Ex. D, 25:11-17, 26:4-8, 31:22-32:3. Cortez's understanding was that Vavra felt the company was "pushing in political correctness issues" and that Vavra did not think the company had a right to do that. *Id*., 23:21:-24:4, 25:11-1. | does not recall if Vavra said "racism" or political correctness," (*Id*. 26:4-8.) Once Cortez saw Vavra's email, however, he understood the basis for Vavra's complaints. (*Id*. 27:4-5.)<br><br>Admit the remainder of paragraph 23. |
| 24. | At 10:11 am on the same day, Cortez forwarded an e-mail chain to Vavra and wrote, "Chuck — as I thought would happen, getting additional pressure to get this training completed. Please get completed today and let me know when done." *See* Exhibit J, Ex. 8 to Vavra Dep. (Cortez E-mail 2).; Ex. A, 67:2-68:9.; Ex. D, 33:17-23. Cortez was not threatened with any potential discipline for failing to get the people on his team to complete the training. Ex. D, 30:8-14. | Admit. |
| 25. | Several e-mails were included in the chain below Cortez's e-mail to Vavra. The first e-mail was from Jennifer Carpenter, Vice President, Human Resources, to John Dillon, and providing a list of individuals in Dillon's organization who had yet to take the training, and requesting Dillon to ask leaders under his supervision to ensure that all individuals completed the training. *See* Exhibit J, at 2.; Ex. A, 67:2-71:4 The second e-mail was from Dillon to his leaders, including Justin Leib, forwarding Carpenter's email and asking them to address the training with their teams ASAP. *Id*. The third e-mail was from Justin Leib, Director Applications / System Sales Engineering to several individuals, including Cortez and Swinkola, informing them that they had individuals on their | Admit. |

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  | teams that had not completed the training, and stating, "I want it completed today, it should take less than 30 minutes." *Id*. at 1. Ex. D, 33:17-23. |  |
| 26. | Cortez explained at his deposition that whenever trainings are announced, "they get escalated pretty fast. They were very good at follow ups." *Id*., 34:20-23. | Admit. |
| 27. | On March 2, 2021 at 10:24 am, Vavra received an e-mail from Swinkola, which also forwarded the email chain Vavra received from Cortez at 10:11 a.m., and asking him to "please complete the Unconscious Bias training." *See* Exhibit K, Ex. 9 to Vavra Dep. (Swinkola E-mail), at 1; 73:2-74:10. Vavra never had a conversation with Swinkola about the training, before or after the aforementioned e-mail. Ex. A, 75:20-76:3. | Admit. |
| 28. | On March 2, 2021, at 12:16 pm, Becker sent an e-mail to an undisclosed list of individual(s), reminding them that the training was due on February 28, 2021, asking recipient(s) to complete the training asap, and encouraging them to let her know if anyone had any issues in completing the training. *See* Group Exhibit L, Ex. 10 to Vavra Dep. (Becker-Vavra E-mails), at Bates Number VAVRA000128; Ex. G, 8:11-13. Vavra received this e-mail, and replied to it that afternoon, stating "Yes, I do have issues completing this. I will be sending out an email shortly explaining why." Ex. L, Ex. 10 to Vavra Dep., at Bates Number VAVRA000127; Ex. A, 79:11 - 81:3. | Admit. |
| 29. | On March 5, 2021, Becker e-mailed Vavra, informing him that the UBA training was required for all Honeywell employees, and asking him what barriers he was having in completing the training. Id. 81:4-19. On March 8, 2021, Vavra sent an e-mail to Becker, carbon-copying Cortez and Swinkola (spanning 7 pages when printed), setting out his objections to Waldron's E- | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | mail. *Id.* at 1-8. Among other things, Vavra made the following statements:<br><br>The reason I'm not taking [the UBA training] is because it's absolutely ridiculous and it doesn't work. How do I know that? Because we have our own CEO to thank for proving to to [sic] all of us that it doesn't work. To be honest, if John Waldron's 9/24 email below hadn't preceded the training mandate a couple months earlier I probably would have just taken it… I'm going to explain in hopefully more than enough detail why I, and I'm sure many others found his email so offensive.<br>…<br>After reading the first sentence in his email I asked myself, why on earth would John Waldron think any of his colleagues are even interested in hearing about his thoughts and feelings about the Breonna Taylor case? What does that have to do with work? Why would he even bring that into the workplace? Then I got to the second sentence where he said, and I quote, "I'm sure I don't have all the facts, and I'm struggling to process all of the thoughts and emotions I have around this tragic situation". At that point I thought to myself, if he doesn't have all the facts, why would he even continue on? Anything after that sentence is meaningless and invalidated, and I'm not sure about any of my other colleagues, but I'm not a shrink to help him sort out his thoughts and emotions about this tragic incident that affected him to the point he needed to share his views with all of his colleagues. THEN he's says, "I can only imagine how our black colleagues are feeling....again". Why would he say that? Why is he only concerned with our BLACK colleagues feelings? I suppose it's possible that a couple of our black colleagues were somehow related to Breonna Taylor...but all of them? If they didn't know | |

