UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES VAVRA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. l:21-cv-06847 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| HONEYWELL INTERNATIONAL INC., a | ) | Magistrate Judge Heather K. McShain |
| Delaware corporation, d/b/a HONEYWELL | ) | |
| INTELLIGRATED, | ) | |
| | ) | |
| Defendant. | ) | |

### REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

#### INTRODUCTION

Plaintiff concedes his public policy wrongful discharge claim will not survive summary judgment and, in a footnote, voluntarily dismisses the claim. While Plaintiff alleged retaliation and discrimination claims under Title VII of the Civil Rights Act (Title VII) and Illinois Human Rights Act ("IHRA"), he maintains he did not raise discrimination and his response does not address and, therefore, abandons his discrimination claims. Plaintiff proceeds solely on his retaliation claim, which also fails. Plaintiff does not dispute any of Honeywell's undisputed material facts, and does not point to any inconsistencies among Honeywell witnesses' testimony about the singular reason for Plaintiff's termination: his steadfast and intentional refusal to undergo a mandatory, company-wide Unconscious Bias Awareness ("UBA") training. Plaintiff cites to materially distinct cases, and misrepresents their holdings in support of his position. But a thorough review of those cases reveal that Plaintiff is in fact advancing a new and radical position that would be a substantial departure from this Circuit's precedents, and permit employees to unilaterally veto an employer's universal, legitimate job requirements by simply declaring them discriminatory.

This Court should reject Plaintiff's invitation to adopt that position, and grant Honeywell's Motion for Summary Judgment.

## ARGUMENT

### I. THERE ARE NO DISPUTED MATERIAL FACTS

Plaintiff does not dispute any of the facts, documents, or testimony presented by Honeywell regarding his claim of retaliation. *See* Nonmovant's Local Rule 56.1 (b)(2) Response to Defendant's Statement of Material Facts ("Response to SOF"). (Dkt. 45). In response to paragraphs 18, 23, 30, 33, 43 and 44, Plaintiff responded with an admission of the facts and by providing additional testimony. (Dkt. 45). None of Plaintiff's added testimony manifest any inconsistencies or disputes with Defendant's Statement of Facts.[1] As such, all those facts should be deemed undisputed. In addition, Plaintiff has not filed a statement of any additional facts under Local Rule 56.1(b)(3)(C). Therefore, there is no genuine dispute over any material facts.

### II. HONEYWELL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM

#### 1. Timing does not support Plaintiff

Plaintiff argues that the timing of his termination "supports an inference of discriminatory intent" and is suspicious because he was terminated 30 days after sending his March 8 email voicing his objections to the UBA training and 15 days after sending his March 24 email renewing his objection to taking the UBA training. *See* Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Response"). (Dkt. 44, at pp. 5-7). Yet, Plaintiff *admits* that suspicious timing alone cannot support such an inference. Indeed, under Seventh Circuit case law,

---

[1] In one instance, Plaintiff omits a pronoun from a witness's deposition statement, materially changing the meaning of deponent's statement and erroneously suggesting that the witness also had concerns about the UBA training. In response to SOF ¶ 23, Vavra quotes Jeff Cortez as stating "I kind of told him I don't see the concern. But had that concern", when in fact, Cortez stated "I kind of told him I don't see the concern. But *he* had that concern." (Dkt. 45).

2

"[s]uspicious timing is rarely enough to create a triable issue." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Therefore, "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). "When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may 'survive summary judgment if there is other evidence that supports the inference of a causal link.' " *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). As discussed herein, there is no such other evidence.

Plaintiff's timing argument misses the mark in several ways. While Plaintiff puts so much focus on the time period between his March 8 and March 24 emails and his termination on April 7, 2021, he entirely ignores the relevant events that occurred prior to his e-mails. Plaintiff originated his path towards termination five months earlier, in November 2020, when Honeywell announced UBA training. There is no dispute that at that time Plaintiff became aware the training was *required* for all U.S. employees and was to be completed by February 25, 2021. *See* SOF ¶¶ 14-15. As the deadline approached, all employees who had yet to take the training received many automated reminders about the deadline. *See* SOF ¶ 21. When only five days remained, Plaintiff received daily reminders about the training. *Id*. Despite the reminders, he decided to intentionally ignore the deadline and continued to not take the training. These events are notable, because they demonstrate the importance of this training to Honeywell and Plaintiff's awareness that the training was both important and required. Additionally, these events evidence that the reminders were not targeting him individually and he received them *before* he ever complained about the training.

