**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES VAVRA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 6847 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| HONEYWELL INTERNATIONAL INC., | ) | |
| a Delaware corporation, d/b/a | ) | |
| HONEYWELL INTELLIGRATED, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Honeywell Intelligrated, Inc. ("Defendant" or "Honeywell") has moved for summary judgment on plaintiff Charles Vavra's ("Plaintiff") claims for retaliation and discrimination under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/6-101(A), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), and for wrongful termination. Plaintiff asserts that Defendant violated the IHRA and Title VII by terminating his employment because he stated his opposition to taking implicit bias training based on his conclusion that it was inherently racist. For the reasons that follow, Defendant's motion for summary judgment is granted.

### I.   BACKGROUND

Plaintiff, who is white, began working at Intelligrated in 2008 as a Project Manager. (DSOF ¶¶ 9-10.)[1] Plaintiff became a Honeywell employee when it acquired Intelligrated in

---

[1] Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (ECF No. 43) shall be referred to herein as "DSOF," while Plaintiff's Local Rule 56.1(b)(2) Response to Defendant's

2016. (*Id*. ¶ 9.) Honeywell integrated Intelligrated into Honeywell's Safety and Productivity

Solutions ("SPS") business unit, and it became known as Honeywell Intelligrated. (*Id*.) At that

time, Plaintiff held the position of Estimating Manager and reported to Todd Bryant. (*Id*. ¶ 10.)

Plaintiff knew his employment with Honeywell was at-will. (*Id*. ¶ 9.)

On September 24, 2020, John Waldron, SPS's President and CEO at the time, sent an e-

mail to all SPS employees, with the subject line "Continue to Fight for Social Justice." (*Id*. ¶ 12.)

The entirety of the e-mail states:

> Dear Friends and Colleagues,
>
> Yesterday's decision by the grand jury in Louisville, Kentucky not to indict the
> officers who killed Breonna Taylor is difficult for me to understand. I'm sure I
> don't have all the facts, and I'm struggling to process the many thoughts and
> emotions I have around this tragic situation. I can only imagine how our Black
> colleagues are feeling ... again. Each time these situations occur, they highlight how
> far we must go to create an equal and just society where all people have the same
> opportunities to succeed.
>
> Racial bias is real. Don't kid yourself. Each of us has unconscious bias within us.
> When these biases compound, they can evolve into institutional biases. Breaking
> out of this cycle is critically important for moving society forward. Breaking this
> cycle requires courage — the courage to discuss, the courage to admit our bias and
> to encourage and promote our differences, the courage to change.
>
> Words alone aren't sufficient. We must take tangible actions to make a difference.
> We have, and we will continue to do so. In SPS, we are committed to doubling our
> efforts on the agenda we have set forth previously which includes engaging our
> Employee Resource Groups (ERG) with another round of listening sessions, upping
> our game when hiring ensuring 100% of the time that the interview panel and
> candidates are diverse, and you can expect to hear of other actions we will be taking.
>
> Shortly after George Floyd's death, one of our Black colleagues reminded me that
> it was white people in America that freed the slaves and ultimately supported the
> civil rights movement and legislation of the 1960s. That time is upon us again —
> we, me included, must insist upon racial equality. We must demand it from
> ourselves. We must welcome dialogue about it. We must have zero tolerance for its
> absence.

---

Statement of Material Facts (ECF No. 45) shall be cited to herein as "Pl. Resp." Plaintiff did not
file a Local Rule 56.1(b)(3) statement of additional material facts.

> My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues. I stand with you.
>
> John

(*Id.*) Plaintiff believed the e-mail contained racist and discriminatory statements, but he did not voice those concerns to Mr. Bryant or anyone in Human Resources ("HR") at the time. (*Id.* ¶ 13.) Plaintiff testified that this email "is basically the basis of this whole lawsuit." (*Id.* Ex. A, 37:10-11; 37:33-38:2.)