| Movant's Fact | Nonmovant's Response |
|---|---|
| her personally why would they feel anything other than maybe some compassion for Breonna Taylor's grieving friends and family? As the CEO of a division of a global company, I'm sure there is no way he would ever suggest that all of his black colleagues should somehow feel like victims in the Breonna Taylor case just because she was black. I'm sure he would never suggest that his colleagues of other races should have no feelings about the Breonna Taylor incident because they're NOT black, right? Because that would be kind of....oh, I don't know...racist and discriminatory? … His next incongruous thought went on to talk about racial bias. Ok, now we're onto racial bias. Sure, why not? When you're on a roll, spitting out random thoughts that have nothing to do with each other,or anything work related, who stop now, right? What does racial bias have to do with a couple police officers accidentally killing Breonna Taylor after they were shot at first? Is he implying that Breonna Taylor's death was somehow racially motivated? Because it sure sounds like it. I would expect that from the liberal media because they love to find just the right story, sensationalize it 24/7 for weeks or months on end it to continue their "systemic racism" narrative, create riots, destroy businesses (even businesses of black owners) and destabilize cities. But our CEO? I wouldn't expect that from him. Then he goes on to say "breaking out of this cycle is critically important to moving society forward. Breaking this cycle requires courage". What cycle is that? The cycle of people like John Waldron and the mainstream media exploiting the deaths of black people to incite racial tensions? Is that what he means? If so, then I wholeheartedly agree with him. But something tells me that John Waldron knew exactly what he was | |

| Movant's Fact | Nonmovant's Response |
|---|---|
| doing by bringing up incendiary topics like Breonna Taylor and George Floyd deaths. So why would he bring this into our workplace? <br> … <br> With regards to courage I found the courage to admit to myself that the CEO of SPS was a race-baiter. It appeared he was gaslighting his non-white colleagues into believing he is some sort of angelic empath that has taken it upon himself to be the spokesperson and apologist for all of his white colleague's and their evil ways by implying that we all are somehow tied to the killings of Breonna Taylor and George Floyd. <br> … <br> Everything has only gotten better since the 1960s until the globalist's and their socialist mouthpieces recently needed to INVENT a new "systemic racism" problem to push their agenda....again. Then there is their media. <br> … <br> Today and for the past decade or so the only time I ever witness "systemic racism" or "racial bias" is when I turn on my TV….or read emails like Waldron's. As a matter of fact, if the mainstream media would just shut up and John Waldron and others like him would quit sending out divisive emails, race relations would probably be better than ever. But we all know that things are going to get far worse and Waldron's email was just another brick in that road to hell. <br> … <br> My initial though, after reading where he says "Racial bias is real, Don't kid yourself. Each of us has racial bias within us" was how dare he even suggest something like that. Says who, him? CNN? Xi Jinping? Klaus Schwab? 99% of some group of nameless psychologists that agree everyone has unconscious bias? Who? But after witnessing all of the lunacy taking place these days, nothing even surprises me | |