Several individuals also directly and indirectly reached out to Plaintiff to personally direct him to complete the training. Plaintiff suggests that it was only after his March 8 email that he

3

received personal reminders to take the training (and that this was somehow targeting him for a future retaliatory action), but he admits in his Response to SOF that several individuals—including Katie Becker, Jeff Cortez and Brian Swinkola—reached out to him *before* his March 8 e-mail and reminded him that the training was required. *See* SOF ¶¶ 22-29. In fact, by the time Plaintiff sent his March 8, 2021 e-mail, he had already missed his deadline for Honeywell's mandatory training by more than two weeks.

Plaintiff wants this court to believe that he made complaints about the UBA training and only then did Honeywell decide to terminate him. Do not be misled. When Plaintiff sent his March 8 email, he was well aware of what the consequences of his not taking the training would be. Indeed, he stated in his email, "Do whatever it is you feel you have to do to deal with my noncompliance…". SOF ¶29. Plaintiff again stated in his March 24 email "Whatever the consequences are of that decision [not to take the training], I will accept." SOF ¶38. These statements evidence that *before* Plaintiff raised his concerns, he knew the training was required and that noncompliance would result in termination.

Plaintiff conveniently ignores the events of several months prior to his March 8 and March 24 emails, because no reasonable fact-finder or jury could consider all those events as a whole, and ascertain any impact by Plaintiff's e-mails on Honeywell's decision to terminate his employment. *See Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("Where, as here, there are reasonable, non-suspicious explanations for the timing of [plaintiff's] termination ... we will not deny summary judgment solely on the strength of [suspicious timing].")

Plaintiff reliance on *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 770 (7th Cir. 2008) is faulty. The facts of that case were significantly different from those here. *Magyar* involved a plaintiff who complained to the company's General Counsel about sexual harassment by a co-

4

worker. After doing so, the plaintiff's supervisor questioned the plaintiff about why she contacted the General Counsel and, two days later, began positioning the plaintiff's job for elimination with the plaintiff being designated ineligible for rehire. In addition, the Court determined that the supervisor in question made statements about plaintiff's complaint to the General Counsel that a reasonable jury could find "defensive and accusatory." It was in light of these facts that the Court found the adverse actions taken as more than suspicious timing.

Here, the facts could not be any more starkly different. Unlike the plaintiff in *Magyar*, Vavra was not subjected to any targeted conduct. The training was required of, and applied to, all U.S. employees. Also, unlike the plaintiff in *Magyar*, Vavra's job was not eliminated, and he was not terminated without his volition. Rather, Vavra was directed over-and-over to undergo a mandatory training like every other U.S. employee and told what the consequences of not meeting the requirement would be, but he nevertheless refused. His termination after five months of repeated requests to undergo the UBA training could not raise an inference of causation in the mind of any reasonable jury.

Vavra's other cited cases are equally incomparable to the facts of this case. Those cases are purportedly cited for the proposition that close timing between a complaint and an adverse action supports an inference of retaliation. Yet, as noted herein, those cases were not decided on timing alone and each had additional supporting evidence of a causal connection. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007) involved a constructive discharge claim by a plaintiff who complained to human resources after enduring months of sex-based comments from her supervisor, only to have her supervisor then deliberately give her negative employee reviews. In *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792 (7th Cir. 2018), the plaintiff brought a retaliation claim against her former employer under the Americans with Disabilities Act,