In November 2020, Honeywell's Diversity, Equity and Inclusion office ("DEI") announced an Unconscious Bias Awareness training ("UBA Training" or "Training") initiative whereby employees were required to complete on-line training by February 25, 2021. (*Id.* ¶¶ 14-15.) On February 24, 2021, Louise Quilter-Wood, Honeywell's Vice President of HR and Communications, SPS, sent an e-mail to certain Honeywell employees, including Plaintiff, with the subject "TAKE ACTION TODAY: Unconscious Bias Awareness Training is Due Now." (*Id.* ¶ 15.) The e-mail stated: "You are receiving this message because you have not completed the Unconscious Bias Awareness training which is due Feb. 25, 2021. Please click the link at the bottom of this email and complete the training within the next 24 hours." (*Id.*) Beneath the directive to complete the training, the e-mail also contained the content of the original e-mail that announced the training:

> As part of our commitment to Inclusion and Diversity, Honeywell has launched Unconscious Bias Awareness training, which is required for all employees.* While it's human nature to have biases, we must strive to overcome them to create an environment that values everyone's perspectives — a workplace based on trust, respect, and open communication. This training aims to equip you with the insights and tools needed to help spot and challenge the ways biases prevent us from creating an inclusive environment. When we work to eliminate our implicit biases, we not only treat each other better, but we become a better company. Combating unconscious bias allows us to build a culture that supports better customer service, stronger business results, and a more engaged workforce. If you want to learn more

3

about unconscious bias, watch this video on Removing Bias from Our Everyday Decision Making. Please complete Unconscious Bias Awareness training by Feb. 25, 2021.

(*Id*.)

The UBA Training was mandatory for all Honeywell employees within the United States, and the consequence of not taking it was termination. (*Id*. ¶¶ 17-18.) Plaintiff was aware that the e-mail contained a link he could click that would open the UBA Training video, but he never clicked on that link during his employment at Honeywell. (*Id*. ¶ 16.) Plaintiff did not, however, immediately raise any concerns about the training to his supervisor or HR. (*Id*. ¶ 19.)

After failing to take the UBA Training in response to the original announcement, Plaintiff received several reminders from DEI about it. (*Id*. ¶ 21.) When only five days remained to the February 25 deadline, Plaintiff began to receive daily reminders. (*Id*.) Plaintiff missed the deadline and thereafter continued to receive daily e-mail notifications indicating how many days he was past due. (*Id*.) Plaintiff testified that he "had no plans" to take the UBA Training. (*Id*. ¶ 20.)

In response to the original announcement, Plaintiff requested to no longer be a manager because he "didn't want to push stuff like this on my reports, the unconscious bias training." (*Id*. ¶ 19.) Plaintiff did not share the reason for his request with Mr. Bryant, who referred Plaintiff to a jobs portal to apply for an alternative position. (*Id*.) In February 2021, Plaintiff's position changed to Principal Application Engineer, and he held that position for the remainder of his employment. (*Id*. ¶ 9.) As Principal Application Engineer, Plaintiff directly reported to Jeffrey Cortez, Manager of Concepting and Estimating. (*Id*.) Mr. Cortez, in turn, reported to Brian Swinkola, who reported to Justin Lieb. (*Id*.) Plaintiff had told Mr. Cortez over a year prior that Plaintiff wanted to get out of a management role. (*Id*. ¶ 19.)

In addition to the automatic reminders, several individuals from Honeywell reached out to Plaintiff and asked him to complete the Training. In the morning of March 2, 2021, Mr. Cortez forwarded Plaintiff an email he had received the prior evening from DEI in which Mr. Cortez was asked to ensure that his direct reports who had not completed the UBA Training complete it. (*Id*. ¶ 22.) In forwarding the email, Mr. Cortez wrote to Plaintiff, "Chuck – know you are not a fan of this training module, however you are currently the only one who hasn't completed this training so would ask that you do this." (*Id*.) Sometime prior to the email, Plaintiff had had a conversation with Mr. Cortez regarding the UBA Training, although neither Plaintiff nor Mr. Cortez recall when the conversation occurred or what was said. (*Id*. ¶ 23.) Mr. Cortez does not recall Plaintiff saying he thought the UBA Training was racist; Mr. Cortez's understanding was that Plaintiff felt the company was "pushing in political correctness issues" and that Plaintiff did not think the company had a right to do that. (*Id*.)

A few hours later, Mr. Cortez forwarded an email chain to Plaintiff and wrote, "Chuck – as I thought would happen, getting additional pressure to get this training completed. Please get completed today and let me know when done." (DSOF ¶ 24.) Shortly thereafter, Plaintiff received an email from Mr. Swinkola forwarding the same email chain and asking Plaintiff to "please complete the Unconscious Bias training." (*Id*. ¶ 27.) Plaintiff never had a conversation with Mr. Swinkola about the Training either before or after that email.