| Movant's Fact | Nonmovant's Response |
|---|---|
| anymore. Perhaps Mr. Waldron should take the red/yellow/green light training because to me, reading that email was bright red light. He didn't just cross a line, he did a cartwheel over it.<br><br>…<br><br>Their so-called "systemic racism" is just another manufactured crisis to keep people at odds with each other and "unconscious bias" training is the decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to.<br><br>…<br><br>Then they talk about it 24/7, non-stop and sensationalize stories like the George Floyd and Breonna Taylor incidents....and talk about THEM for months on end until the more easily manipulated people who aren't able to see through the bullshit actually start to believe there really is a problem. The media companies and the people that write their scripts know it.<br><br>…<br><br>You may have heard that Mr. Potato Head has recently gone gender neutral, the Coca-Cola polar bears are being told to stop being so white and Dr. Seuss books are now somehow racist and being pulled from Ebay and other distribution outlets. So what's next? If I like my coffee with cream, does that somehow make me a racist now? How much more insane can this get? This is exactly why emails like Waldron's are so dangerous because they just add fuel to the fire. He's making his non-white colleagues all victims and turning his white colleagues, that had absolutely nothing to do with those two incidents into villains.<br><br>…<br><br>So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias.<br><br>… | |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | If racial bias exists within some people, don't kid yourself. There is nothing unconscious about it. Just ask John Waldron. He made a "conscious" decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated. Some of his colleagues will actually buy that. People aren't inherently racist. It is learned. It is pushed into and absorbed in the heads of gullible victims that have had their trust betrayed by people in positions of power like greedy, self-serving politicians, the media and even CEOs of global corporations that are all working in concert towards a common "political" goal. I'm here to work. I'm not here for an indoctrination into John Waldron's mindset or his ideologies that he feels empowered to shove down our thoughts just because he's in a leadership position in this organization. … If someone has complained about any racist, misogynistic or homophobic behavior I'm associated with, only then would I consider taking the training. Until then, I have no intention of taking it. … The most disturbing…..and somewhat laughable observation I made in Mr. Waldron's email was the exclusion of an entire race of his colleagues that his heart went out to. And I quote, "My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues". … So why did John Waldron give a nod to the Hispanics and Asians, but not us white people? To hell with all of our feelings, right? … It may surprise Mr. Waldron that I, being white and all, had feelings about the Breonna Taylor case as well. It was tragic what happened to her. There is no doubt about that. What was even more tragic is how a certain political party and their | |

| Movant's Fact | Nonmovant's Response |
|---|---|
| media…and John Waldron himself shamelessly exploited their deaths to push their "systemic racism" lie. It's a textbook example of race-baiting. John Waldron would never say hist [sic] heart goes out to ALL of his colleagues for the same reason BLM would never say ALL lives matter. To them, if you've been paying attention, saying "all lives matter" is a cardinal sin and somehow racist. Wouldn't it make more sense to just say nothing at all and keep your opinions to yourself to prevent racial tensions in the workplace? … I remember a year or two ago taking "active shooter" training here at Honeywell. I thought it bizarre. I thought to myself, why would they even have this training? Now it's all beginning to make sense to me. Maybe it's because they knew someone might stir the political pot enough to make something like that actually happen. It's no secret that the media started riots with their lies about the Breonna Taylor and George Floyd incidents. Why would John Waldron even think it would be ok to suggest that he killing was somehow racially motivated here at work? … John Waldron's excluding and alienating an entire race of his colleagues was a passive aggressive way of making it clear to all of our non-white colleagues who the bad people are….all of us whit folks of course. … It seems a little counterintuitive to EXCLUDE an entire race of his colleagues "who his heart goes out to", especially when he's planning on following up with an "unconscious bias" training mandate…. That is being headed up by the "INCLUSION" and diversity group. That's where the irony and hypocrisy come in. It's | |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | laughable. You can't make shit up. But you know, maybe he's right. Maybe SOME of us DO have unconscious bias. If John Waldron does, I think it would be best for him to just deal with it himself on a personal level rather than project his racial biases or his "white guilt" onto his employees. To say that "each of us has unconscious bias within us" is reckless and irresponsible. That's a pretty broad brush stroke. … I couldn't care less how John Waldron feels about the Breonna Taylor or George Floyd cases or any other social or political issues he may feel compelled to share with us in the future....that have absolutely NOTHING to do with work. … My heart goes out to ALL of my colleagues. It goes out to my white colleagues, that had nothing to do with the Breonna Taylor incident, for being demonized by John Waldron's email through exclusion, and it goes out to the rest of my non-white colleagues, that had nothing to do with the Breonna Taylor incident for being made victims by John Waldron when may of them probably didn't want to be. I think he'd be surprised to know how may people of all races feel these so-called "social justice warriors" cause more damage to society than actual racists. … To reiterate, I AM NOT taking this training because it's a joke, and I'll use John Waldron's email as proof of it. I refuse to take part in this ridiculous charade. I feel John Waldron owes ALL of his colleagues an apology for even perpetuating this nonsense. Do whatever it is you feel you have to do to deal with my noncompliance, but I can tell you this...I am not a sellout to myself, my integrity, my convictions or to the tens of millions of freedom-loving, | |