5

alleging she was retaliated against for requesting accommodations. Notably, the Court found that the suspicious timing alone (one month) would not have been sufficient, but plaintiff had presented no fewer than seven different facts suggesting her firing was pretextual. Similarly, the Court in *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) rejected a "bright-line numeric rule" on timing, but denied defendant's summary judgment only after acknowledging "corroborating evidence of retaliatory evidence." In *Brown v. Chicago Transit Auth.*, No. 17 CV 08473, 2020 WL 777296, at *1 (N.D. Ill. Feb. 14, 2020), suspicious timing was coupled with direct race-based statements by a supervisor and evidence of other employees who had received more favorable treatment. In *Patton v. Forest River, Inc.*, No. 3:18-CV-419 DRL-MGG, 2020 WL 805753, at *1 (N.D. Ind. Feb. 18, 2020), plaintiff's suspicious timing argument was coupled with other evidence of pretext, including targeted adverse treatment against him following his complaint. *Suarez v. Kwoks Int'l Trading, Inc.*, No. 05 C 6979, 2007 WL 2874216, at *12 (N.D. Ill. Sept. 25, 2007) involved yet another plaintiff that, in the eyes of the court, had presented not just evidence of suspicious timing, but "substantial evidence tending to show … pretext." Finally, Plaintiff's reliance on *Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680, 681–82 (N.D. Ind. 2012), is peculiar because the court granted the employers' motion for summary judgment, because "Seventh Circuit precedent is clear that suspicious timing alone is generally insufficient to prove a retaliation claim. That principle is particularly applicable where, as here, an overwhelming weight of evidence shows that the adverse action was undertaken for reasons apart from any retaliatory motive." *Id*.

Plaintiff's string citation of these cases *sans* any discussion about their individual contexts or the courts' analysis manifests two major flaws in his reasoning. First, all of these cases involve employees who complained about specific conduct by an individual (usually in a position of authority) against the plaintiff, only to later become the target of some form of adverse action. This

type of fact pattern is not analogous to the facts of this case, which involve an employee who complained about a required, mandatory training program, and then claimed that the employer's refusal to provide him with *preferential treatment* by not waiving the requirement just for him somehow constituted retaliation. Second, Vavra fails to recognize that the analysis on suspicious timing is always case-specific, and rarely deemed enough by itself to provide a reasonable basis for inference of retaliation. Vavra's argument that the timing of his termination was suspicious fails on its own and further fails because he cannot point to any other evidence supporting a causal connection.

### 2. Honeywell followed its policies at all times, and took appropriate action in response to Plaintiff's complaint

In an apparent attempt to bolster his inadequate suspicious timing argument, Plaintiff argues that Honeywell somehow did not follow its policies with respect to processing his complaint. Plaintiff cites to no supporting evidence or testimony supporting his claim that Honeywell significantly deviated from its policies – or deviated from its policies at all. His argument is without merit and the record reflects that Honeywell followed its policies in response to Plaintiff's complaint and took appropriate action.

As Plaintiff correctly notes, Honeywell's Code of Business Conduct ("Code" or "the Code") prohibits discrimination, and encourages employees to report any unlawful or inappropriate discrimination or harassment to Honeywell. SOF ¶¶ 5, 7. It also specifically prohibits retaliation for making a good faith complaint of discrimination. SOF ¶ 6. Honeywell's policies do not require it to conduct a specific type of investigation. Plaintiff insinuates that no investigation of his complaint was done and he erroneously claims that no one at Honeywell spoke with him about his complaint. Response, at 10. He ignores Katie Becker's testimony that the manner of investigation of any complaint differs upon the situation, but that upon receiving Plaintiff's

7

complaint she communicated Plaintiff's concerns within human resources and it was reviewed by Honeywell's legal department before proceeding with his termination. Ex. G, 19:19-20:6, 43:8-44:11.

Plaintiff's March 8 email was voluminous – spanning seven pages. It set forth in detail Plaintiff's thoughts on the UBA training and why he would not take it. Speaking to him further about the email was not a requirement nor was it necessary given the nature of the complaint – he voiced objections to the training and was not raising specific conduct *taken against him* by any individual.[2] Vavra was complaining about a training program that not only Honeywell already knew about, but it was vetted and approved by Honeywell's Diversity, Equity and Inclusion Department, as well as the Law Department. In other words, Vavra disclosed no *facts* about the training or its contents to which Honeywell was unaware. The only information of which Honeywell was unaware was how Vavra felt about the training. Becker testified that "in this particular instance, [the training] had already been reviewed by our legal team. So I didn't have the same concerns[.]" Ex. G, 45:13-16. In fact, one is left at a loss as to what an investigation that would have been to Plaintiff's liking would have looked like with respect to an already vetted program, and one that *only Plaintiff*, out of thousands of its U.S. employees, found objectionable. Finally, Plaintiff fails to cite any case law that would obligate an employer to conduct a specific type of investigation into a complaint of discrimination, or communicate the results with the employee – because there is none.