Later that afternoon, Katie Becker, the HR Director supporting Intelligrated business, emailed an undisclosed list of individuals reminding them that the Training was due, asking the recipient(s) to complete it asap, and encouraging them to let her know if anyone had any issues in completing the training. (*Id*. ¶ 28.) Plaintiff replied to Ms. Becker's email that afternoon,

stating, "Yes, I do have issues completing this. I will be sending out an email shortly explaining why." (*Id*. ¶ 28.)

On March 5, 2021, Ms. Becker emailed Plaintiff, informing him that the UBA Training was required for all Honeywell employees, and asking him what barriers he was having in completing the Training. (*Id*. ¶ 29.) On March 8, 2021, Plaintiff sent a seven-page email to Ms. Becker, cc'ing Mr. Cortez and Mr. Swinkola, stating his objections line-by-line to Mr. Waldron's September 24 email. (*Id*.) Among other things, Plaintiff stated,

> The reason I'm not taking [the UBA Training] is because it's absolutely ridiculous and it doesn't work. How do I know that? Because we have our own CEO to thank for proving to to [*sic*] all of us that it doesn't work. To be honest, if John Waldron's 9/24 email below hadn't preceded the training mandate a couple months earlier I probably would have just taken it… I'm going to explain in hopefully more than enough detail why I, and I'm sure so many others found his email so offensive.
> \*\*\*
> Why is he only concerned with our BLACK colleagues feelings? I suppose it's possible that a couple of our black colleagues were somehow related to Breonna Taylor…but all of them? If they didn't know her personally why would they feel anything other than maybe some compassion for Breonna Taylor's grieving friends and family? As the CEO of a division of a global company, I'm sure there is no way he would ever suggest that all of his black colleagues should somehow feel like victims in the Breonna Taylor case just because she was black. I'm sure he would never suggest that his colleagues of other races should have no feelings about the Breonna Taylor incident because they're NOT black, right? Because that would be kind of…. oh, I don't know…racist and discriminatory?
> \*\*\*
> What does racial bias have to do with a couple police officers accidentally killing Breonna Taylor after they were shot at first? Is he implying that Breonna Taylor's death was somehow racially motivated? Because it sure sounds like it. I would expect that from the liberal media because they love to find just the right story, sensationalize it 24/7 for weeks or months on end it [*sic*] to continue their "systemic racism" narrative, create riots, destroy businesses (even businesses of black owners) and destabilize cities. But our CEO? I wouldn't expect that from him.
> \*\*\*
> With regards to courage I found the courage to admit to myself that the CEO of SPS was a race-baiter. It appeared he was gaslighting his non-white colleagues into believing he is some sort of angelic empath that has taken it upon himself to be the spokesperson and apologist for all of his white colleague's [*sic*] and their evil ways by implying that we all are somehow tied to the killings of Breonna Taylor and George Floyd.

6

***

Everything has only gotten better since the 1960s until the globalist's [*sic*] and their socialist mouthpieces recently needed to INVENT a new "systemic racism" problem to push their agenda....again. Then there is their media.

***

Today and for the past decade or so the only time I ever witness "systemic racism" or "racial bias" is when I turn on my TV….or read emails like Waldron's.

***

My initial though[t], after reading where he says "Racial bias is real, don't kid yourself. Each of us has racial bias within us" was how dare he even suggest something like that. Says who, him? CNN? Xi Jinping? Klaus Schwab? 99% of some group of nameless psychologists that agree everyone has unconscious bias? Who? But after witnessing all of the lunacy taking place these days, nothing even surprises me anymore. Perhaps Mr. Waldron should take the red/yellow/green light training because to me, reading that email was bright red light. He didn't just cross a line, he did a cartwheel over it.

***

Their so-called "systemic racism" is just another manufactured crisis to keep people at odds with each other and "unconscious bias" training is the decades old joke of a solution to a problem that doesn't even exist to anywhere near the extent they make it out to.

***

[Mr. Waldron is] making his non-white colleagues all victims and turning his white colleagues, that had absolutely nothing to do with those two incidents into villains.

***

So let me make this perfectly clear, John Waldron nor anybody else gets to tell me I have unconscious bias.