18

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  | Constitution-loving Americans of ALL races and genders in this country that feel the same way I do. If I am expected to agree with John Waldron's opinions on social and political issues, I feel I am being forced into having to re-evaluate my working relationship with Honeywell. I shouldn't be made to feel that way. If that's not the expectation, I'll get back to work and wait for my apology to arrive. … He should keep his social and political opinions to himself. *Id.* at 1-8. |  |
| 30. | According to Vavra, this e-mail set out all the reasons for his objection to the training and he left nothing out. Ex. A, 83:23-84:23. Prior to sending this email, Vavra had not expressed any objections to taking the training to the three recipients of his March 8, 2021 e-mail. *Id.*, 87:11-21. Becker replied to Vavra's March 8, 2021 e-mail, stating "I wanted to acknowledge that I have received your response on this, will review and get back with you." *Id.* Becker communicated Vavra's concerns to other individuals within Human Resources. Ex. G, 43:15-21. Cortez did not have a conversation with anyone about Vavra's e-mail. Ex. D, 41:22-42:4. | Plaintiff stated that he "believed" he did include everything in the email; he "tried to b e as thorough as possible." (Exhibit A, at 83:18-22.) Admit the remainder of paragraph 30. |
| 31. | After Vavra sent his March 8 e-mail, he continued to receive automated daily reminders about the training. Ex. A, 90:3-7; *See* Ex. H, Ex. 11 to Vavra Dep., at Bates Number VAVRA000367. | Admit. |
| 32. | On March 19, 2021, Chris Maines, Vice President of Engineering had a Microsoft Teams meeting with Vavra. Ex. A, 92:13-21; 95:8-14; *See* Exhibit M, Ex. 12 to Vavra Dep. (Teams Call Information). According to Vavra, during the call, Maines told Vavra that the training was "just another check box of things to do", and he should not read too much into it. Ex. A, 96:7- 97:2. Maines tried to convince Vavra to take the training. *Id*. Vavra told Maines he would think about it over the weekend and get back to him the | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | following week. Id. Maines told Vavra that not taking the training would be considered insubordination. *Id.*, 97:19-21.Vavra does not recall whether he told Maines that he felt the training was racist and or discriminatory. *Id.*, 97:3-12. | |
| 33. | Cortez recalls seeing Vavra's March 8 e-mail, but did not read it closely beyond the first page. Ex. D, 37:15-20. He does not remember reading the portion of the e-mail that referenced "race-baiting" or "discrimination." *Id.*, 37:21-38:13. After Cortez underwent the training, he explained to Vavra that Cortez did not see anything racist about it. *Id.*, 24:23-25:2. Cortez even mentioned an example from the video to Vavra where a white male was being subjected to bias, as the holder of the bias had assumed a woman would be more capable of doing a specific task. *Id.*, 25:3-7. Cortez does not remember Vavra complaining that the training was "racist" and he believes that Vavra's issue was on political correctness. *Id.*, 25:14-17; 26:4-8; 31:22-32:3. | Jeff Cortez testified that once he saw Vavra's email he understood the basis for Vavra's complaints. (*Id.* 27:4-5.) Admit to the remainder of paragraph 33. |
| 34. | Vavra claims that after this meeting with Maines, he found an Implicit Association Test (IAT) on a Harvard.edu website, and he took the test four times with inconsistent results about whether he had any implicit biases, and against what groups. Dkt 10, ¶ 19; Ex. A, 128:5-129:9; Ex. H, Ex. 14 to Vavra Dep., at Bates Number HON_00000735. Vavra does not know if Honeywell's training would have had employees take an IAT. Ex. A, 129:22-130:2. He believes "unconscious bias" and "implicit bias" are "similar," that unconscious bias" is a made-up term, and people's biases are more conscious than unconscious. *Id.*, 130:14-18. Vavra did not know what the content of Honeywell's training was, but had his "thoughts" on it based on Waldron's email, and thought "it was going to try to make [him] feel guilty | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | for the color of [his] skin, that it was going to make people of color feel like victims for the color of their skin." *Id*. 131:23-132:10. | |