Nevertheless, Honeywell did speak to him about his concerns. On March 19, 2021, Plaintiff had a one-on-one meeting with Chris Maines, Vice President of Engineering. SOF ¶ 32.

---

[2] Plaintiff's March 24 email was similarly detailed in setting forth Plaintiff's concerns and a follow-up discussion about his views was unnecessary.

8

During this meeting, Plaintiff had the opportunity to share his views about the training, and Maines responded to any issues that Plaintiff chose to raise about the training during this meeting. *Id*.

Plaintiff's allegation that Honeywell did not "otherwise take seriously [his] complaints of discrimination" are unsupported and he wildly misrepresents the testimony of Jeff Cortez and Katie Becker. Cortez never testified that he did not seriously read Plaintiff's complaints.[3] Rather, Cortez testified that he spoke to Plaintiff about his beliefs regarding the content of the training, shared with Plaintiff that he did not think the training was racist, and talked to him about the content of the training – including that there was an example of bias directed towards a white male. SOF ¶33. Similarly, Becker did not testify that no one in human resources did any investigation.[4] As noted above, Becker testified Plaintiff's concerns were reviewed by human resources and legal.

Furthermore, while Plaintiff argues that Honeywell did not report the result of any investigation to him, he fails to point out any part of the Code that required Honeywell to report investigation results to employees or any testimony that Honeywell's practice in conducting investigations was to discuss the results with the complainant. As an employer, it is Honeywell's prerogative to intake and process complaints of discrimination, and have a remedial response in any form that it deems necessary, which may or may not include reporting the results to the complaining employee on a case-by-case basis. The record supports that Honeywell acted according to its policies and Plaintiff's argument to the contrary must not be considered.

---

[3] Plaintiff cites to SOF ¶¶ 10 and 17 for this contention but neither address Cortez actions.
[4] Plaintiff cited testimony does not support his contention. Plaintiff's counsel asked Ms. Becker: "And you communicated that [Plaintiff's complaint] up the flagpole as you said." Ms. Becker answered, "Correct." "Okay. You don't remember to who you reported that." "I don't remember. It would've been someone within HR." Ex. G, 43:15-21.

### 3. There are no disputes of material fact and no credibility issues that require a jury to weigh in

Plaintiff attempts to manufacture credibility issues to survive summary judgment, but there are no credibility issues that would require a jury to weigh in. Plaintiff argues that because he claims that his termination was in retaliation for complaining about the training, and Honeywell asserts that the termination was due to Plaintiff's refusal to undergo a required company-wide training, "[t]hat issue cannot normally be answered except by a jury's weighing of credibility." Response, at 11. This is a general proposition that, if taken to its logical conclusion, would preclude summary judgment on virtually *all* retaliation claims, which invariably involve plaintiffs who claim retaliation and defendants who point to non-discriminatory reasons for taking adverse actions.

It is true that in cases where the defendant's motive or state of mind is an essential element of a plaintiff's case, a court must be circumspect in granting summary judgment based solely on the defendant's denial that the requisite mental state existed. *See Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988) ("When the issue is one of intent, we approach the application of [summary judgment] principles with special caution."). However, "where the plaintiff has had the opportunity to depose the defendant to test the defendant's veracity and the plaintiff has failed to 'shake' the defendant's version of the facts or to raise significant issues of credibility, summary judgment for the defendant may ordinarily be granted[,] unless the plaintiff has adduced other 'significant probative evidence' from which a jury would be entitled to infer contrary conclusions about the mental state at issue." *Corrugated Paper Prod., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989). As the Seventh Circuit in *Corrugated Paper Prod., Inc.* explained, "[a]lthough the movant's testimony about the existence of a particular mental state may not be dispositive, the movant is entitled to summary judgment if the burden is on the nonmovant to

10

establish the state of mind and the nonmovant has failed to come forward with even circumstantial evidence from which a jury could reasonably infer the relevant state of mind." *Id*. "[T]he opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id*. (citing *Curl v. International Business Mach. Corp.*, 517 F.2d 212, 214 (5th Cir.1975)).