***

If racial bias exists within some people, don't kid yourself. There is nothing unconscious about it. Just ask John Waldron. He made a "conscious" decision to race-bait all of his colleagues by suggesting the Breonna Taylor case was racially motivated. Some of his colleagues will actually buy that. People aren't inherently racist. It is learned. It is pushed into and absorbed in the heads of gullible victims that have had their trust betrayed by people in positions of power like greedy, self-serving politicians, the media and even CEOs of global corporations that are all working in concert towards a common "political" goal. I'm here to work. I'm not here for an indoctrination into John Waldron's mindset or his ideologies that he feels empowered to shove down our thoughts just because he's in a leadership position in this organization.

***

If someone has complained about any racist, misogynistic or homophobic behavior I'm associated with, only then would I consider taking the training. Until then, I have no intention of taking it.

***

The most disturbing…..and somewhat laughable observation I made in Mr. Waldron's email was the exclusion of an entire race of his colleagues that his heart

went out to. And I quote, "My hands and heart are open to each of our Black, Hispanic, Asian, and LGBTQ colleagues". … So why did John Waldron give a nod to the Hispanics and Asians, but not us white people? To hell with all of our feelings, right? … It may surprise Mr. Waldron that I, being white and all, had feelings about the Breonna Taylor case as well. It was tragic what happened to her.

***

John Waldron's excluding and alienating an entire race of his colleagues was a passive aggressive way of making it clear to all of our non-white colleagues who the bad people are….all of us whit[e] folks of course.

***

It seems a little counterintuitive to EXCLUDE an entire race of his colleagues "who his heart goes out to", especially when he's planning on following up with an "unconscious bias" training mandate…. That is being headed up by the "INCLUSION" and diversity group. That's where the irony and hypocrisy come in. It's laughable. You can't make shit up. But you know, maybe he's right. Maybe SOME of us DO have unconscious bias. If John Waldron does, I think it would be best for him to just deal with it himself on a personal level rather than project his racial biases or his "white guilt" onto his employees. To say that "each of us has unconscious bias within us" is reckless and irresponsible. That's a pretty broad brush stroke.

***

To reiterate, I AM NOT taking this training because it's a joke, and I'll use John Waldron's email as proof of it. I refuse to take part in this ridiculous charade. I feel John Waldron owes ALL of his colleagues an apology for even perpetuating this nonsense. Do whatever it is you feel you have to do to deal with my non-compliance, but I can tell you this...I am not a sellout to myself, my integrity, my convictions or to the tens of millions of freedom-loving, Constitution-loving Americans of ALL races and genders in this country that feel the same way I do. If I am expected to agree with John Waldron's opinions on social and political issues, I feel I am being forced into having to re-evaluate my working relationship with Honeywell. I shouldn't be made to feel that way. If that's not the expectation, I'll get back to work and wait for my apology to arrive.

***

He should keep his social and political opinions to himself.

(*Id*. ¶ 29 (internal ellipses original).)

Plaintiff testified that his email set out all the reasons for his objection to the Training and that he left nothing out. (*Id*. ¶ 30.) Ms. Becker replied to Plaintiff's email acknowledging receipt and indicating she "will review and get back with you." (*Id*.) Ms. Becker communicated Plaintiff's concerns to other individuals within HR. (*Id*.)

8

Plaintiff continued to receive automated daily reminders about the Training. (*Id*. ¶ 31.) On March 19, Chris Maines, Vice President of Engineering, held a Microsoft Teams meeting with Plaintiff. (*Id*. ¶ 32.) During the meeting, Mr. Maines tried to convince Plaintiff to take the Training and said it was "just another check box of things to do" and Plaintiff should not read too much into it. (*Id*. ¶ 32.) Plaintiff responded that he would think about it over the weekend and get back to him the following week. (*Id*.) Mr. Maines told Plaintiff that not taking the Training would be considered insubordination. (*Id*.) Plaintiff does not recall whether he told Mr. Maines that he felt the Training was racist or discriminatory. (*Id*.)