| 35. | Cortez underwent the training, and considered it to be a relatively simple training. Ex. D, 24:5-7. The training was between 20-30 minutes long. It contained short, pre-recorded videos about various scenarios, with a quiz at the end. *Id*., 50:16-51:3. Trainees were not asked to sign a document stating that they agreed with the contents of the training. *Id*., 51:4-11. Cortez did not find the training offensive or racist, and found it pretty balanced, fairly diverse and innocuous. *Id*., 24:20-25:10, 52:6-24. | Admit. |
| 36. | No individual other than Vavra refused to undergo the training. *Id*., 51:12-17; Ex. G, 48:6-9. | Admit. |
| 37. | On March 23, 2021, Maines e-mailed Vavra and asked him if Vavra had changed his mind about the training. *See* Exhibit N, Ex. 13 to Vavra Dep. (Maines-Vavra E-mails), at 1. Vavra replied that he was going to get back to Maines soon. *Id*. at 2. | Admit. |
| 38. | On March 24, 2021, Vavra forwarded to Becker another e-mail he had sent to Maines on March 23, 2021, along with a note stating "I just I [sic] should copy you on the email I sent to Chris Maines after our Teams meeting on Friday." *See* Ex. L, Ex. 14 to Vavra Dep., at Bates Numbers HON-00000732-000737. In that e-mail to Maines (spanning 5 pages when printed), Vavra stated that he "had a little more to say about the matter to hopefully provide more detail as to why I am not going to take the training." *Id*. He also stated, "Whatever the consequences are of that decision, I will accept." *Id*. Vavra then provided links to media coverage of a mass shooting at an Atlanta spa, where the victims were Asian, that he represented were examples of "how the media and politicians sensationalize and twist the facts of certain stories to push their | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | agendas which ultimately lead to things like "Unconscious Bias" training." *Id*. Vavra stated, "I refuse to take training that was developed as a result of, or perhaps in concert but nothing with nothing but lies and manipulation by the media and corrupt public servants that insist on perpetuating division." *Id*. Vavra further stated, "I found John Waldron's 9/24 [email] incredibly offensive, discriminatory and racist and I don't want to be "trained" to be someone like that. His email was meant to be offensive as far as I'm concerned." *Id*. At the end of his e-mail to Maines, Vavra stated "I am still expecting an apology from John Waldron. I would prefer this to be the end of any further requests for me to take the training." *Id*., at 5. | |
| 39. | According to Vavra, he tried to be "as thorough as possible" in his March 8 and 23, 2021 e-mails regarding why he thought Waldron's e-mail was "discriminatory and racist." Ex. A, 107:2-12. | Admit. |
| 40. | On March 30, 2021, Vavra e-mailed Becker, and shared the link to a YouTube video in which, he claimed, an individual "very eloquently explains why I have taken such a strong stance on not taking the unconscious bias training." *See* Ex. L, Ex. 15 to Vavra Dep., at Bates Numbers HON-00000824-00000825. Vavra also stated: It has been three weeks since I sent my explanation on why I am refusing to take the training and I have not heard anything back since 3/8, other than daily requests to take the training up until last Tuesday, 3/23 after my conversation with Chris Maines. Can you please give me an update as to where things stand? Can we schedule some time to discuss? Please let me know. Id. at 16-17. Becker replied to Vavra's e-mail on April 1, 2021, stating that she | Admit. |