Plaintiff's cited cases are inapposite. *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464 (1962) involved an action to recover treble damages based on alleged violations of the restraint of trade and monopoly sections of the Sherman Act. Plaintiff cites to a single sentence from this case, and misquotes same. Response, at 11. The full quote reads, "*We believe that summary procedures should be used sparingly in complex antitrust litigation* where motive and intent play leading roles, *the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.*" *Id*. at 473 (italicized portions are missing from Plaintiff's Response). The Seventh Circuit was clearly discussing summary judgment in the context of a complex commercial litigation case involving witnesses that had exclusive access to certain evidence. The directive has little relevance to a single plaintiff employment case. Plaintiff's reference to *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394 (7th Cir. 1997) is more than mere misleading; it suggests the exact opposite of that case's holding. In *Wallace*, the Seventh Circuit affirmed summary judgment in favor of the employer. In doing so, the Court explained:

> Summary judgment is proper only if there is no genuine (in the sense of reasonably contestable) issue of material (that is, potentially outcome-determinative) fact. Language in some of our cases implies that because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate in such cases. But as there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases, what the language we have referred to really means is just that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is

11

> genuinely contestable, which an issue of intent often though not always will be. In antitrust law, we note by way of analogy, early decisions pronouncing it a field inapt for summary judgment were later repudiated. Summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial, … many of them on the basis of summary judgment for the defendant.

*Id*. at 1396. In fact, "when challenges to witness' credibility are all that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.") *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (emphasis in original); *see also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

Here, intent is a non-issue. Honeywell's witnesses have been consistent from the inception of the training until the present: the UBA training was mandatory for all employees; refusing to take it would result in termination; Plaintiff knew well before he ever raised a complaint about the training – and acknowledged in his complaints – that a failure to take it would result in termination but, nevertheless, he intentionally decided to refuse undergoing the training; Plaintiff received many warnings to come into compliance and he was ultimately terminated as a result or his refusal.

Plaintiff claims that his "insubordination" and the protected activity are "one and the same." Response, at 12. That is incorrect. The protected activity was Plaintiff's complaint about the training, while his insubordination was his actual refusal to undergo the training that Honeywell had vetted and found to be nondiscriminatory. Plaintiff could have chosen to undergo the mandatory training while complaining about the training both before and after his attendance, but he chose not do so. Plaintiff's refers to *Castro v. DeVry Univ., Inc.*, 786 F.3d 559 (7th Cir. 2015) in support of the proposition that an employer cannot brand a protected activity as "insubordination." But the facts in that case are starkly different than those here. In *Castro*, the

12

Seventh Circuit only reversed a retaliation claim brought by one of three plaintiffs in the case. The defendant claimed it terminated the plaintiff for performance and his "volatile behavior." In reversing, the court found the plaintiff produced evidence that the defendant did not honestly believe in its proffered reason for terminating him. There, the plaintiff had evidence that the defendant provided false information to the EEOC regarding his supervisor's lack of knowledge of his protected activity, where there was an internal e-mail specifically referencing the plaintiff's protected activity and recommending his termination. *Id*. at 563. Evidence in that case reflected the plaintiff's supervisor believed employees who complained to human resources were disloyal and insubordinate, as the supervisor stated that staff should not go "running off to HR" and another supervisor told plaintiff that people who "went to HR no longer work here." *Id*. at 568-569.

This case is unlike *Castro,* where the protected activity and alleged insubordination leading to termination really were one and the same. Here, Plaintiff's complaint about UBA training played no role in his termination. Solely his refusal to take the required training resulted in his termination. Intent is not at issue. Additionally, there is no evidence of pretext. Before Plaintiff raised his concerns about the training, he was fully aware of the consequences of not taking the training. SOF ¶¶29, 38. He even admitted to his former colleague: "I was fired for not complying with [Honeywell]'s 'Unconscious Bias' training mandate" (SOF ¶ 46), *not* for complaining about the training. Plaintiff's speculation about the reason for his termination does not create a genuine credibility issue, and summary judgment remains proper.

4. **Plaintiff fails to properly address Honeywell's cited cases**

Plaintiff unsuccessfully attempts to distinguish Honeywell's cited cases. In *Daza v. State*, 331 F. Supp. 3d 810 (S.D. Ind. 2018), contrary to Plaintiff's assertion, while plaintiff brought his retaliation claim based on his political affiliation under the First Amendment, he brought race and

color discrimination and retaliation claims under Title VII. *Id*. at 837. Further, there is no discussion whatsoever in *Daza* regarding any "long history of unprofessional and insubordinate behavior", as Plaintiff asserts. Response, at 13. To the contrary, according to the defendant, Daza's performance was "historically good." *Daza*, 331 F. Supp. 3d. at 832. Similar to Vavra, the only basis for Daza's termination was his conduct in relation to a training he opposed. Plaintiff's failure to draw any substantive distinctions between *Daza* and this case makes that case all the more relevant.