Mr. Cortez recalls seeing Plaintiff's March 8 email but did not read it closely beyond the first page and did not discuss it with anyone. (*Id*. ¶¶ 30, 33.) Once Mr. Cortez saw the email, however, he understood the basis for Plaintiff's complaints. (Pl. Resp. ¶ 33.) Mr. Cortez underwent the Training and considered it to be a relatively simple, as well as balanced, fairly diverse, and innocuous. (DSOF ¶ 35.) It took between 20-30 minutes and contained short, pre-recorded videos about various scenarios, with a quiz at the end. (*Id*.) Trainees were not asked to sign a document stating that they agreed with the contents. (*Id*.) Mr. Cortez explained to Plaintiff that he did not see anything racist about it and mentioned an example from the video where a white male was being subjected to bias, as the holder of the bias had assumed a woman would be more capable of doing a specific task. (*Id*. ¶ 33.)

After Plaintiff's meeting with Mr. Maines, he found an Implicit Association Test ("IAT") on a Harvard.edu website, which he took four times with inconsistent results about whether he had any implicit biases and against what groups. (*Id*. ¶ 34.) Plaintiff does not know if the UAB Training would have had employees take an IAT. (*Id*.) He believes "unconscious bias" and "implicit bias" are "similar," that "unconscious bias" is a made-up term, and that people's biases

are more conscious than unconscious. (*Id.*) Plaintiff did not know what the content of the Training was but had his "thoughts" on it based on Mr. Waldron's email. (*Id.*) Plaintiff testified that he thought "it was going to try to make [him] feel guilty for the color of [his] skin, that it was going to make people of color feel like victims for the color of their skin." (*Id.*)

On March 23, Mr. Maines emailed Plaintiff and asked him if he had changed his mind about the Training. (*Id.* ¶ 37.) Plaintiff replied that he was going to get back to Mr. Maines soon. (*Id.*) The next day, Plaintiff forwarded to Ms. Becker another email he had sent to Mr. Maines on March 23. (*Id.* ¶ 38.) That five-page email stated, among other things, that he "had a little more to say about the matter to hopefully provide more detail as to why I am not going to take the training." (*Id.*) He also stated, "Whatever the consequences are of that decision, I will accept." (*Id.*) He then provided links to media coverage of a mass shooting at an Atlanta spa, where the victims were Asian, that he represented were examples of "how the media and politicians sensationalize and twist the facts of certain stories to push their agendas which ultimately lead to things like 'Unconscious Bias' training." (*Id.*) He stated, "I refuse to take training that was developed as a result of, or perhaps in concert with nothing but lies and manipulation by the media and corrupt public servants that insist on perpetuating division." (*Id.*) Plaintiff further stated, "I found John Waldron's 9/24 [email] incredibly offensive, discriminatory and racist and I don't want to be 'trained' to be someone like that. His email was meant to be offensive as far as I'm concerned." (*Id.*) At the end of his e-mail to Mr. Maines, Plaintiff stated, "I referenced John Waldon's discriminatory remarks in his 9/24 email in my last letter to HR. I am referencing it again today. I don't know what would be considered an 'official' discrimination claim, but both should be considered as such. I am still expecting an apology from John Waldron. I would prefer this to be the end of any further requests for me to take the training." (*Id*; *Id*. Ex. L at

10

VAVRA000232-33.) Plaintiff testified that he "believed" he included everything and that he tried to be "as thorough as possible" in his March 8 and 23, 2021 e-mails regarding why he thought Mr. Waldron's e-mail was "discriminatory and racist." (*Id*. ¶ 39; Pl. Resp. ¶ 39.)

On March 30, 2021, Plaintiff emailed Ms. Becker, sharing the link to a YouTube video in which, he claimed, an individual "very eloquently explains why I have taken such a strong stance on not taking the unconscious bias training." (DSOF ¶ 40.) Plaintiff also requested "an update as to where things stand" and to "schedule some time to discuss." (*Id*.) Ms. Becker replied on April 1, stating that she would schedule a time the following week to discuss the situation. (*Id*.)

Mr. Cortez scheduled a Teams call with Plaintiff and Ms. Becker for April 7. (*Id*. ¶ 41.) Before the meeting, Mr. Cortez asked Plaintiff, "Chuck, are you sure you won't take the training?" (*Id*. ¶ 42.) Plaintiff responded that he would not. (*Id*.) During the meeting, Mr. Cortez told Plaintiff that he had to take the Training or be terminated. (*Id*.) Plaintiff responded that he needed to speak with his wife, who was in another room. (*Id*.) After speaking with his wife, Plaintiff confirmed to Mr. Cortez that he would not take the Training. (*Id*.) Plaintiff was then terminated for refusing to undergo the Training. (*Id*.) Ms. Becker walked Plaintiff through the final steps of ending Plaintiff's employment. (*Id*.) No individual other than Plaintiff refused to undergo the Training. (*Id*. ¶ 36.) Honeywell considered Plaintiff's termination to be a "voluntary separation," and one where Plaintiff was choosing to quit. (*Id*. ¶ 43; Pl. Resp. ¶ 43.)