|   | Movant's Fact | Nonmovant's Response |
|---|---|---|
|   | would schedule a time the following week to discuss the situation. Id. |   |
| 41. | Cortez subsequently scheduled a Teams call with Vavra for the following Wednesday, April 7, 2021. Ex. A, 118:17-119:4; Ex. D, 18:9-24. Becker was also present on that call. Ex. A, 113:20-114:9; Ex. D, 16:14-18; Ex. G, 26:14-17. | Admit. |
| 42. | Cortez recalls speaking with Vavra before the meeting, and asking "Chuck, are you sure you won't take the training?" Ex. D, 19:4-16. Vavra responded that he would not take the training. *Id*. During the meeting, Cortez told Vavra that he had to take the training or be terminated. Ex. A, 120:5-10. At that point, Vavra told Cortez that he needed to speak with his wife, who was in another room. *Id*., 122:13-123:6. After speaking with his wife, Vavra confirmed to Cortez that he would not take the training. *Id*., 124:16-18. Vavra was then terminated for refusing to undergo the training. Ex. D, 16:14-22. Thereafter, Becker walked Vavra through the final steps of ending Vavra's employment. Vavra Dep. 124:19-21. | Admit. |
| 43. | Vavra's termination was considered a "voluntary separation", and one where Vavra was choosing to quit. *Id*., 20:20-21:5. Vavra was terminated for refusing to undergo the UBA training. Ex. G, 27:12-14; 45:17-22. Becker informed Vavra that the reason for his termination was his failure to complete the training. *Id*., 33:19-24; 39:23-25. | Jeff Cortez testified that Honeywell "considered" the Plaintiff's termination to be voluntary. Exhibit D, at 21:4. Admit the remainder of paragraph 43. |
| 44. | Cortez believes that Vavra's refusal to undergo the UBA training could be viewed as insubordination. Ex. D, 15:15-16:10 | Jeff Cortez testified as follows: Q: Assuming that what I just told you is true, was he insubordinate, as a general rule? A: I am not aware that that was an issue. My understanding was it was purely because of his not complying with doing the training. You could consider him insubordinate because he didn't comply |