In *Norgren v. Minnesota Dep't of Hum. Servs.*, No. CV 22-489 ADM/TNL, 2023 WL 35903, at *4 (D. Minn. Jan. 4, 2023), the court did not dismiss the plaintiff's claim due to a lack of protected activity, as Plaintiff alleges. Response, at 13. It dismissed it because the Amended Complaint failed to allege facts that would show the plaintiff suffered adverse action. *Id*. at *7. Plaintiff claims that "**Nothing** in *Norgren* is relevant to this case," (Response, at 13), but he must mean nothing in that case is helpful to him, because the reason the Court found that the plaintiff did not suffer any adverse action was that the employer could legitimately require all employees to undergo diversity training, and the plaintiff could not refuse to undergo the training, no matter how objectionable or discriminatory he found it. In *Bourgeois v. United States Coast Guard*, 151 F. Supp. 3d 726, 739–40 (W.D. La. 2015), the fact that the plaintiff alleged that the training itself was adverse action is immaterial to Honeywell's argument. Honeywell's argument is that as an employer, it could legitimately institute a mandatory diversity program, and indiscriminately require all employees to attend it, and an employee could not be relieved from the requirement by claiming the training was retaliation (as in *Bourgeouis*) or discrimination (as in his case). Finally, Vavra claims that *Brennan v. City of Philadelphia*, No. CV 18-1417, 2020 WL 3574454, at *1 (E.D. Pa. June 30, 2020), aff'd, 856 F. App'x 385 (3d Cir. 2021) was different than this case

14

because there, "the employer had legitimate reasons, wholly distinct from Brennan's protected activity, to require him to undergo the sensitivity training." Response, at 14. In doing so, Vavra again fails to acknowledge that he, too, was required to undergo the UBA training months before he ever complained about the training, and therefore, the training requirement for him, too, was "wholly distinct from [his] protected activity."

Finally, Vavra fails to address one of Honeywell's key arguments, which it dismisses as a "parade of horribles" (Response, at 12);

> Vavra is effectively arguing that once an employee objects to a job requirement by alleging that the requirement in question is discriminatory (even when the employee lacks any knowledge or understanding of the requirement's contents), the employee should be permitted to refuse to meet the requirement and be immune from any discipline.

Dkt. 42, at 7. This point bears emphasizing because Plaintiff's position, if accepted, would not be limited to diversity training programs. Vavra's position would permit a plaintiff to contravene *any* job requirement—from meeting performance metrics to complying with attendance policies—by simply alleging that the employee considered the requirement discriminatory. In light of the fact that Courts in this Circuit "do[ ] not sit as a superpersonnel department that reexamines an entity's business decisions", *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986), this Court should reject Plaintiff's proposal to permit the *employee* to act as a one-person superpersonnel department by vetoing and waiving his employer's job requirements as he sees fit.

15

## CONCLUSION

Vavra cannot meet his burden on any of the claims advanced. Accordingly, for all of the foregoing reasons, Honeywell is entitled to judgment on all claims.

**DATED:** April 3, 2023.

Respectfully submitted,

By: _____/s/ Sam Sedaei_____
One of the Attorneys for Defendant
**HONEYWELL INTERNATIONAL, INC.**

Jennifer Colvin (ARDC No. 6274731)
Sam Sedaei (ARDC No. 6317657)
**OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.**
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Telephone: 312.558.1220
jennifer.colvin@ogletree.com
sam.sedaei@ogletree.com

## **CERTIFICATE OF SERVICE**

    The undersigned attorney hereby certifies that on April 3, 2023, a true and correct copy of the foregoing ***Defendant's Reply in Support of Its Motion for Summary Judgment*** was filed electronically with the Clerk of Court using the ECF system, which sent notification of such filing to all parties of record.

                                                 */s/ Sam Sedaei*

55752869.v1-OGLETREE