Later that same day, Plaintiff emailed Ms. Becker, stating in part, "I'm sorry that things couldn't have worked out differently. I was hoping that a discrimination claim wouldn't have ended with getting terminated, but it's a different country we're living in these days." (*Id*. ¶ 45.) Plaintiff also responded to a coworker's email, stating in part, "I was hoping things would have worked out differently but I'm not surprised how they did. My leaving wasn't voluntary. I was

fired for not complying with their 'Unconscious Bias' training mandate. I know to some that it was just another checkbox of things to do but to me it was so much more to me. I feel very strongly about this corporate 'wokeism' crap. I sent HR a very detailed email as to why I wasn't taking the training, pointing out the hypocrisy and discrimination in John Waldron's 9/24 email." (*Id*. ¶ 46.)

On April 8, 2022, Plaintiff sent Ms. Becker another e-mail, asking "Are you going to send something stating the exact reason why I was fired, or will that come from Jeff Cortez?" (*Id*. ¶ 47.) On April 11, Ms. Becker replied, "There is not additional information sent regarding your termination. You will however receive all of the benefits information in the mail within the next 7 - 10 days." (*Id*.) Honeywell typically did not send out written notices of any kind to state the reasons for involuntary termination. (*Id*. ¶ 48.)

Defendant maintains a number of policies in its Code of Business Conduct (the "Code") that applied to all employees at all relevant times. (*Id*. ¶ 4.) Plaintiff received and was aware of the Code throughout his employment. (*Id*.) The Code expressly prohibits discrimination, stating in part, "Our workplace is one that reflects the diversity of the communities in which we operate and we are committed to providing employees with a workplace that is free from unlawful discrimination, harassment, or personal behavior that is not conducive to a productive work climate. This pledge applies to all phases of the employment relationship, including . . . termination . . . and selection for training or related programs." (*Id*. ¶ 5.) The Code also prohibits retaliation, stating in part, "It is important that you feel comfortable raising your questions and concerns. Honeywell will not tolerate retaliation against you for making a good faith report of actual or potential misconduct. Making a report in 'good faith' means your report is honest, sincere, and complete to the best of your knowledge. If you feel an act of retaliation has

12

occurred, you should report your concerns via one of the methods outlined in 'Ask for Advice and Voicing Concerns.'" (*Id*. ¶ 6.) Defendant offers employees multiple methods by which they can report concerns of perceived harassment, discrimination and/or retaliation, including an independent third-party 24-hour Helpline. (*Id*. ¶ 7.) During his employment, Plaintiff was aware of each of these policies. (*Id*. ¶ 8.)

Plaintiff filed this suit, asserting that Honeywell's decision to terminate Plaintiff because he opposed the Training based on his conclusion that it was inherently racist constituted retaliation and discrimination in violation of the IHRA and Title VII, as well as wrongful termination. In Plaintiff's response filings, he withdraws his wrongful termination claim and denies that he alleges race discrimination. Accordingly, to the extent Plaintiff's First Amended Complaint asserts claims for wrongful termination and race discrimination, those claims are dismissed. The Court discusses only Plaintiff's retaliation claim, which is also dismissed for the reasons stated below.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action raises claims involving a United States statute. (DSOF ¶ 3.) The Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. (*Id*.)

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id*. at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

## III.   DISCUSSION

The parties agree that Plaintiff's IHRA retaliation claim is analyzed under the same framework as Plaintiff's Title VII retaliation claim. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims."). The Court accordingly proceeds with its analysis under Title VII.

Title VII protects an employee from discrimination when "he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that [1] he engaged in protected activity and [2] suffered an adverse employment action, and that [3] there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). There is no dispute that Plaintiff's termination constitutes an adverse employment action. Rather, the parties' disagreement lies in the first and third elements. Defendant concedes that Plaintiff's complaint emails were protected activity, but the parties dispute whether Plaintiff's refusal to take the UBA Training was itself protected activity. Additionally, Defendant argues that Plaintiff fails to make a *prima facie* showing that engagement in a protected activity caused his

termination, and that even if he did, Defendant has presented unrebutted evidence of a non-invidious reason for Plaintiff's termination—refusal to undergo mandatory training.