|  | Movant's Fact | Nonmovant's Response |
|---|---|---|
|  |  | with the training that he was told to take, if you view it that way. But that's not – I can't say from my understanding that – and I was not part of the choice of laying him off – I mean, having him terminated or not. It was – That was something that was told that was done. And I was just part of the process of relaying – you know, informing him of that situation.<br><br>(Exhibit D, at 15:21-24, 16:1-10.) |
| 45. | Sometime after the April 7, 2023 meeting on the same day, Vavra e-mailed Becker, stating:<br><br>I just wanted to let you know that I think I've got all my personal stuff off of the laptop. Richard and Chris were a big help. I'm sorry that things couldn't have worked out differently. I was hoping that a discrimination claim wouldn't have ended with getting terminated, but it's a different country we're living in these days. I wish you all the best and thanks for everything.<br><br>*See* Ex. L, Ex. 16 to Vavra Dep., at Bates Number VAVRA000227. Becker responded to Vavra's e-mail on the same day, thanking him for his e-mail, attached a copy of an IP agreement, and invited "any additional questions on the exit items this morning." *Id*.; Ex. A, 134:10-137:3. | Admit. |
| 46. | On April 7, 2021, one of Vavra's coworkers, Susan Parmenter, e-mailed him to express "sad[ness]" about Vavra's departure. *See* Exhibit O, Ex. 22 to Vavra Dep. (Vavra- Parmenter E-mails) at 2; Ex. A, 154:21- 55:5. On April 9, 2021, Vavra replied to Parmenter's email. In the e-mail, he stated:<br><br>Thank you so much for the kind words. That means a lot. I was hoping things would have worked out differently but I'm not surprised how they did. My leaving wasn't | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | voluntary. I was fired for not complying with their "Unconscious Bias" training mandate. I know to some that it was just another checkbox of things to do but to me it was so much more to me. I feel very strongly about this corporate "wokeism" crap. I sent HR a very detailed email as to why I wasn't taking the training, pointing out the hypocrisy and discrimination in John Waldron's 9/24 email. Wednesday morning Jeff Cortez scheduled a Teams meeting with me and tried one last time to get me to take the training and I stood my ground. Jeff is a good guy. I felt bad for putting him in this position. But at the end of the day, you can see where our country is headed if me taking this training was their highest priority and took precedence over everything else.<br><br>*Id*. at 1; Ex. A, 156:12-15. | |
| 47. | On April 8, 2022, Vavra sent Becker another e-mail, asking "Are you going to send something stating the exact reason why I was fired, or will that come from Jeff Cortez?" *See* Ex. L, Ex. 16 to Vavra Dep., at Bates Number VAVRA000226; Ex. A, 137:12-16. On April 11, 2022, Becker replied to Vavra's e-mail, stating "There is not additional information sent regarding your termination. You will however receive all of the benefits information in the mail within the next 7 - 10 days." Id.; Ex. A, 137:17-138:10. | Admit. |
| 48. | In cases of involuntary terminations, Honeywell did not typically send out written notices of any kind to state the reasons for the terminations. Ex. G, 39:7-20. Vavra did not have any further communications of any kind with Becker, Cortez, Maines, or anyone else within Honeywell's management. Ex. A, 138:11-139:13. | Admit. |
| 49. | Vavra has never seen Honeywell's UBA training video, and does not know the | Admit. |

| | Movant's Fact | Nonmovant's Response |
|---|---|---|
| | length of the training. *Id*., 132:13-18. He understood from the e-mail reminders about the training that it was required for all employees. *Id*., 133:4-8. He is not aware of any other employee who failed to take the training. *Id*., 134:4-6. | |
| 50. | Cortez has never been told that Vavra's March 8, 2021 e-mail was the reason Vavra was terminated. Vavra was terminated for refusing to undergo the training. Ex. D, 41:12-19. Vavra was told during the meeting on April 7, 2021 that the reason for his termination was his refusal to undergo the training. *Id*. 48:20-49:4; Ex. G, 48:10-19. Becker has also testified that Vavra was terminated for failing to undergo the mandatory UBA training. Ex. G, 48:20:22. | Admit. |

Dated:  March 20, 2023                                    Respectfully submitted,

                                                         Charles Vavra

John W. Mauck                                            By: s/ Alec J. Beck
Whitman H. Brisky                                        One of his attorneys
Kirstin M. Erickson
**MAUCK & BAKER, LLC**
One North LaSalle Street, Suite 600
Chicago, Illinois 60602
Telephone:      (312) 726-1243
Facsimile:      (866) 619-8661

Alec J. Beck (MN #201133)
PARKER DANIELS KIBORT
888 Colwell Building
123 North Third Street
Minneapolis, MN 55401
(612) 355-4119
beck@parkerdk.com

Douglas P. Seaton (MN #127759)
James V. F. Dickey (MN #393613)
**UPPER MIDWEST LAW CENTER**
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN 55426
(612) 428-7000
doug.seaton@umlc.org
james.dickey@umlc.org