### A. Protected Activity

The Court first considers the nature of the protected activity at the heart of this case. "For the first element—a statutorily protected activity—'[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII.'" *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019)). Opposition to an unlawful employment practice need not consist of a verbal or written communication; rather, "an employee can oppose unlawful employment practices by his or her conduct." *Collazo v. Bristol-Myers-Squibb Mfg.*, 617 F.3d 39, 46-47 (1st Cir. 2010) (citing *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009)). Plaintiff argues that his refusal to take the UBA Training itself was protected activity. As the argument goes, Plaintiff sincerely believed that the Training was racist and discriminatory, and so by refusing to take it he was "oppos[ing]" an "unlawful employment practice[.]" 42 U.S.C. § 2000e-3(a).

As an initial matter, it is far from clear from the undisputed facts that Plaintiff even subjectively believed that an unconscious bias training requirement was a racially discriminatory employment practice. He admits that he had no knowledge of the actual contents of the Training other than that it included an example of unconscious bias against a white man. His stated objections to the Training seemed to have more to do with his belief that the Training would be ineffective, unwarranted to the extent it was not directed at any misconduct among employees at the company, and counterproductive because it would prove divisive, than with a belief that the

15

Training itself was racist. But even if the Court assumes that the basis for his refusal to take the UBA Training was based on a subjective belief that the training was racially discriminatory, his belief was not objectively reasonable.

"The objective reasonableness of the plaintiff's belief is not assessed by examining whether the [employer's] conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Logan*, 4 F.4th at 538 (quoting *Lord*, 839 F.3d at 563) (cleaned up). "That assessment requires [the court] to ask whether the complained-of conduct entailed a motive that Title VII prohibits." *Id.* (quoting *Lord*, 839 F.3d at 563) (cleaned up). "Title VII protects people of all races, including white people, from race discrimination." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (citation omitted). Nonetheless, "[t]he complaint must involve discrimination that is prohibited by Title VII, and if a plaintiff opposed conduct that was not proscribed by Title VII, no matter how frequent or severe, then his sincere belief that he opposed an unlawful practice cannot be reasonable." *Logan*, 4 F.4th at 539 (quoting *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000), overruled on other grounds by *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339 (7th Cir. 2017)) (cleaned up).

There is no evidence that the Training, or Defendant's requirement to complete the Training, constituted an unlawful employment practice proscribed by Title VII. The only evidence before the Court is that the Training video was vetted and approved by DEI and the Law Department in an attempt to promote an inclusive environment, and that all U.S. employees were required to watch it. Again, Plaintiff admits that he lacks knowledge of the content of the Training. Merely "being required to attend across-the-board diversity training is not a discriminatory practice under Title VII." *Norgren v. Minn. Dep't of Human Servs.*, No. CV 22-

489 ADM/TNL, 2023 WL 35903, at *7 (D. Minn. Jan. 4, 2023), *appeal docketed*, No. 23-1208 (8th Cir. Feb. 3, 2023); *see also Brennan v. City of Phila.*, 856 F. App'x 385, 387 (3d Cir. 2021); *Daza v. State*, 331 F. Supp. 3d 810, 844 (S.D. Ind. 2018) ("Mr. Daza has not pointed to any evidence that the Core4 Principles were racially discriminatory in any way, nor that requiring him to comply – along with his fellow INDOT colleagues – with the Core4 Principles was motivated by racial animus. While Mr. Daza may have disagreed with the Core4 Principles, this disagreement is not evidence that he faced racial discrimination by being required to abide by those principles."), *aff'd*, 941 F.3d 303 (7th Cir. 2019); *Bourgeois v. U.S. Coast Guard*, 151 F. Supp. 3d 726, 739 (W.D. La. 2015) (requiring all employees to watch a cultural diversity training video does not constitute an "adverse employment action").

In short, Plaintiff puts forth no evidence that the Training, or Defendant's requirement that all U.S. employees take the Training, was racially discriminatory or motivated by racial animus, and so it does not fall into any category of conduct prohibited by Title VII. Plaintiff's belief that the Training was racially discriminatory, however sincere, was not objectively reasonable and his refusal to take the Training cannot be considered protected activity under Title VII.[2]

### B. Causation

Having determined that Plaintiff's only protected activity were his complaint emails—as opposed to his refusal to complete the Training—the Court turns next to whether Plaintiff presents sufficient evidence for a factfinder to conclude that Defendant terminated him for

---

[2] While the Court accepts Defendant's concession that Plaintiff's complaint emails, including his complaint about the Training, constitutes protected activity, it notes that an employee's complaint about something that is not proscribed by Title VII would not constitute protected activity for the same reasons explained above.

engaging in that protected activity. "A plaintiff demonstrates a causal connection by showing that the defendant 'would not have taken the adverse action but for [his] protected activity.'" *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)) (internal punctuation omitted). Plaintiff does not rely on direct evidence of unlawful animus, pointing instead to purportedly "circumstantial evidence from which a jury may infer intentional discrimination." *Id*. (citation omitted). "If a plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Id*. (citation omitted) (cleaned up).

Plaintiff argues that the timing of his termination—one month after his first complaint email and fifteen days after his second complaint email—together with Defendant's purported departure from established policies in responding to Plaintiff's complaints supports an inference of discriminatory intent. "An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *Id*. at 664 (citing *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012)). So too can suspicious timing, although that alone is not enough. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). "[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Id*. (listing cases).

Here, Plaintiff points to no deviation by Defendant from any established policy that led to his termination. Defendant's Code prohibits discrimination and encourages employees to report any unlawful or inappropriate discrimination or harassment to Defendant. It also prohibits

retaliation for making a good faith complaint of discrimination. Plaintiff points to no policy requiring a specific type of investigation. He points to no evidence that the review undertaken of Plaintiff's emails by HR and the legal department, and the multiple conversations Plaintiff had with his superiors, were insufficient under any of Defendant's policies. Plaintiff points to no internal policy requiring Defendant to report the results of its investigation to Plaintiff in any particular manner. Plaintiff does not even present evidence or argument of who made the decision to terminate Plaintiff's employment; the only evidence before the Court is that the decision was not made by either Mr. Cortez or Ms. Becker. *See Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 356 (7th Cir. 2023) ("[F]uture litigation on the retaliation claim should focus on what motivated Fletcher, *as the ultimate decision maker for the adverse action*, to make the contingent decision to terminate Xiong on March 7." (emphasis added)); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769 (7th Cir. 1994) ("Hiatt has therefore failed to show *that those in charge of his actual discharge* possessed an impermissible ulterior motive." (emphasis added)).

Plaintiff points to no evidence that it was his complaint of discrimination that motivated the termination decision. Rather, the evidence shows that Defendant followed its company policies when it required the UBA Training for all U.S. employees to promote diversity and inclusion and terminated Plaintiff's employment for failing to complete it. *See Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 863 (7th Cir. 2011). "This Court does not sit as a super-personnel department that reexamines an entity's business decisions," *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (citations omitted), and there is no evidence before the Court that would permit it to second-guess Defendant's mandatory training requirements where there is no evidence in the record that the Training was racist or discriminatory. *Supra*. Plaintiff is left

only with only his claim of suspicious timing, which even he concedes is insufficient on its own to create a triable issue.

At the summary judgment stage, a party cannot rely on allegations; he must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A). "As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Plaintiff's arguments regarding witness credibility are unsupported by any evidence whatsoever. Plaintiff fails to put forth sufficient evidence that there is a triable fact as to whether any protected activity caused his termination.

Finally, Plaintiff's reliance upon *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) for the proposition that "[e]mployers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity" is unavailing. The court made that statement in dicta in reference to a superior's comment that her staff should not go "running off to HR," and another's comment that people who "went to HR no longer work here," which comments the court found did not show evidence of retaliation. *Id*. In any event, here there is no evidence that any decisionmaker viewed Plaintiff's complaints to HR as an act of "disloyalty" or insubordination.

There is no genuine dispute of material fact in this case because plaintiff has not come forward with sufficient evidence to permit a factfinder to conclude that Plaintiff would not have been terminated but for his discrimination complaints. Accordingly, Defendant's motion for summary judgment is granted.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [41] is granted. Civil case terminated.


**SO ORDERED.**                                    **ENTERED: August 21, 2023**


                                                   **HON. JORGE ALONSO**
                                                   **United States District Judge**